1  **TYCKO & ZAVAREEI LLP**
   KRISTEN LAW SAGAFI, California Bar No. 222249
2  ksagafi@tzlegal.com
   483 Ninth Street, Suite 200
3  Oakland, CA  94607
   Telephone (510) 254-6808
4  Facsimile (202) 973-0950

5  **CHIMICLES & TIKELLIS LLP**
   Nicholas E. Chimicles (to seek admission *pro hac vice*)
6  NEC@chimicles.com
   Kimberly M. Donaldson Smith (to seek admission *pro hac vice*)
7  KMD@chimicles.com
   Stephanie E. Saunders (to seek admission *pro hac vice*)
8  SES@chimicles.com
   361 W. Lancaster Avenue
9  Haverford, PA  19041
   Telephone (610) 642-8500
10 Facsimile (610) 649-3633

11 Attorneys for Plaintiffs

12            **IN THE UNITED STATES DISTRICT COURT**

13          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14
   RACHEL CONDRY, on behalf of herself and all others          Case No.:
15 similarly situated,

16                     Plaintiff,                                **CLASS ACTION COMPLAINT**

17            v.

18 UnitedHealth Group Inc.; UnitedHealthcare, Inc.;
   UnitedHealthcare Insurance Company; and,                     **DEMAND FOR JURY TRIAL**
19 UnitedHealthcare Services, Inc.,

20                     Defendants.

21         Plaintiff Rachel Condry, on behalf of herself and all others similarly situated persons ("Class,"

22 defined below), by and through undersigned counsel, bring this Class Action Complaint against

23 UnitedHealth Group Inc. ("UnitedHealth Group"); UnitedHealthcare, Inc. ("UHC"); UnitedHealthcare

24 Insurance Company ("UHC Insurance"); and, United Healthcare Services, Inc. ("UHC Services")

25 (collectively referred to as "UnitedHealth" or "Defendants").  Plaintiff hereby alleges upon personal

26 knowledge as to herself and her own acts, and upon information and belief as to all other matters,

27 based upon, *inter alia*, the investigation undertaken by her attorneys, as follows:

28

**INTRODUCTION**

1. Defendants have wrongfully denied and continue to deny Plaintiff and the members of the Class access to and coverage for a vital women's preventive service – breastfeeding support, supplies and counseling – which coverage is mandated by The Patient Protection and Affordable Care Act (the "ACA") (as amended by the Health Care and Education Reconciliation Act of 2010 ("HCERA") and other laws).

2. A key directive of the ACA was that all individual and group health plans would provide access to and coverage for preventive health care benefits.[1] As stated by the U.S. Department of Health & Human Services ("HHS"), prior to the enactment of the ACA "too many Americans did not get the preventive care they need to stay healthy, avoid or delay the onset of disease, and reduce health care costs, [and,] [o]ften because of cost, Americans used preventive services at about half the recommended rate." *See* http://www.hhs.gov/healthcare/facts-and-features/fact-sheets/aca-rules-on-expanding-access-to-preventive-services-for-women/index.html (last visited 1/11/2017).

3. In addition to the policy of promoting preventive health benefits for all, the ACA specifically recognized the need to address the unique preventive health needs of women throughout their lives. *Id.* Building upon the ACA's women's preventive health service mandate, on August 1, 2011 HHS adopted its Health Resources and Services Administration's ("HRSA") Health Plan Guidelines for Women's Preventive Services ("HHS Guidelines") which require access to and coverage for certain women's preventive services by most non-Grandfathered Health Plans starting with the first plan or policy year beginning on or after August 1, 2012.

4. The HHS Guidelines, which were recommended by the independent Institute of Medicine ("IOM") and based on scientific evidence, ensure women's accessibility to a comprehensive set of preventive services, including health services related to breastfeeding support, supplies and

---

[1] The only exception is health insurance plans that are grandfathered. To be classified as a "Grandfathered Plan" plans must have (1) been in existence prior to March 23, 2010; (2) refrained from making significant changes to the benefits or plan participants' costs since that time; and (3) had at least one person enrolled in the plan on March 23, 2010 and continually covered at least one individual since that date. While there is no specific termination date for grandfathered status, it is expected that eventually all plans will lose their grandfathered status. As of 2014, only about a quarter of workers with employer sponsored coverage participated in Grandfathered Plans.

CLASS ACTION COMPLAINT

counseling. Under the HHS Guidelines, pregnant and postpartum women must have access to comprehensive lactation support and counseling provided by a trained provider during pregnancy and/or in the postpartum period ("Comprehensive Lactation Benefits"), as well as breastfeeding equipment. *See* HHS Guidelines, http://hrsa.gov/womensguidelines/ (last visited 1/11/2017).

5. According to the Centers for Disease Control and Prevention ("CDC")*, "[b]reastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health."* http://www.cdc.gov/breastfeeding/pdf/2016breastfeedingreportcard.pdf (last visited 1/11/2017) (emphasis added).

6. While the protection, promotion and support of breastfeeding have been a national public policy for over 25 years, the CDC, the American Academy of Pediatrics and the enactment of the ACA's Comprehensive Lactation Benefits coverage have brought breastfeeding to the forefront of women's health issues.

7. As the then HHS Secretary Kathleen Sebelius announced in July 2012:

> Aug. 1, 2012 ushers in a new day for women's health when, for the first time ever, women will have access to eight new services at no out-of-pocket cost to keep them healthier…..This benefit will take effect for millions of adult and adolescent women over the course of the next year—and *it's just one of many benefits of the health care law that let women and their doctors, not insurance companies, make decisions about a woman's care*.
>
> …. *Instead of letting insurance companies decide what care women receive, the health care law requires insurers to cover these preventive services* in new plans beginning Aug. 1.
>
> …Women's health decisions shouldn't be made by politicians or insurance companies. Rather than wasting time refighting old political battles, this Administration is moving forward and *putting women in control of their own health care*. If women are going to take care of their families and friends, they have to take care of themselves. The Affordable Care Act is making it easier for women to do that by making health care more accessible and affordable for millions of American women and families.

"Giving Women Control Over Their Health Care," Posted July 31, 2012, By Kathleen Sebelius, Secretary of Health and Human Services, https://www.whitehouse.gov/blog/2012/07/31/giving-women-control-over-their-health-care (last visited 1/11/2017) (emphasis added).

8.    On October 25, 2016, the U.S. Preventive Services Task Force ("USPSTF") issued updated statements again recommending interventions during pregnancy and after birth to support breastfeeding, including intervention by professional support, and set forth in summary the rationale and importance of such recommendation:

> There is convincing evidence that breastfeeding provides substantial health benefits for children and adequate evidence that breastfeeding provides moderate health benefits for women. However, nearly half of all mothers in the United States who initially breastfeed stop doing so by 6 months, and there are significant disparities in breastfeeding rates among younger mothers and in disadvantaged communities.

USPSTF    Reports:    http://jamanetwork.com/journals/jama/fullarticle/2571249?resultClick=1; http://jamanetwork.com/journals/jama/fullarticle/2571243?resultClick=1; jamanetwork.com/journals/jama/article-abstract/2571222; jamanetwork.com/journals/jama/fullarticle/ 2571248? resultClick=1 (last visited 11/16/2016).

9.    Contrary to the ACA, the HHS Guidelines, USPSTF recommendations, and Secretary Sebelius' expressed confidence that insurance companies could no longer dictate women's health decisions, Defendants are denying Plaintiff and the members of the Class, the ACA mandated access to and coverage for Comprehensive Lactation Benefits from trained providers for insured pregnant and postpartum women.

10.    Defendants (in their capacities as both insurers and third-party administrators of self-insured plans) have employed the following scheme to circumvent the ACA mandates:

(A)    Defendants have not established networks of trained providers of Comprehensive Lactation Benefits.[2]

---

[2]    Comprehensive Lactation Support is unlike other preventive services.  For example, prior to the ACA's enactment, medical services such as male prostate exams were typically not covered by insurers even when such services were provided by in-network urologists.  After the ACA's enactment, such services were deemed preventive services that are covered at no cost when provided by in-network providers.  For Comprehensive Lactation Support, such services were not, prior to the ACA, typically covered health benefits for which established networks of trained providers existed.

4

(B)    *Why?* If Defendants do not establish networks and women are not provided a network as part of their insurance plan, one of three things occurs:

    i.    Women forego Comprehensive Lactation Benefits because they are unable to pay out-of-pocket, *ergo*, Defendants never have to administer and pay for the preventive service; or,

    ii.    Women pay out-of-pocket for Comprehensive Lactation Benefits, never seek reimbursement from Defendants, *ergo*, Defendants never have to administer or pay for the preventive service; or,

    iii.    Women pay out-of-pocket for Comprehensive Lactation Benefits, seek reimbursement, and get either no or partial reimbursement, *ergo,* Defendants minimize their cost related to the preventive service, and force women to pay out-of-pocket.

(C)    Because of Defendants' failure to provide in-network trained providers, Plaintiff and the members of the Class are forced to either forego the Comprehensive Lactation Benefits preventive service or go out-of-network to get it.  It is not by Plaintiff's and the Class members' own choosing to go "out-of-network."  It is of Defendants' making.  Yet, Defendants exploit their wrongful conduct by, at best, reimbursing only a portion of the out-of-pocket costs or flatly denying any reimbursement or coverage for Comprehensive Lactation Benefits, because Plaintiff and the members of the Class used "out-of-network" providers.

11.    The scheme violates the ACA and their duties to Plaintiff and the members of the Class.

12.    Plaintiff is enrolled in a health care plan ("health care plans" or "plans") insured or administered by Defendants.  Defendants insure and/or administer health care plans that are Employee Welfare Benefit Plans, as that term is defined in 29 U.S.C. § 1002(1)(A), as well as individual and

---

Notwithstanding the ACA's mandate, Defendants failed to establish networks of providers of Comprehensive Lactation Support thereby circumventing the ACA's preventive service provisions for women.

family health care plans offered directly by Defendants, or on an insurance exchange pursuant to the applicable provisions of the ACA ("ACA Exchanges").

13.    Based on the Defendants' conduct and the claims alleged herein, Plaintiff on behalf of herself and the members of the Class seek to put an end to, and secure monetary redress for, Defendants' wrongful and harmful conduct.   Such conduct is done in flagrant disregard of the ACA and the right it created for women to access preventive health benefits.

14.    Such conduct violates: the ACA; the ACA's anti-discrimination provisions prohibiting discrimination on the basis of gender; the plan documents which incorporate by reference the ACA's preventive service provisions; and, the Employee Retirement Income Security Act ("ERISA"). Defendants also have been unjustly enriched at Plaintiff's and the Class's expense.  Plaintiff seeks monetary and injunctive relief for herself and the members of the Class to stop and redress the substantial harms inflicted by Defendants.

## PARTIES

### Plaintiff.

15.    Plaintiff Rachel Condry ("Condry") is an adult individual residing in Oakland, California.  Plaintiff Condry is, and was, at all relevant times, insured by a non-grandfathered UHC Insurance UnitedHealthcare Choice Plus plan through her spouse's employer, Insperity Holdings, Inc. After the birth of her child in February 2015, Plaintiff Condry sought coverage from UHC Insurance for Comprehensive Lactation Benefits, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $556.

### Defendants.

16.    Defendant UnitedHealth Group Incorporated ("UnitedHealth Group"), a Delaware corporation, is a diversified managed health care company with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota.  UnitedHealth Group providers a vast array of healthcare products and services through two business platforms:  the health benefits operating under UnitedHealthcare, Inc. and health services operating under Optum.

17.    Defendant UnitedHealthcare, Inc. ("UHC"), a subsidiary of UnitedHealth Group with its principal place of business in Minnesota, provides health care benefits to an array of customers and

markets through reportable segments including: UnitedHealthcare Employer & Individual, which serves employers ranging from sole proprietorships to large, multi-site and national employers, public sector employers and other individuals and serves the nation's active and retired military and their families through the TRICARE program; UnitedHealthcare Medicare & Retirement, which delivers health and well-being benefits for Medicare beneficiaries and retirees; and UnitedHealthcare Community & State, which manages health care benefit programs on behalf of state Medicaid and community programs and their participants.

18.    Defendant UnitedHealthcare Insurance Company ("UHC Insurance"), doing business as UnitedHealthOne, is one of Defendant UnitedHealth Group's wholly-owned subsidiaries that provides health benefit plans to members of the Class and to the Plaintiff.   UHC Insurance is incorporated in Connecticut and has its principal place of business in Hartford, Connecticut. Other UnitedHealth Group subsidiaries that provide health benefit plans to members of the Class include the following entities:

| Name of Entity | Doing Business As (if different) |
| --- | --- |
| All Savers Insurance Company | |
| AmeriChoice Corporation | |
| AmeriChoice Health Services, Inc. | |
| AmeriChoice of Connecticut, Inc. | |
| AmeriChoice of New Jersey, Inc. | UnitedHealthcare Community Plan |
| Harken Health Insurance Company | |
| Health Net Insurance of New York, Inc. | |
| Health Plan of Nevada, Inc. | |
| MAMSI Insurance Resources, LLC | |
| MAMSI Life and Health Insurance Company | MAMSI LIFE AND HEALTH MLH |
| Medica Health Plans of Florida, Inc. | EZ Care |
| Medica HealthCare Plans, Inc. | |
| Oxford Health Insurance, Inc. | |
| Oxford Health Plans (CT), Inc. | |
| Oxford Health Plans (NJ), Inc. | |
| Oxford Health Plans (NY), Inc. | |
| Oxford Health Plans LLC | Oxford Agency - Oxford Health Plans Inc. |
| PacifiCare Life and Health Insurance Company | UnitedHealthOne |
| PacifiCare of Arizona, Inc. | PacifiCare Secure Horizons |
| PacifiCare of Colorado, Inc. | Comprecare, Inc. Secure Horizons |

| | |
|---|---|
| PacifiCare of Nevada, Inc. | PacifiCare<br>Secure Horizons |
| Sierra Health and Life Insurance Company, Inc. | |
| Sierra Health Services, Inc. | Sierra Military Health Services, LLC |
| UHC of California | PacifiCare<br>PacifiCare of California<br>Secure Horizons<br>UnitedHealthcare of California |
| Unison Health Plan of Delaware, Inc. | UnitedHealthcare Community Plan |
| Unison Health Plan of the Capital Area, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare Benefits of Texas, Inc. | PacifiCare<br>Secure Horizons |
| UnitedHealthcare Benefits Plan of California | |
| UnitedHealthcare Community Plan of California, Inc. | |
| UnitedHealthcare Community Plan of Georgia, Inc. | |
| UnitedHealthcare Community Plan of Ohio, Inc. | Unison<br>Unison ABD Plus<br>Unison Advantage<br>Unison Health Plan<br>Unison Kids |
| UnitedHealthcare Community Plan of Texas, L.L.C. | United Healthcare - Texas<br>UnitedHealthcare Comminity Plan |
| UnitedHealthcare Community Plan, Inc. | |
| UnitedHealthcare Insurance Company of Illinois | |
| UnitedHealthcare Insurance Company of New York | |
| UnitedHealthcare Insurance Company of the River Valley | |
| UnitedHealthcare of Alabama, Inc. | |
| UnitedHealthcare of Arizona, Inc. | |
| UnitedHealthcare of Arkansas, Inc. | Complete Health |
| UnitedHealthcare of Colorado, Inc. | MetraHealth Care Plan |
| UnitedHealthcare of Florida, Inc. | AMERICHOICE<br>EVERCARE AT HOME<br>OPTUMHEALTH<br>OVATIONS |
| UnitedHealthcare of Georgia, Inc. | United HealthCare of Georgia |
| UnitedHealthcare of Illinois, Inc. | |
| UnitedHealthcare of Kentucky, Ltd. | United HealthCare of Kentucky, L.P. |
| UnitedHealthcare of Louisiana, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare of Mississippi, Inc. | |
| UnitedHealthcare of New England, Inc. | |
| UnitedHealthcare of New Mexico, Inc. | |
| UnitedHealthcare of New York, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare of North Carolina, Inc. | |
| UnitedHealthcare of Ohio, Inc. | |
| UnitedHealthcare of Oklahoma, Inc. | PacifiCare<br>PacifiCare Health Options<br>PacifiCare of Oklahoma<br>Secure Horizons |
| UnitedHealthcare of Oregon, Inc. | Secure Horizons |
| UnitedHealthcare of Pennsylvania, Inc. | |
| UnitedHealthcare of Texas, Inc. | |

CLASS ACTION COMPLAINT

| | |
|---|---|
| UnitedHealthcare of the Mid-Atlantic, Inc. | |
| UnitedHealthcare of the Midlands, Inc. | |
| UnitedHealthcare of the Midwest, Inc. | |
| UnitedHealthcare of Utah, Inc. | UnitedHealthcare of Idaho, Inc. |
| UnitedHealthcare of Washington, Inc. | PacifiCare<br>Secure Horizons<br>UnitedHealthcare Community Plan |
| UnitedHealthcare of Wisconsin, Inc. | UnitedHealthcare of Wisconsin - Personal Care Plus |
| UnitedHealthcare Plan of the River Valley, Inc. | |

19.     United Healthcare Services, Inc. ("UHC Services"), a wholly-owned subsidiary of UnitedHealth Group, is a Minnesota corporation with its principal place of business in Minnesota. Through and in combination with UHC's subsidiaries, affiliates and agents, it administers health insurance policies for Defendants.

20.     Defendant UHC's UnitedHealthcare Employer & Individual segment offers an array of consumer health benefit plans and services nationwide, including providing: fully insured health plan product offerings; administrative and other management services to customers that elect to self-fund the health care costs of their employees and employees' dependents; and a variety of insurance options for purchase by individuals, including students. UnitedHealthcare Employer & Individual offers its products through affiliates that are licensed as insurance companies, health maintenance organizations (HMOs), or third-party administrators (TPAs). In 2015, UHC's UnitedHealthcare Employer & Individual segment participated in 23 individual and 12 small group state public ACA Exchanges and in 2016 it participated in individual public ACA Exchange offerings in 34 states.  For 2017 UHC's individual and family marketplace medical policies are offered by Health Plan of Nevada, Inc., UnitedHealthcare of New York, Inc., or UnitedHealthcare of the Mid Atlantic, Inc. (https://www.uhc.com/individual-and-family/understanding-health-insurance/how-insurance-works/health-insurance-marketplace)

21.     Defendants participate in various federal, state and local government health care benefit programs, including as a payer in Medicare Advantage, Medicare Part D, various Medicaid programs, Children's Health Insurance Programs (CHIP), and through a TRICARE contract with the Department of Defense which provides health insurance for the nation's active and retired military and their families.  UnitedHealth Group states that it "receive[s] substantial revenues from these programs."

2015 Form 10-K, UnitedHealth Group, at p. 16, https://www.sec.gov/Archives/edgar/data/731766/000073176616000058/unh2015123110-k.htm (last visited 1/11/2017).

22.     Defendant UNH's UnitedHealthcare Military & Veterans business is the provider of health care services for nearly 3 million active duty and retired military service members and their families in 21 states under the Department of Defense's (DoD) TRICARE Managed Care Support contract. UNH's TRICARE contract began on April 1, 2013 and continues through at least 2017. *See also, infra,* ¶86.

23.     In addition, Defendant UHC's UnitedHealthcare Medicare & Retirement segment provides health insurance services, among other things, to individuals age 50 and older. Premium revenues from the Centers for Medicare & Medicaid Services (CMS) represented 26% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2015, most of which were generated by UnitedHealthcare Medicare & Retirement. *See* 2015 Form 10-K, UnitedHealth Group, at p. 4.

24.     Further, Defendants provide Federal Employee Program ("FEP") services benefit plans for federal employees through various health plans including UnitedHealthcare of California and through United Healthcare Insurance Company, Inc.[3]

25.     Whenever in this Complaint reference is made to any act, deed or transaction of a Defendant, the allegation is imputed to its officers, directors, agents, employees or representatives.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action based on diversity of citizenship under the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2). The amount in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and is a class action in which members of the Class are citizens of states different from

---

[3] The Federal Employees Health Benefits Program ("FEHBP") was established by the Federal Employees Health Benefits Act ("FEHB Act") which was created to provide health insurance benefits for federal employees, annuitants, and qualified dependents.

Defendants. Further, greater than two-thirds of the members of the Class reside in states other than the state in which Defendants are citizens.

27.    The Court also has federal question subject matter jurisdiction based on the ACA claims asserted herein.

28.    In addition, this action is brought by Plaintiff pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to remedy Defendants' violations of ERISA §§ 404(a) and 405(a), 29 U.S.C. §1104(a) and § 1105(a). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). Moreover, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process. All Defendants are residents of the United States and subject to service in the United States, and this Court therefore has personal jurisdiction over them. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because Defendants reside or may be found in this district.

29.    This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in this District. Each Defendant systematically and continuously conducts business in Minnesota and otherwise has minimum contacts with Minnesota sufficient to establish personal jurisdiction. Each Defendant is authorized to do business and is conducting business throughout the United States, including in this District, authorized to market and sell, and have in fact marketed and sold health insurance and healthcare products to citizens in this District, has sufficient minimum contacts with the various states of the United States, including this District, and/or sufficiently avails itself of the markets of the various states of the United States, including in this District, through its promotion, sales, and marketing within the United States, including in this District, to render the exercise of personal jurisdiction by this Court permissible.

30.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District. Venue is also proper because Defendants are authorized to conduct business in this District and have

intentionally availed themselves of the laws and markets within this District through promotion, marketing, and sales in this District.

## FACTUAL ALLEGATIONS

### A.     Breastfeeding is a National Public Health Policy.

31.     The protection, promotion and support of breastfeeding have been a national public policy for over 25 years.  In October 2000, former Surgeon General David Satcher, M.D., Ph.D. issued the *HHS Blueprint for Action on Breastfeeding,* then reiterating the commitment of previous Surgeons General to support breastfeeding as a public health goal. *See* http://www.pnmc-hsr.org/wp-content/uploads/2011/01/BreastfeedingBlueprint.pdf (last visited 1/11/2017).

32.     Breastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health. According to the CDC, breastfeeding is one of the most effective preventive measures mothers can take to protect their health and that of their children. CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies.* Atlanta: U.S. Department of Health and Human Services, 2013, available at: http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF  (last visited 1/11/2017).

33.     In 2011, Regina M. Benjamin, M D., M.B.A. Vice Admiral U.S. Public Health Service Surgeon General and Kathleen Sebelius the then HHS Secretary jointly issued the *HHS Call to Action* specifying the society-wide responsibilities to encourage and support breastfeeding ("*HHS Call to Action*"). HHS, *The Surgeon General's Call to Action to Support U.S. Department of Health and Human Services. The Surgeon General's* Call to Action to Support Breastfeeding. 2011, available at: http://www.ncbi.nlm.nih.gov/books/NBK52682/pdf/  Bookshelf_NBK52682.pdf     (last visited 1/11/2017).

34.     Further, numerous prominent medical organizations, including but not limited to, the American Academy of Pediatrics, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American College of Nurse-Midwives, the American Dietetic Association, and the American Public Health Association, recommend that breastfeeding commence immediately upon birth and continue uninterrupted until the child's first birthday. *HHS Call to Action*, *supra*, p. 4.

35.     Therefore, access to and coverage for Comprehensive Lactation Benefits advances the long held public policy goal to improve the health of Americans by increasing access and diminishing the cost barriers to sustained breastfeeding during the first year of a child's life.  As detailed in the *HHS Call to Action*:

(A)     the American Academy of Pediatrics stated, "Human milk is species-specific, and all substitute feeding preparations differ markedly from it, making human milk uniquely superior for infant feeding. Exclusive breastfeeding is the reference or normative model against which all alternative feeding methods must be measured with regard to growth, health, development, and all other short- and long-term outcomes." *HHS Call to Action*, *supra*, p. 5.

(B)     "The health effects of breastfeeding are well recognized and apply to mothers and children in developed nations such as the United States as well as to those in developing countries. Breast milk is uniquely suited to the human infant's nutritional needs and is a live substance with unparalleled immunological and anti-inflammatory properties that protect against a host of illnesses and diseases for both mothers and children." *Id*. at p. 1.

(C)     Quality sustained breastfeeding provides health benefits to the mother, including lowered risk of breast and ovarian cancers, and long term health benefits to the infant, which in turn enhance the health of society and decrease costs due to poor childhood and adult health. Breast-fed babies suffer lower rates of hospitalizations for lower respiratory tract diseases in the first year, gastrointestinal infection, acute ear infection, Sudden Infant Death Syndrome, childhood leukemia, asthma, type 2 diabetes, and childhood obesity. *Id.* at p. 2.

36.     The *HHS Call to Action* also cited psychological, economic and environmental benefits attributed to breastfeeding. Specifically that: breastfeeding may reduce the risk of postpartum depression; families who follow optimal breastfeeding practices could save more than $1,200 to $1,500 a year in expenditures for infant formula in the first year alone; If 90% of the US families followed guidelines to breastfeed exclusively for six months, the US would save $13 billion annually

from reduced direct medical and indirect costs[4] and the cost of premature death; if 80% of families followed the guidelines, $10.5 billion a year would be saved; and, environmentally, breastfeeding requires minimal additional resources (a small amount of additional calories is all that is required) compared to infant formula that requires a significant carbon footprint of energy to produce formula, paper containers to store and ship that largely end up in landfills and fuel to prepare, ship and store. *Id.* at pp. 3-4.

37.    Various studies conducted by states in the context of Medicaid coverage of lactation services also demonstrate the need and reason for coverage of Comprehensive Lactation Benefits as a preventive health care benefit: North Carolina estimated that covering lactation consultations was prevent 14-18 infant deaths and save North Carolina Medicaid $7 million in treating common and sometimes                    lethal                    infancy                    infections, http://www.ncleg.net/DocumentSites/Committees/NCCFTF/Perinatal%20Health/2014-2015/PHC%20-%20Lactation%20Cost%20Benefit%20Estimates.pdf (last visited 1/12/2017).

38.    Furthermore, the importance of education is a central theme in the *HHS Call to Action:*

> "Unfortunately, education about breastfeeding is not always readily available to mothers nor easily understood by them. Many women rely on books, leaflets, and other written materials as their only source of information on breastfeeding, but using these sources to gain knowledge about breastfeeding can be ineffective, especially for low income women, who may have more success relying on role models. *The goals for educating mothers include increasing their knowledge and skills relative to breastfeeding and positively influencing their attitudes about it."*

*HHS Call to Action*, *supra*, p. 11 (emphasis added).

39.    The HHS *Call to Action* also highlighted that mothers need "access to trained individuals who have established relationships with members of the health care community, are flexible enough to meet mother's needs outside of the traditional work hours and locations, and provide consistent information." *Id.* Yet, outside of the hospital setting, mothers "may have no means of identifying or obtaining  the skilled support needed to address their concerns about lactation and

---

[4] Costs related to illnesses reduced or avoided through breastfeeding include: sudden infant death syndrome, hospitalizations for lower respiratory tract infection in infancy, atopic dermatitis, childhood leukemia, childhood obesity, childhood asthma and type 1 diabetes mellitus.

breastfeeding; further, there may be barriers to reimbursement for needed lactation care and services." HHS, *Call to Action*, *supra*, p. 25.

40.    According to the HHS *Call to Action,* International Board Certified Lactation Consultants ("IBCLCs") are credentialed health care professionals specializing in the clinical management of breastfeeding certificated by the International Board of Lactation Consultant Examiners which operates "under the direction of the U.S. National Commission for Certifying Agencies and maintains rigorous professional standards" and are the "only health care professionals certified in lactation management." *Id.* at p. 27.   IBCLCs work in many health care settings, such as hospitals, birth centers, physicians' offices, public health clinics, and their own offices.  There are over 15,000 certified IBCLCs in the United States and the average lactation consultation ranges from $120 - $350 per session, based on location.

41.    In 2013, the CDC set objectives, illustrated in the chart below, to promote, support, and ultimately increase breastfeeding rates in the United States by 2020.  *See* CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies*. Atlanta: HHS; 2013, available at: http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF (last visited 1/11/2017).

| *Healthy People 2020* Objectives | | |
|---|---|---|
| **Maternal, Infant, and Child Health (MICH) Objectives** | **Baseline** | **Target** |
| MICH 21: Increase the proportion of infants who are breastfed | | |
| Ever | 74.0% | 81.9% |
| At 6 months | 43.5% | 60.6% |
| At 1 year | 22.7% | 34.1% |
| Exclusively through 3 months | 33.6% | 46.2% |
| Exclusively through 6 months | 14.1% | 25.5% |

42.    Over the past few decades, the rate of breastfeeding has increased, but disparities have persisted. Research suggests that 1) race and ethnicity are associated with breastfeeding regardless of income, and 2) income is associated with breastfeeding regardless of race or ethnicity.



**Breastfeeding Demographics**
Rates of exclusive breastfeeding at six months vary significantly by income and race.

| | | |
|---|---|---|
| Income | Six times above poverty line | 21% |
| | Two to four times above poverty line | 20 |
| | Below poverty line | 12 |
| Race | White* | 19 |
| | Hispanic | 16 |
| | Black* | 9 |
| | Average | 16 |

Source: Centers for Disease Control and Prevention    *Non-Hispanic    Rani Molla/The Wall Street Journal

Wall Street Journal, *5 Reasons American Women Won't Breastfeed*, April 14, 2014, available at: http://blogs.wsj.com/briefly/2014/04/14/5-reasons-american-women-wont-breastfeed/ (last visited 1/11/2017).

43.     As reported on September 3, 2016 by *The New York Times* Editorial Board, in "America's Shocking Maternal Deaths," the rate at which women die during pregnancy or shortly after childbirth *has risen* materially in the United States, with the United States having the second-highest maternal mortality rate among 31 members of the Organization for Economic Cooperation and Development; only Mexico had a higher rate. For example, in Texas "the maternal mortality rate doubled from 17.7 per 100,000 live births in 2000 to 35.8 in 2014. *See* https://www.nytimes.com/2016/09/04/opinion/sunday/americas-shocking-maternal-deaths.html?_r=0 (last visited 1/11/2017).  Compare that with Germany, which had 4.1 deaths per 100,000 live births in 2014."  As the article asserted: "A big part of the problem is the inequality embedded in America's health care system. The [ACA] made health insurance more available, but millions of families still cannot afford the care they need." The inequality of the United States health care system exists directly because of conduct of the type alleged herein: insurers' bolstering their bottom lines by avoiding costs of mandated women's health care services and shifting the cost, which is more than just dollars and cents, to women.

44.     Addressing the pervasive disparities that existed in the American health care system (and continue to) and securing for all women and families the immense health benefits of

breastfeeding are the impetuses of the preventive service mandates of the ACA and its inclusion of providing access to and coverage of Comprehensive Lactation Benefits.

**B.    Breastfeeding and Comprehensive Lactation Benefits Are Time-Sensitive.**

45.    Importantly, and obviously, breastfeeding *is an extremely time-sensitive event*. Initiating breastfeeding within the first hours and days of a newborn's life can significantly impact its success. *HHS Call to Action*, *supra*, pp. 21-22.

46.    Moreover, the need for Comprehensive Lactation Benefits often arises days after birth, when the mother and child are home, and during this postpartum period the provision of Comprehensive Lactation Benefits is essential to the continuation of successful breastfeeding. *Id.* at p. 13. Further, continuation of breastfeeding upon illness or a mother's return to work presents another critical milestone; it is at such times that a mother may seek Comprehensive Lactation Benefits, as well as access to breastfeeding pumps. *Id.* at pp. 29-32.

47.    Lactation support, encouragement, education and counseling must be timely and occur during pregnancy, at the time of birth and until the child is weaned. Lactation equipment may be necessary immediately following birth, at one or several times during the first year, or continuously during the first year.  Immediate access to lactation services and products is critical because the window to address such needs is narrow.

**C.    Comprehensive Lactation Benefits Are a Preventive Service Required by the ACA.**

48.    The ACA provides the following in relevant part:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph...

42 U.S.C. § 300gg-13(a)(4).

49.    The required preventive services derive from recommendations made by four expert medical and scientific bodies – the USPSTF, the Advisory Committee on Immunization Practices, the

HRSA, and the IOM committee on women's clinical preventive services. The USPSTF is an independent panel of sixteen nationally recognized experts in primary care and prevention who systematically reviews the evidence of effectiveness and develops recommendations for clinical preventive services. The panel is convened by the Agency for Healthcare Research and Quality, which is part of HHS. Recommendations issued by the USPSTF are considered to be the "gold standard" for clinical preventive services. When analyzing a particular preventive service, the USPSTF evaluates the balance of potential benefits against harms, and then assigns a letter grade to the service. A letter grade of "A" or "B" means the service is recommended.[5] In its Final Recommendation Statement issued in October 2008, USPSTF recommended "intervention during pregnancy and after birth to promote and support breastfeeding" with a grade B.[6]

50.    On October 25, 2016, an updated Evidence Report and Systematic Review with respect to Primary Care Interventions to Support Breastfeeding was issued updating the 2008 review (http://jamanetwork.com/journals/jama/fullarticle/2571248 (last visited 11/18/2016)), and the USPSTF again recommended, after reviewing the evidence on the effectiveness of interventions to support breastfeeding, "providing interventions during pregnancy and after birth to support breastfeeding (B recommendation)." http://jamanetwork.com/journals/ jama/fullarticle /2571249?resultClick=1 (last visited 1/11/2017). As the USPSTF reiterated the importance and effectiveness of Comprehensive Lactation Benefits as follows:

> There is convincing evidence that breastfeeding provides substantial health benefits for children and adequate evidence that breastfeeding provides moderate health benefits for women. However, nearly half of all mothers in the United States who initially breastfeed stop doing so by 6 months, and there are significant disparities in breastfeeding rates among younger mothers and in disadvantaged communities.
> *       *       *
> Adequate evidence indicates that interventions to support breastfeeding increase the duration and rates of breastfeeding, including exclusive breastfeeding.

---

[5] *See* USPSTF, www.uspreventiveservicestaskforce.org/Page/Name/grade-definitions (last visited 1/11/2017).

[6] USPSTF, www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/breastfeeding-counseling (last visited 1/11/2017).

51.     The USPSTF recommendations are specifically incorporated into Section 2713 of the Public Health Service Act (29 CFR 2590.715-2713) as follows:

> [Non-grandfathered health plans] must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements…:
> **(i)** Evidenced-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved…;
>
>       \*           \*           \*
>
> **(iv)** With respect to women…evidence-informed preventive care and screening provided for in comprehensive guidelines supported by the Health Resources and Services Administration ….

52.     The comprehensive HRSA Guidelines, Women's Preventive Services: Required Health Plan Coverage Guidelines, were adopted and released on August 1, 2012, and expanded the previously required intervention to promote and support breastfeeding by specifically requiring new plans, as of August 1, 2012, to cover comprehensive prenatal and postnatal lactation support and counseling, and breastfeeding equipment and supplies, such as breast pumps, for the duration of breastfeeding.[7]

53.     Section 1001 of the ACA amends § 2713 of the Public Health Services Act to provide that all non-grandfathered group health plans and health insurance issuers offering group or individual coverage are required to cover one hundred percent (100%) of the costs of certain recommended preventive services for women, including "comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment for the duration of breastfeeding."[8]

54.     The ACA requirement mandating comprehensive prenatal and postnatal lactation support, supplies, and counseling applies to *all* private plans – including individual, small group, large

---

[7]*See*     HHS,     Women's     Preventive     Services     Guidelines,     available     at https://www.hrsa.gov/womensguidelines/ (last visited 1/11/2017).

[8] *See* FAQs About Affordable Care Act Implementation (Part XII), Q20, which states that "coverage of comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment extends for the duration of breastfeeding," available at www.dol.gov/ebsa/faqs/faq-aca12.html     and     www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_faqs12.html (last visited 10/10/2016).

group, and self-insured plans in which employers contract administrative services to a third party payer – with the exception of those plans that maintain "grandfathered" status.[9]

55.    The DOL, HHS, and the Treasury Department (the "Departments") are charged with establishing regulations and guidelines that specify the implementation of the ACA. The Departments have jointly prepared Frequently Asked Questions ("FAQs") regarding the implementation of the ACA, including FAQs regarding preventive services and Comprehensive Lactation Benefits.  These FAQs are publicly available, including through the DOL and CMS websites.

56.    In the FAQs Part XXIX, dated October 23, 2015, the Departments reiterated previous guidance and "answer questions from stakeholders to help people understand the laws and benefit from them, as intended." *See* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxix.pdf (last visited 10/18/2016).

57.    Questions 1 through 5 of the FAQs Part XXIX, which specifically address Comprehensive Lactation Benefits under the ACA are provided here (emphasis added):

**Q1: Are plans and issuers required to provide a list of the lactation counseling providers within the network?**

***Yes.*** The HRSA guidelines provide for coverage of comprehensive prenatal and postnatal lactation support, counseling, and equipment rental as part of their preventive service recommendations, including lactation counseling…group health plans subject to the Employee Retirement Income Security Act (ERISA)…must provide a Summary Plan Description (SPD) that describes provisions governing the use of network providers, ***the composition of the provider network,*** and whether, and under what circumstances, coverage is provided for out-of-network services …issuers of qualified health plans (QHPs) in the individual market Exchanges and the SHOPs currently ***must make their provider directories available online.***

**Q2:** My group health plan has a network of providers and covers recommended preventive services without cost sharing when such services are obtained in-network. **However, the network does not include lactation counseling providers. Is it**

---

[9] To be classified as "grandfathered," plans must have (1) been in existence prior to March 23, 2010; (2) refrained from making significant changes to the benefits or plan participants' costs since that time; and (3) had at least one person enrolled in the plan on March 23, 2010 and continually covered at least one individual since that date.  While there is no specific termination date for grandfathered status, it is expected that eventually all plans will lose their grandfathered status.  As of 2014, only about a quarter of workers with employer sponsored coverage participated in grandfathered plans.

permissible for the plan to impose cost sharing with respect to lactation counseling services obtained outside the network?

*No*. As stated in a previous FAQ, while nothing in the preventive services requirements under section 2713 of the PHS Act or its implementing regulations requires a plan or issuer that has a network of providers to provide benefits for preventive services provided out-of-network*, these requirements are premised on enrollees being able to access the required preventive services from in-network providers*…if a plan or issuer does not have in its network a provider who can provide a particular service, then the plan or issuer must cover the item or service when performed by an out-of-network provider and not impose cost sharing with respect to the item or service. Therefore, if a plan or issuer does not have in its network a provider who can provide lactation counseling services, the plan or issuer must cover the item or service when performed by an out-of-network provider without cost sharing.

**Q3: The State where I live does not license lactation counseling providers and my plan or issuer will only cover services received from providers licensed by the State. Does that mean that I cannot receive coverage of lactation counseling without cost sharing?**

*No***.** Subject to reasonable medical management techniques, *lactation counseling must be covered* without cost sharing by the plan or issuer when it is performed by any provider acting within the scope of his or her license or certification under applicable State law. Lactation counseling could be provided by another provider type acting within the scope of his or her license or certification (for example, a registered nurse), and the plan or issuer would be required to provide coverage for the services without cost sharing.

**Q4: A plan or issuer provides coverage for lactation counseling without cost sharing only on an inpatient basis. Is it permissible for the plan or issuer to impose cost sharing with respect to lactation counseling received on an outpatient basis?**

*No*. If a recommendation or guideline does not specify the frequency, method, treatment, or setting for the provision of a recommended preventive service, then the plan or issuer may use reasonable medical management techniques to determine any such coverage limitations. However, *it is not a reasonable medical management technique to limit coverage for lactation counseling to services provided on an in-patient basis*. Some births are never associated with a hospital admission (e.g., home births assisted by a nurse midwife), and it is not permissible to deny coverage without cost sharing for lactation support services in this case. Moreover*, coverage for lactation support services without cost sharing must extend for the duration of the breastfeeding which, in many cases, extends beyond the in-patient setting for births that are associated with a hospital admission.*

**Q5: Are plans and issuers permitted to require individuals to obtain breastfeeding equipment within a specified time period (for example, within 6 months of delivery) in order for the breastfeeding equipment to be covered without cost sharing?**

CLASS ACTION COMPLAINT

*No. The requirement to cover the rental or purchase of breastfeeding equipment without cost sharing extends for the duration of breastfeeding*, provided the individual remains continuously enrolled in the plan or coverage.[10]

58.    Among other things, the FAQs confirm that:

(A)    Defendants are required to provide a list of in-network lactation consultants.

(B)    If a plan does not have in-network lactation consultant providers, the plan may not impose cost sharing for lactation consulting services obtained out of network.

(C)    Plans may not limit lactation counseling services to an inpatient basis.

(D)    Coverage for lactation support services must extend for the duration of breastfeeding.

(E)    Plans may not require individuals to obtain equipment within a specified time period, such as within six months of delivery, in order for it to be covered without cost sharing.

59.    Having in-network providers of the required preventive service is key and is highlighted in the following relevant subsections of 29 CFR 2590.715-2713(a)(3) ((titled "Coverage of preventive health services")(emphasis added)):

(3) *Out-of-network providers* - (i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer *that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider*. Moreover, nothing in this section precludes a plan or issuer *that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider*. (ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service.

60.    Plainly, absent a network, Plaintiff and the members of the Class cannot be deemed by Defendants to have chosen to have gone "out-of-network" for the services, yet that is precisely what

---

[10] *See* CMS, *"FAQs About Affordable Care Act Implementation (Part XXIX) And Mental Health Parity Implementation" (10/23/2015), Q1-5*, available at:
https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/FAQs-Part-XXIX.pdf (last visited /1/11/2017) (emphasis added).

Defendants have done.  Defendants have forced Plaintiff and the members of the Class to either forego the preventive services or go "out-of-network" and pay the price.  That violates the ACA, the anti-discrimination provisions of the ACA, the terms of the plan documents and ERISA.

### D. Defendants Have Engaged in a Systemic Practice With Respect to Comprehensive Lactation Benefits that Violates the Preventive Service Mandates of the ACA.

61.    Defendants provide, and serve as an administrator for, non-grandfathered health plans that are required to cover certain preventive health services and screenings mandated by the ACA, including Comprehensive Lactation Benefits, as alleged *supra*.

62.    In Defendants' Preventive Care Services, Commercial Coverage Determination Guideline (Effective 10/1/2016) Defendants acknowledge that the HHS requirements, for plan years beginning on or after August 1, 2012, include specifically the "Expanded Women's Preventive Health" service of "Breastfeeding Support, Supplies, and Counseling", and characterize their coverage of such services as purportedly "comprehensive":[11]



---

[11] https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical_Policies/Preventive_Care_Services_CD.pdf (last visited 1/10/2017).

CLASS ACTION COMPLAINT

| Expanded Women's Preventive Health | | |
| --- | --- | --- |
| *These are the requirements of Health and Human Services for plan years that begin on or after 8/1/12.* | | |
| *For additional services covered for women, see the Preventive Care Services table above. Certain codes may not be payable in all circumstances due to other policies or guidelines.* | | |
| **Service:** | **Code(s):** | **Preventive Benefit Instructions:** |
| **Breastfeeding Support, Supplies, and Counseling** <br><br> HHS Requirement: <br> Breastfeeding support, supplies, and counseling: Comprehensive lactation support and counseling, from a trained provider, during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment, in conjunction with each birth. | <u>Support and Counseling</u>: <br> **Procedure Code(s):** <br> • S9443 <br> • 99241, 99242, 99243, 99244, 99245 <br> • 99341, 99342, 99343, 99344, 99345 <br> • 99347, 99348, 99349, 99350 <br><br> *Also see the codes in the* ***Wellness Examinations*** *section of the Preventive Care Services table above.* <br><br> **Diagnosis Code(s):** <br> • <u>*ICD-10:*</u> Z39.1 <br><br> <u>Breast Pump Equipment & Supplies</u>: <br> **Procedure Code(s):** <br> *Personal Use Electric:* <br> • E0603 <br> *Breast Pump Supplies:* <br> • A4281, A4282, A4283, A4284, A4285, A4286 <br><br> **Diagnosis Code(s):** <br> • Pregnancy Diagnosis Code (see Pregnancy Diagnosis Code list above), **OR** <br> • <u>*ICD-10:*</u> Z39.1 | <u>Support and Counseling</u>: <br> • The Diagnosis Code listed in this row is required for     99241 – 99245, 99341 – 99345, and 99347 – 99350 <br> • The Diagnosis Code listed in this row is not required for S9443 <br><br><br><br> <u>Breast Pump Equipment & Supplies</u>: <br> • E0603 is limited to one purchase per birth. <br> • E0603, and A4281 – A4286 are payable as preventive with at least one of the diagnosis codes listed in this row. |

63. Moreover, in Defendants' "network bulletin" dated May 2013, which provides information to health care professionals and facilities, Defendants even acknowledge the need to "expand" its reimbursement policy to "align[] UnitedHealthcare more closely with CMS and CPT Guidance" and created the "Nonphysician Healthcare Professionals Billing Evaluation and Management Codes Policy" which included, as a separate specialist, "Lactation specialist":

CLASS ACTION COMPLAINT

**Name Change and Revisions -
Registered Dietitians and Home
Health Specialties Billing Evaluation
and Management Codes Policy**

Effective third quarter 2013, this UnitedHealthcare
reimbursement policy will expand to cover non-
physician specialties in addition to registered
dieticians and home health specialties. Accordingly,
the policy will be renamed the Nonphysician
Healthcare Professionals Billing Evaluation and
Management Codes Policy. The expanded policy
will deny Evaluation and Management (E/M)
services (CPT codes 99201-99499) when reported
by additional non-physician provider specialties
when reported under their own tax identification
number (TIN) or a group TIN assigned to one of
these specialists:

• Audiologist
• Clinical social worker
• Clinical psychologist
• Registered nurse
• Homeopathy
• Addiction medicine specialists
• Lactation specialist

• Surgical assistant
• Neuropsychologist
• Pastoral counselor
• Psychologist social worker
• Psychiatric nurse specialist
• Athletic trainer

The expansion aligns UnitedHealthcare more closely
with CMS and CPT Guidance.



(http://www.uhc-
networkbulletin.com/page.aspx?QS=2e4c31a3756cb940c68abdcab6ee94c2b436a3366fc7c38bdf3821e8
56bbad80, last visited 11/17/2016).

64.    In addition, Defendants' health plans and plan documents set forth that non-
grandfathered health plans provide preventive care benefits consistent with the provisions of the ACA,
including for breastfeeding support, supplies and consultation. For example, Plaintiff's Certificate of
Coverage, provides the following which tracks specifically the ACA Preventive Services mandate, and
cites to sources that acknowledge coverage for comprehensive breastfeeding support as a preventive
care service:

CLASS ACTION COMPLAINT

**21. Preventive Care Services**

Benefits for preventive care that are payable at 100% of Eligible Expenses (without application of any Copayment, Coinsurance, or deductible) apply to the following:

- Evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the *United States Preventive Services Task Force.*

- Immunizations that have in effect a recommendation from the *Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention.*

- With respect to infants, children and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the *Health Resources and Services Administration.*

- With respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported by the *Health Resources and Services Administration.*

For a comprehensive list of recommended preventive services, go to www.healthcare.gov/center/regulation/prevention.html.

(Specific URL cited in Plaintiff's Certificate of Coverage is inactive; current www.healthcare.gov link to Preventive care benefits for women can be found at: https://www.healthcare.gov/coverage/preventive-care-benefits/ and https://www.healthcare.gov/preventive-care-women/, last visited 1/9/2017)

- If you do not have a grandfathered plan, in-network benefits for preventive care services described below will be paid at 100%, and not subject to any deductible, coinsurance or copayment. If you have pharmacy benefit coverage, your plan may also be required to cover preventive care medications that are obtained at a network pharmacy at 100%, and not subject to any deductible, coinsurance or copayment, as required by applicable law under any of the following:

  - Evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the *United States Preventive Services Task Force.*

  - Immunizations that have in effect a recommendation from the *Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention.*

  - With respect to infants, children and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the *Health Resources and Services Administration.*

  - With respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported by the *Health Resources and Services Administration.*

65.    However, the foregoing information is a subterfuge and misleading, and has not resulted in women getting access to and coverage for Comprehensive Lactation Benefits. Defendants fail to establish networks of lactation consultants nationwide and by fail to provide timely, complete and accurate information to women of the identity of in-network lactation consultants nationwide. Defendants prevent women from getting access to timely and necessary Comprehensive Lactation Benefits and circumvent the clear requirement that health plans provide, at no cost, Comprehensive Lactation Benefits as a preventive service, just like all other preventive services.

66.    In contravention of the ACA's preventive health services mandate and the Defendants' plan documents, Defendants have failed to provide mandated preventive benefits coverage for Comprehensive Lactation Benefits and have established administrative procedures intended frustrate women from receiving mandated preventative benefits to the detriment of plan members including by (among other things):

(A)    failing to establish a network of lactation consultants;

(B)    improperly attributing an out-of-network characterization to Comprehensive Lactation Benefits in response to insureds' inquires and when such benefits are sought;

(C)    providing inconsistent and misleading information through its customer service representatives, including but not limited to: the necessity of a gap exception and approval of out of network provider charges with the commitment to reimburse lactation consultation services in full prior to the service being provided only to have the claim denied in whole or in part;

(D)    imposing major administrative barriers to insureds seeking to receive information about and access to Comprehensive Lactation Benefits, including gap exceptions, the failure to identify the reason a claim was denied, and the failure to provide consistent accurate guidance for reimbursement;

(E)    failing to construct a list of in-network providers of Comprehensive Lactation Benefits; and

(F)    failing to provide any list of in-network providers of Comprehensive Lactation Benefits including failing to provide such list either by mail, through customer representatives that provide phone consultation to members, or through the Defendants' website.

67.    Defendants have also wrongly erected significant administrative barriers that prevent and deter women from obtaining timely Comprehensive Lactation Benefits.  Among these barriers, Defendants have failed to establish networks of providers and failed to provide plan participants with

any list or directory that clearly disclose the in-network providers (if any) who are certified and qualified to provide Comprehensive Lactation consultations.[12]

68.     Defendants have, contrary to the plain intent and purpose of the ACA's imposition of no-cost preventive services and the inclusion of Comprehensive Lactation Benefits as a preventive service, improperly shifted costs to the insured by failing to establish networks of providers of Comprehensive Lactation Benefits.

69.     Time is of the essence with respect to breastfeeding. Mothers who seek out and need guaranteed no-cost women's preventive services pursuant to the ACA, are victims of Defendants' barriers.  Defendants have erected these barriers to prevent their insureds from timely receiving, if they receive it at all, Comprehensive Lactation Support.  Defendants then illegally force their insureds, who obtain such support, to pay for it, by failing to provide full reimbursement.

70.     Plaintiff, like the members of the Class, has been denied through Defendants' wrongful conduct the women's preventive service benefit for Comprehensive Lactation Benefits that is required by the ACA.  A few weeks after the home birth of her child on February 13, 2015, Plaintiff Condry was experiencing difficulties breastfeeding and her daughter was losing a considerable amount of weight.  In need of immediate assistance, Plaintiff Condry was referred to Ellen H. Schwerin, MPH, IBCLC of Happy Milk Lactation Support. On March 4, 2015, Plaintiff Condry had an in-home lactation consultation provided by the IBCLC for which she paid $225 out-of-pocket.

71.     Following the in-home lactation consultation, Plaintiff Condry submitted the claim to UHC Insurance for coverage and reimbursement.  UHC Insurance processed and fully denied the service as "not a reimbursable service," thereby holding Plaintiff Condry responsible for the $225 service fee.  The EOB received on our around March 18, 2015 indicated that, "[t]here may be a more

---

[12] Physicians and clinicians who "are ambivalent about breastfeeding or who feel inadequately trained to assist patients with breastfeeding may be unable to properly counsel their patients on specifics about breastfeeding techniques, current health recommendations on breastfeeding, and strategies to combine breastfeeding and work." HHS, *Call to Action*, supra, p. 15.  In a recent study of obstetricians' attitudes, 75% admitted they had either inadequate or no training in how to appropriately educate mothers about breastfeeding. The information on breastfeeding included in medical texts is often incomplete, inconsistent, and inaccurate." *Id.* at p. 26.

appropriate CPT or HCPCS code that describes this service and/or the use of the modifier or modifier combination is inappropriate."

72.    Irrespective of the denied claim, Plaintiff Condry and her newborn still required and sought the assistance of the same IBCLC on two separate occasions, March 19, 2015 and April 14, 2015, in order to successfully continue breastfeeding.  Plaintiff Condry paid $181 and $150 for the second and third visit, respectively.

73.    Plaintiff Condry did not submit claims for the second or third lactation consultation, nor did she take further action by appealing the first denied claim because she believed it would have been futile based upon the previous difficulties she had encountered with UHC Insurance covering numerous claims associated with her home childbirth.

74.    Accordingly, because of UHC Insurance's wrongful conduct, Plaintiff Condry was fully denied reimbursement and the no-cost ACA preventive service to which she was entitled, resulting in a total out-of-pocket expenditure of $556 for the three consultations.

75.    Based on Plaintiff's counsel's investigation, the experience of Plaintiff characterizes the experience of numerous other women covered under UHC health plans in a wide cross-section of the United States. Therefore, although Defendants operate a multi-tiered web of entities that provide health care coverage, it is apparent that the directives with respect to the handling of claims for breastfeeding support, supplies and counseling, including the failure to provide adequate or reasonable in-network providers for such services, emanate from a central UHC authority.

**E.    Defendants' Conduct Violates the Non-Discrimination Provision of the ACA.**

76.    Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

77.    The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

78.    Title IX prohibits discrimination on the basis of sex.  Plaintiff and the members of the Class are being excluded from participation in, being denied the benefits of, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of their sex.

79.    By their conduct alleged herein, Defendants are providing disparate levels of health benefits, and specifically ACA mandated preventive services, for women.

80.    Defendants are subject to Section 18116 because Defendants are health programs and activities which are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.  *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference).

81.    Defendants are health programs and activities because they provide and administer health insurance and plans.

82.    Defendants are receiving Federal financial assistance, including credits, subsidies and contracts of insurance, at least in the following ways.

83.    UnitedHealth Group serves as a plan sponsor offering Medicare Part D prescription drug insurance coverage under contracts with CMS. Under the Medicare Part D program, UnitedHealth Group receives the following payments from CMS: *Low-Income Premium Subsidy.* For

> qualifying low-income members, CMS pays some or all of the member's monthly premiums to UnitedHealth Group on the member's behalf.*Catastrophic Reinsurance Subsidy.* CMS pays UnitedHealth Group a cost reimbursement estimate monthly to fund the CMS obligation to pay approximately 80% of the costs incurred by individual members in excess of the individual annual out-of-pocket maximum. *Low-Income Member Cost Sharing*

CLASS ACTION COMPLAINT

*Subsidy.* For qualifying low-income members, CMS pays on the member's behalf some or all of a member's cost sharing amounts, such as deductibles and coinsurance.Defendants also provide health plans through the ACA Exchanges (*see* ¶20 *supra*) and thereby receive Federal financial assistance in the form of the direct and/or indirect subsidies, including the "premium tax credit," provided for under the ACA for qualified individuals who purchase health insurance from Defendants through the Exchange.  A premium tax credit is a refundable tax credit designed to help eligible individuals and families with low or moderate income afford health insurance purchased through the Exchange. When enrolled in an Exchange plan, the insured can choose to have the Exchange compute an estimated credit that is paid to the insurance company to lower what the insured pays for monthly premiums (advance payments of the premium tax credit, or APTC). *See*  http://fas.org/sgp/crs/misc/R41137.pdf  (last visited 1/11/2017).  On information and belief, Defendants have and will receive such credits.

85.     In addition to the premium credits, ACA establishes subsidies that are applicable to cost-sharing expenses. The HHS Secretary will provide full reimbursements to exchange plans that provide cost-sharing subsidies.  It was estimated in early 2014, that such cost-sharing subsidies would increase federal outlays from FY2015 through FY2024 by $167 billion.  *See* http://fas.org/sgp/crs/misc/R41137.pdf (last visited 1/11/2017). On information and belief, Defendants have and will receive such credits.

86.     Furthermore, the federal government provides funds, grants and/or other financial assistance to Defendants and their segments and operating businesses.  A review of the federal-government-run  www.USASpending.gov  – a website mandated by the Federal Funding Accountability and Transparency Act of 2006 (S. 2590) to give the American public access to information on how their tax dollars are spent – indicates as follows:

(A) UnitedHealth Military & Veterans Services, LLC has received over $9 Billion from 2012 through present from the federal government (DoD)[13]:

---

[13]   *See*   https://www.usaspending.gov/Pages/TextView.aspx?data=RecipientFundingTrends& dunsnumber=826295136&fiscalyear=2016;   https://www.usaspending.gov/transparency/Pages/ RecipientProfile.aspx?DUNSNumber=826295136&FiscalYear=2016  (last visited 1/9/2017).

| Fiscal Year | Award Type | Funds Awarded | Number of Transactions |
|---|---|---|---|
| 2012 | Contracts | $11,475,879 | 52 |
| 2013 | Contracts | $1,026,605,169 | 84 |
| 2014 | Contracts | $2,970,075,676 | 124 |
| 2015 | Contracts | $2,505,344,547 | 124 |
| 2016 | Contracts | $2,723,068,419 | 194 |
| 2017 | Contracts | $260,491,446 | 2 |

(B) United Healthcare Services, Inc. has been paid $1,120,592 to date for FY 2017 by the Department of Treasury.[14]

87.    As alleged in ¶¶20-24 *supra,* Defendants have entered into agreements or contracts of insurance with the federal government.

88.    Defendants violated and continue to violate Section 1557(a) of the ACA on the basis of sex discrimination because, as set forth herein, Defendants refuse and otherwise fails to comply with the ACA's provisions with respect to preventive women's care for Comprehensive Lactation Benefits.

89.    By violating the women's preventive services requirements under the ACA, plan participants have been and continue to be denied mandated access to coverage for breastfeeding benefits. Defendants' denial of benefits and unlawful cost sharing has – in addition to violating the ACA – unjustly enriched Defendants and deprived thousands of women of their mandated lactation benefits.  If Defendants' unlawful and discriminatory conduct is not foreclosed, many more mothers will be wrongfully denied the benefits they are entitled to receive under the ACA.

F.    **Defendants' Status as, and Duties of, ERISA Fiduciaries.**

90.    ERISA fiduciaries include not only parties explicitly named as fiduciaries in the governing plan documents or those to whom there has been a formal delegation of fiduciary responsibility, but also any other parties who in fact performs fiduciary functions. Under ERISA, a

---

[14]https://www.usaspending.gov/transparency/Pages/RecipientProfile.aspx?DUNSNumber=071778674&FiscalYear=2017 (last visited 1/2/2017).

CLASS ACTION COMPLAINT

person is a fiduciary "to the extent . . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . . .," ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), or "he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). Thus, if a Defendant exercises discretionary authority or control in managing or administering the plan, or, if it exercises any authority or control (discretionary or not) with respect to management or disposition of plan assets, it is an ERISA fiduciary.

91.     At all relevant times, Defendants have been fiduciaries of the Defendants' health plans because: (a) they had the authority with respect to the Defendants' health plans' compliance with the ACA requirements; (b) they exercised discretionary authority and/or discretionary control with respect to the Defendants' compliance with the ACA requirements for their health plans; (c) they had the authority to establish a network of providers for Comprehensive Lactation Benefits for the Defendants' health plans; (d) they exercised discretionary authority and/or discretionary control with regard to establishing a network of providers for Comprehensive Lactation Benefits for Defendants' health plans; (e) they had the authority and/or discretionary responsibility over the management and administration of preventive services as required by the ACA for the Defendants' health plans; and/or, (f) they exercised discretion over provider lists for Defendants' plans with respect to providers of Comprehensive Lactation Benefits, and, on information and belief, failed to establish a network of providers in order to maximize its profits and minimize its costs of coverage for ACA women's preventive services.

92.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA §§ 404(a)(1), 404(a)(1)(A), and (B) are referred to as the duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

93.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA plans and their participants. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their fiduciary obligations.

94.    ERISA also holds fiduciaries liable for the misconduct of co-fiduciaries. ERISA § 405(a), 29 U.S.C. § 1105(a). Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.  Even if a fiduciary merely knows of a breach with which it had no connection, it must take steps to remedy that breach. *See* 1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080 ("[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.").

95.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies set forth in § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. §1104.

96.    In addition, Plaintiff and the members of the Class were not required to exhaust their administrative remedies and any pursuit, or further pursuit, of any administrative remedies would be futile.  Futility here is clear because pursuit of administrative remedies could not address Defendants' failure to establish nationwide an in-network of providers of Comprehensive Lactation Benefits, and to

provide, cover, and administer Comprehensive Lactation Benefits as a no-cost preventive service in accordance with the ACA.  Defendants' health plans fail to comply with the provisions of the ACA with respect to preventive services, the redress for which could not be accomplished by pursuit of administrative remedies.  Since the action concerns Defendants' violations with respect to the fundamental constructs of the Defendants' plans and networks, and does not evoke Defendants' discretion with respect to the payment of an individual claim, any effort to exhaust administrative remedies would be futile and is not required as a matter of law.

97.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for appropriate equitable relief from Defendants as fiduciaries (and, in the alternative, from Defendants as knowing participants in breaches of any of ERISA's fiduciary responsibility provisions), including without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, equitable surcharge, and restitution.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action on behalf of herself and the proposed Class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3).  Specifically, Plaintiff seeks to represent the following Class:

> All persons who, on or after August 1, 2012, are or were participants in or beneficiaries of any non-Grandfathered Health Plan and non-federal employee health plan, sold, underwritten or administered by Defendants in their capacity as insurer or administrator, who did not receive full coverage and/or reimbursement for Comprehensive Lactation Benefits.

99.    Excluded from the Class are Defendants, their subsidiaries or affiliate companies, their legal representatives, assigns, successors, and employees.

100.    The members of the Class are so numerous that joinder of all members is impracticable. Thousands of members are enrolled in Defendants' health care plans.  Although information is not publicly available at the present time as to the number of women who paid for Comprehensive Lactation Benefits, Plaintiff alleges on information and belief that discovery will show that the putative Class include at least hundreds if not thousands of geographically dispersed women, making joinder of all class members impracticable. Plaintiff alleges on information and belief that the

identities and contact information of the members of the Class can be readily ascertained from Defendants' records which include the identities of the Damages Class members who paid for Comprehensive Lactation Benefits.

101.    There are common questions or law and fact within the meaning of Fed. Rule of Civ. P. 23(a)(2).  These common legal and factual questions include, but are not limited to:

(A)    Whether Defendants have violated the ACA's mandate of providing access to and coverage for Comprehensive Lactation Benefits to the members of the Class;

(B)    Whether Defendants unlawfully discriminated on the basis of sex in violation of the ACA by virtue of the conduct described herein;

(C)    Whether Defendants owed ERISA fiduciary duties to Plaintiff and the members of the Class and breached such duties under ERISA and/or in violation of ERISA;

(D)    Whether Defendants have been unjustly enriched (and if so, in what amount);

(E)    Whether Plaintiff and the members of the Class are entitled to equitable relief, including but not limited to surcharge, disgorgement of profits, and/or restitution;

(F)    Whether Plaintiff and the members of the Class are entitled to a declaration regarding their rights under ERISA;

(G)    Whether Plaintiff and the members of the Class are entitled to a declaration regarding their rights under the ACA and/or ERISA;

(H)    Whether Plaintiff and the members of the Class are entitled to an Order enjoining Defendants from violating the ACA requirements related to Comprehensive Lactation Benefits and compelling compliance with the ACA; and

(I)    The extent and measurement of damages to the Damages Class members for out-of-pocket payments for Comprehensive Lactation Benefits and the nature of other appropriate relief.

102.    Plaintiff's claims are typical of the claims of the members of the Class within the meaning of Fed. R. Civ. P. 23(a)(3) because Defendants have breached the ACA, the terms of the plans, and their obligations to Plaintiff and the Class in a uniform manner.  Defendants failed to establish a network of providers of Comprehensive Lactation Benefits and thereby caused Plaintiff and

36

the members of the Class to pay out-of-pocket for Comprehensive Lactation Benefits.   Defendants unjustly enriched themselves to the detriment of Plaintiff and the members of the Class who sustained economic injuries arising from the same wrongful and unlawful conduct of the Defendants.

103.   Plaintiff will fairly and adequately protect the interests of the members of the Class, and does not have interests antagonistic to them.   Plaintiff has retained attorneys experienced in the prosecution of class actions, including healthcare, antitrust, and consumer protection matters, and Plaintiff and her counsel intend to prosecute this action vigorously.

104.   Plaintiff and the members of the Class have all suffered, and will continue to suffer harm, and damages as a result of Defendants' unlawful and wrongful conduct.   A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, since joinder of all members of the Class is impracticable and the cost of litigation would far outweigh the likely value of individual class member claims.

105.   Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Defendants' misconduct.   Further, if individual Class members were required to bring separate actions, this and other courts would be confronted with a multiplicity of lawsuits that would burden the judicial system and risk inconsistent rulings and contradictory judgments.   And, in contrast to the shared and unitary costs of a class action, case-by-case adjudication would greatly magnify the expense and time incurred by the parties and the courts.

106.   Class certification is appropriate because Defendants engaged in a uniform and common practice, and all Class Members have the same legal right to, and interest in, redress for damages associated with violations of the ACA's lactation coverage requirements.

## CLAIMS FOR RELIEF

### COUNT I
**Equitable Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Breach of Fiduciary Duties Under ERISA § 404(a), 29 U.S.C. § 1104(a)**
**Against Defendants**

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Defendants are fiduciaries of the ERISA-governed health care plans in which Plaintiff and the members of the Class are participants.

109.    Defendants breached their fiduciary duties of prudence under ERISA § 404(a)(1)(B) by, as alleged herein, failing to provide and to administer their health plans in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiff and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits.

110.    Defendants also breached their duty of loyalty under ERISA § 404(a)(1)(A) by, as alleged herein, failing to provide and to administer their health plans in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiff and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits in order to maximize their profits and cost-shift the ACA preventive service coverage requirement to the Plaintiff and the members of the Class.

111.    Defendants' breaches of fiduciary duty caused direct injury and losses to Plaintiff and each member of the Class.

112.    Plaintiff and the Class seek appropriate equitable relief along with such other and additional relief set forth in the Prayer and/or as may otherwise be available.

CLASS ACTION COMPLAINT

<u>COUNT II</u>
**Claim for Equitable Relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a)**
**Against Defendants**

113.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.    As Defendants are fiduciaries under ERISA, they are liable under ERISA § 405(a) for each other's violations of ERISA.

115.    Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)    if, by his failure to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

116.    Each Defendant knowingly participated in and enabled the other Defendants' breaches of fiduciary duty by allowing Defendants to, as alleged herein, provide and administer health plans that were not in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiff and members of the Class to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits, and by failing to monitor Defendants' compliance with the ACA and plan documents.

117.    Defendants failed to fulfill their ongoing and continuing duty to determine whether their health plans were being established and administered in accordance with the ACA, and in the best interests of Plaintiff and the members of the Class.

118.    Co-fiduciary liability is joint and several under ERISA, and thus Defendants are jointly and severally liable to Plaintiff and the members of the Class for the others' breaches of ERISA's fiduciary responsibility provisions.

**COUNT III**
**Discrimination in Violation of Section 1557(a), 42 U.S.C. § 18116(a),**
**of the Patient Protection and Affordable Care Act**
**Against Defendants**

119.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

120.    Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

121.    The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

122.    Defendants are subject to Section 18116 because Defendants are health programs and activities which will or are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.  *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference), as alleged in ¶¶20-24, *supra*.

123.    Title IX prohibits discrimination on the basis of sex.  Plaintiff and the members of the Class, who are necessarily all women, are being excluded from participation in, being denied the

benefits of, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of their sex.

124.    Defendants have violated and continue to violate Section 1557(a) of the ACA on the basis of sex discrimination because, as alleged herein, Defendants refuse and otherwise fail to provide parity in coverage for women's preventive services required under the ACA.

125.    Defendants have violated and continue to violate the ACA by discriminating on the basis of sex in Defendants' failure to provide Comprehensive Lactation Benefits as a no-cost preventive service as mandated by the ACA; failure to provide a listing of in-network providers for Comprehensive Lactation Benefits; denial of coverage for Comprehensive Lactation Benefits secured by purported out-of-network providers in the absence of the availability of in-network providers; imposition of cost and unreasonable administrative burdens intended to deter Plaintiff and the members of the Class from seeking Comprehensive Lactation Benefits; and placing of other restrictions or limitations on Comprehensive Lactation Benefits, all of which causes widespread detrimental consequences to women.

126.    By violating the women's preventive services requirements under the ACA, Plaintiff and the members of the Class have been and continue to be denied mandated access to coverage for Comprehensive Lactation Benefits.  Defendants' unlawful conduct violates the ACA and unjustly enriches Defendants, depriving thousands of women of their ACA- mandated women's preventive services.

127.    If Defendants unlawful and discriminatory conduct is not foreclosed, many more of their female insureds will be wrongfully foreclosed from receiving benefits, and/or reimbursement for covered services, to which they are entitled under the ACA.

128.    Plaintiff and members of the Class have been aggrieved and damaged by this violation of Section 1557 of the ACA.

**COUNT IV**
**Violation of the Patient Protection and Affordable Care Act**
**through Incorporation by Reference in HSCS Plan Documents**
**Against Defendants**

129.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

130.    Plaintiff's and the Class members' plan documents describe the plan's terms and conditions related to the operation and administration of the plans.

131.    The Plaintiff's and the Class members' health plans are subject to the ACA.   In addition, the plan documents specifically reference and track the preventive care provisions of the ACA, including the women's preventive care provisions set forth in 42 U.S.C. § 300gg-13(a)(4).

132.    Accordingly, as plan participants, Plaintiff has the right to seek to enforce the provisions of the ACA, and in particular, as alleged herein, the provisions of the ACA requiring the provision of Comprehensive Lactation Benefits as a no cost women's preventive service.

133.    As a result of Defendants' failure to provide Comprehensive Lactation Benefits to Plaintiff and the members of the Class, Plaintiff and the members of the Class have sustained monetary damages and, if Defendants' conduct is not stopped, continue to be harmed by Defendants' misconduct.

**COUNT V**
**Unjust Enrichment**
**Against Defendants**

134.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.    Defendants have been unjustly enriched by the conduct alleged herein, including by (a) withholding money due to Plaintiff and the members of the Class paid for Comprehensive Lactation Benefits; (b) implementing a course of conduct that prevents Plaintiff and Class members from seeking Comprehensive Lactation Benefits (or makes them pay out-of-pocket), including by their failure to establish a network of providers for Comprehensive Lactation Benefits; and (c) shifting the cost of ACA-mandated no-cost women's preventive services to Plaintiff and Class members.

136.    Although it is part of Defendants' responsibilities and duties to provide and administer health insurance coverage that satisfies the ACA mandated preventive care requirements, including for Comprehensive Lactation Benefits, Defendants have failed to fulfill such responsibilities.

137.    As a result, Plaintiff and members of the Class conferred an unearned tangible economic benefit upon Defendants by paying out-of-pocket for a preventive service, namely, Comprehensive Lactation Benefits.

138.    Equity weighs against Defendants retaining these economic benefits, which should be returned to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of the members of the Class, prays for relief as follows as applicable for the particular cause of action:

A.    An order certifying this action to proceed on behalf of the Class, and appointing Plaintiff and their counsel to represent the Class;

B.    An order finding that Defendants violated their fiduciary duties to Class Members and awarding Plaintiff and Class members such relief as the Court deems proper;

C.    An order finding that Defendants violated the preventive services provisions of the ACA, and awarding Plaintiff and members of the Class such relief as the Court deems proper;

D.    An order finding that Defendants violated the ACA "nondiscrimination" provision, Section 1557(a), 42 U.S.C. § 18116(a), and awarding Plaintiff and members of the Class such relief as the Court deems proper;

E.    An order finding that Defendants were unjustly enriched and awarding Plaintiff and members of the Class such relief as the Court deems proper;

F.    Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on it by the ACA and ERISA with respect to Comprehensive Lactation Benefits;

G.    An order awarding, declaring or otherwise providing Plaintiff and members of the Class all relief under ERISA, that the Court deems proper and such appropriate equitable relief as the Court

may order, including damages, an accounting, equitable surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

H.    An order finding that Defendants are jointly and severally liable as co-fiduciaries in violations of ERISA;

I.    An order awarding Plaintiff and the members of the Class other appropriate equitable and injunctive relief to the extent permitted by the above claims;

J.    An order awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine; and

K.    Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial  by jury for all claims asserted in this Complaint so triable.

Dated: January 13, 2017            **TYCKO & ZAVAREEI LLP**


By: _/s/ Kristen Law Sagafi_____
                KRISTEN LAW SAGAFI, California Bar No. 222249
                ksagafi@tzlegal.com
                483 Ninth Street, Suite 200
                Oakland, CA  94607
                Telephone (510) 254-6808
                Facsimile (202) 973-0950


                Nicholas E. Chimicles (to seek admission *pro hac vice*)
                Kimberly Donaldson Smith (to seek admission *pro hac vice*)
                Stephanie E. Saunders (to seek admission *pro hac vice*)
                **CHIMICLES & TIKELLIS LLP**
                361 W. Lancaster Avenue
                Haverford, PA 19041
                (610) 642-8500
                NEC@Chimicles.com
                KMD@Chimicles.com
                SES@Chimicles.com

Jonathan W. Cuneo (to seek admission *pro hac vice*)
Pamela B. Gilbert (to seek admission *pro hac vice*)
Matthew E. Miller (to seek admission *pro hac vice*)
Katherine Van Dyck (to seek admission *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Phone: (202) 789-3960
Fax: (202) 789-1813

***Attorneys for Plaintiff and the proposed Class***

CLASS ACTION COMPLAINT