1    **TYCKO & ZAVAREEI LLP**
     KRISTEN LAW SAGAFI, California Bar No. 222249
2    ksagafi@tzlegal.com
     483 Ninth Street, Suite 200
3    Oakland, CA  94607
     Telephone: (510) 254-6808
4    Facsimile: (202) 973-0950

5    Counsel for Plaintiffs

6    *Additional counsel for Plaintiffs on signature page*

7
                    **IN THE UNITED STATES DISTRICT COURT**
8
                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9

10   RACHEL CONDRY, JANCE HOY, CHRISTINE          Case No.:  3:17-cv-00183-VC
     ENDICOTT, LAURA BISHOP, FELICITY BARBER,
11   and RACHEL CARROLL on behalf of themselves and
     all others similarly situated,
12                                                 **SECOND AMENDED CLASS ACTION
                      Plaintiffs,                   COMPLAINT**
13
              v.
14
     UnitedHealth Group Inc.; UnitedHealthcare, Inc.;   **DEMAND FOR JURY TRIAL**
15   UnitedHealthcare Insurance Company;
     UnitedHealthcare Services, Inc.; and UMR, Inc.,
16
                      Defendants.
17

18        Plaintiffs, Rachel Condry, Jance Hoy, Christine Endicott, Laura Bishop, Felicity Barber, and

19   Rachel Carroll (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated,

20   ("Class" or "Classes," defined below), by and through their undersigned counsel, submit this Second

21   Amended Class Action Complaint against Defendants, UnitedHealth Group Inc. ("UnitedHealth

22   Group"), UnitedHealthcare, Inc. ("UHC"), UnitedHealthcare Insurance Company ("UHC Insurance"),

23   United Healthcare Services, Inc. ("UHC Services") and UMR, Inc. ("UMR") (collectively,

24   "UnitedHealth" or "Defendants").  Each Plaintiff hereby alleges upon personal knowledge as to

25   herself and her own acts, and upon information and belief as to all other matters, based upon, *inter

26   alia*, the investigation undertaken by her attorneys, as follows:

27

28

**NATURE OF THE ACTION**

1.     Defendants provide health benefit plans and policies of health insurance, including individual health benefit plans, employer-sponsored group health plans, and government-sponsored health benefit plans, and provide benefits administration and third-party claims processing services to numerous employee benefit plans (the "plan" or "plans").

2.     Defendants have wrongfully denied and continue to deny Plaintiffs and the members of the Classes access to and coverage for a vital women's preventive service – breastfeeding support, supplies and counseling – which coverage is mandated by The Patient Protection and Affordable Care Act (the "ACA") (as amended by the Health Care and Education Reconciliation Act of 2010 ("HCERA") and other laws).

3.     A key directive of the ACA was that all individual and group health plans would provide access to and coverage for preventive health care benefits.[1]  As stated by the U.S. Department of Health & Human Services ("HHS"), prior to the enactment of the ACA, "too many Americans did not get the preventive care they need to stay healthy, avoid or delay the onset of disease, and reduce health care costs, [and,] [o]ften because of cost, Americans used preventive services at about half the recommended rate." *See*  http://www.hhs.gov/healthcare/facts-and-features/fact-sheets/aca-rules-on-expanding-access-to-preventive-services-for-women/index.html (last visited 1/11/2017).

4.     In addition to the policy of promoting preventive health benefits for all, the ACA specifically recognized the need to address the unique preventive health needs of women throughout their lives. *Id.*  Building upon the ACA's women's preventive health services mandate, on August 1, 2011, HHS adopted its Health Resources and Services Administration's ("HRSA") Health Plan Guidelines for Women's Preventive Services ("HHS Guidelines"), which require access to and

---

[1]     The only exception is health insurance plans that are grandfathered. To be classified as a "grandfathered plan," plans must have (1) been in existence prior to March 23, 2010; (2) refrained from making significant changes to the benefits or plan participants' costs since that time; and (3) had at least one person enrolled in the plan on March 23, 2010 and continually covered at least one individual since that date.  While there is no specific termination date for grandfathered status, it is expected that eventually all plans will lose their grandfathered status.  As of 2014, only about a quarter of workers with employer-sponsored coverage participated in grandfathered health plans.

coverage for certain women's preventive services by most non-grandfathered plans starting with the first plan or policy year beginning on or after August 1, 2012.

5.      The HHS Guidelines, which were recommended by the independent Institute of Medicine ("IOM") and based on scientific evidence, ensure women's accessibility to a comprehensive set of preventive services, including health services related to breastfeeding support, supplies and counseling.   Under the HHS Guidelines, pregnant and postpartum women must have access to comprehensive lactation support and counseling provided by a trained provider during pregnancy and/or in the postpartum period ("Comprehensive Lactation Benefits"), as well as breastfeeding equipment. *See* HHS Guidelines, http://hrsa.gov/womensguidelines/ (last visited 1/11/2017).

6.      According to the Centers for Disease Control and Prevention ("CDC")*, "[b]reastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health."*      http://www.cdc.gov/breastfeeding/pdf/2016breastfeeding reportcard.pdf (last visited 1/11/2017) (emphasis added).

7.      While the protection, promotion and support of breastfeeding have been a national public policy for over 25 years, the CDC, the American Academy of Pediatrics and the enactment of the ACA's Comprehensive Lactation Benefits coverage have brought breastfeeding to the forefront of women's health issues.

8.      As the then-HHS Secretary Kathleen Sebelius announced in July 2012:

> Aug. 1, 2012 ushers in a new day for women's health when, for the first time ever, women will have access to eight new services at no out-of-pocket cost to keep them healthier…..This benefit will take effect for millions of adult and adolescent women over the course of the next year—and *it's just one of many benefits of the health care law that let women and their doctors, not insurance companies, make decisions about a woman's care*.
>
> …. *Instead of letting insurance companies decide what care women receive, the health care law requires insurers to cover these preventive services* in new plans beginning Aug. 1.
>
> …Women's health decisions shouldn't be made by politicians or insurance companies. Rather than wasting time refighting old political battles, this Administration is moving forward and *putting women in control of their own health care*. If women are going to take care of their families and friends, they have to take care of themselves. The Affordable Care Act is making it easier for

women to do that by making health care more accessible and affordable for millions of American women and families.

"Giving Women Control Over Their Health Care," posted July 31, 2012, By Kathleen Sebelius, Secretary of Health and Human Services, https://www.whitehouse.gov/blog/2012/07/31/giving-women-control-over-their-health-care (last visited 1/11/2017) (emphasis added).

9.      On October 25, 2016, the U.S. Preventive Services Task Force ("USPSTF") issued updated statements again recommending interventions during pregnancy and after birth to support breastfeeding, including intervention by professional support, and set forth in summary the rationale and importance of such recommendation:

> There is convincing evidence that breastfeeding provides substantial health benefits for children and adequate evidence that breastfeeding provides moderate health benefits for women. However, nearly half of all mothers in the United States who initially breastfeed stop doing so by 6 months, and there are significant disparities in breastfeeding rates among younger mothers and in disadvantaged communities.

USPSTF Reports, http://jamanetwork.com/journals/jama/fullarticle/2571249?resultClick=1; http://jamanetwork.com/journals/jama/fullarticle/2571243?resultClick=1; jamanetwork.com/ journals/ jama/article-abstract/2571222; jamanetwork.com/journals/jama/fullarticle/ 2571248? resultClick=1 (last visited 11/16/2016).

10.     Contrary to the ACA, the HHS Guidelines, USPSTF recommendations, and Secretary Sebelius' expressed confidence that insurance companies could no longer dictate women's health decisions, Defendants are denying Plaintiffs and the members of the Classes the ACA-mandated access to and coverage for Comprehensive Lactation Benefits from trained providers for insured pregnant and postpartum women.

11.     Defendants (in their capacities as both insurers and third-party administrators of self-insured plans) have employed the following scheme to circumvent the preventive service mandates established by the ACA and incorporated in their insureds' plans:

(A)     Defendants have not established networks of trained providers of Comprehensive Lactation Benefits.[2]   If Defendants do not establish networks and women are not provided a network as part of their insurance plan, one of three things occurs:

> i.     Women forego Comprehensive Lactation Benefits because they are unable to pay out-of-pocket, *ergo*, Defendants never have to administer and pay for the preventive service; or
>
> ii.    Women pay out-of-pocket for Comprehensive Lactation Benefits, never seek reimbursement from Defendants, *ergo*, Defendants never have to administer or pay for the preventive service; or
>
> iii.   Women pay out-of-pocket for Comprehensive Lactation Benefits, seek reimbursement, and get either no or partial reimbursement, *ergo,* Defendants minimize their costs related to the preventive service, and force women to pay out-of-pocket.

(B)     It is not by Plaintiffs' and the Class members' own choosing to go "out-of-network."  It is of Defendants' making.  Yet, Defendants exploit their wrongful conduct by cost-shifting and imposing costs on the insureds for what is supposed to be a preventive service.

(C)     Contrary to the plans' express claims procedures, Defendants also fail to properly and timely process and/or respond to Plaintiffs and other participants' benefit claims, and appeals for benefit claim denials.  In essence, Defendants' claims administration is reminiscent of a Kafkaesque bureaucratic nightmare—written appeals do not qualify as

---

[2]     Comprehensive Lactation Benefits are unlike other preventive services in an important respect. For example, prior to the ACA's enactment, in-network urologists were typically available to insureds for male prostate exams, though generally subject to a co-pay, deductible or co-insurance.   After the ACA's enactment, such services were deemed preventive services that are covered at no-cost when provided by in-network providers.  For Comprehensive Lactation Support, such services were not, prior to the ACA, typically covered health benefits for which established networks of trained providers existed. Defendants have not established networks of providers of Comprehensive Lactation Support, and procedures for properly processing such claims, thereby circumventing the ACA's and their contractual preventive service provisions for women.

appeals, disappear mysteriously into the "system," and are never substantively addressed or resolved, while claimants are repeatedly advised to make such written appeals when their previous written appeals are ignored and/or somehow have disappeared. The claims "administration" process and violations of law detailed herein reflect a callous disregard for the rights and needs of insureds, such as Plaintiffs, and this behavior is particularly egregious when one considers the fact that these insured individuals are recent mothers confronting the challenges of caring for their newborn children, as well as themselves, during a period that can be emotionally and physically exhausting and in which Plaintiffs and other similarly situated individuals should not be forced to endure the unwarranted denial of critical and needed health insurance coverage.

12. The scheme violates the ACA and Defendants' duties to Plaintiffs and the members of the Classes. Based on the Defendants' conduct and the claims alleged herein, Plaintiffs, on behalf of themselves and the members of the Classes seek to put an end to, and secure monetary redress for, Defendants' wrongful and harmful conduct. Such conduct has been taken in flagrant disregard of the ACA and the right it created for women to access preventive health benefits. Through this suit, Plaintiffs seek to recover, on behalf of themselves and members of the Classes, out-of-pocket expenses incurred for lactation services that should have been covered by the plans, and enjoin Defendants' improper and illegal practices, and recover other and additional relief as the Court deems appropriate and just.

13. Plaintiffs are enrolled in health care plans insured or administered by Defendants. Defendants insure and/or administer health care plans that are Employee Welfare Benefit plans, as that term is defined in 29 U.S.C. § 1002(1)(A), as well as individual and family health care plans offered directly by Defendants, or on an insurance exchange pursuant to the applicable provisions of the ACA ("ACA Exchanges").

14. Because Defendants act as "fiduciaries" of the employee benefit plans they administer, as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), Defendants are obligated to administer plan benefits in accordance with the terms of the plan documents and applicable law. 29 U.S.C. § 1104(a)(1)(D). In administering plan benefits, Defendants must adhere to

ERISA's strict duties of loyalty and care, including the obligation to act solely in the interests of the plan participants and the beneficiaries.  29 U.S.C. §§ 1104(a)(1)(A)(i) and 1104(a)(1)(B).

15.     Notwithstanding these obligations and upon information and belief, at all relevant times, Defendants have administered claims of the plans and other ERISA plan participants and beneficiaries nationwide in a manner contrary to the express terms and purpose of the plans they serve, as well as applicable law.

16.     Defendants' conduct with respect to establishing a network and administering benefits and processing claims has denied participants and beneficiaries (collectively, "participants") in the plans and other plan participants benefits to which those individuals are entitled under the terms of their respective plans.   Moreover, by employing a benefits administration and claims processing system that furthers Defendants' interests, rather than the interests of plan participants, Defendants have breached their ERISA duties of loyalty and care.

17.     As a result of Defendants' unlawful healthcare benefits administration and claims processing practices, hundreds, if not thousands, of ERISA plan participants in the United States, including Plaintiffs, have been: (a) improperly denied lactation and other medical service benefits; (b) forced to pay for lactation and other medical services which should have been approved and paid by the plans Defendants administer; (c) forced to incur unnecessary time and expense in appealing Defendants' improper denials of benefits; and/or (d) subjected to credit disparagement and the prospect of being denied future lactation or other medical services due to outstanding, unpaid medical bills.

18.     In addition to the ACA, the Pregnancy Discrimination Act of 1978 ("PDA") requires health plans to cover maternity-related expenses, and the ACA further requires breastfeeding support and supplies with no-cost sharing on the part of the insured.   Nevertheless, Defendants have failed to provide in-network lactation consultants throughout the United States.   Furthermore, Defendants have refused and continue to refuse to reimburse participants in the plans, such as Plaintiffs, for their expenses incurred after being compelled to seek out-of-network lactation services.

19.     Such conduct violates: the ACA; the ACA's anti-discrimination provisions prohibiting discrimination on the basis of gender; the plan documents which incorporate by reference the ACA's

preventive service provisions; and, ERISA.  Defendants also have been unjustly enriched at Plaintiffs' and the members of the Classes' expense.  Plaintiffs seek monetary and injunctive relief for themselves and the members of the Classes to stop and redress the substantial harms inflicted upon them by Defendants.

**PARTIES**

*Plaintiffs.*

20.     Plaintiff Rachel Condry ("Plaintiff Condry") is an adult individual residing in Oakland, California.  Plaintiff Condry is, and was, at all relevant times, insured by a non-grandfathered UHC Insurance UnitedHealthcare Choice Plus plan through her spouse's employer, Insperity Holdings, Inc. After the birth of her child in February 2015, Plaintiff Condry sought coverage from UHC Insurance for Comprehensive Lactation Benefits, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $556.

21.     Plaintiff Jance Hoy ("Plaintiff Hoy") is an adult individual residing in Montgomery County, Pennsylvania. Plaintiff Hoy is, and was, at all relevant times, an employee of Santander Bank, N.A., a subsidiary of Santander Holdings USA, Inc., and, by virtue of that employment, was a participant in the health benefits plan sponsored and self-funded by Santander Holdings USA, Inc. -- the Santander Holdings USA, Inc. Flexible Benefits Plan, which was administered by UHC Services. After the birth of her child in September 2015, Plaintiff Hoy sought coverage from UHC Services for comprehensive lactation support and counseling, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $345.

22.     Plaintiff Christine Endicott ("Plaintiff Endicott") is an adult individual residing in Glastonbury, Connecticut.  Plaintiff Endicott was, at all relevant times, insured by a non-grandfathered UHC Services UnitedHealthcare Choice Plus plan through her husband's employer, Travelers Companies, Inc.  After the birth of her child in July 2015, Plaintiff Endicott sought coverage from UHC Services for comprehensive lactation support and counseling, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $255.

23.     Plaintiff Laura Bishop ("Plaintiff Bishop") is an adult individual residing in Leander, Texas.  At all relevant times, Plaintiff Bishop was insured by a non-grandfathered UHC Services Choice

8

Plus plan through her employer.  After the birth of her child in July 2015, Plaintiff Bishop sought coverage from UHC Services for comprehensive lactation support and counseling, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $130.

24.     Plaintiff Felicity Barber ("Plaintiff Barber") is an adult individual residing in San Francisco, California.  Plaintiff Barber was, at all relevant times, insured by a non-grandfathered UHC Insurance plan through her husband's employer, EventBrite, Inc.  After the birth of her child in February 2016, Plaintiff Barber sought coverage from UHC Insurance for comprehensive lactation support and counseling, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $590.

25.     Plaintiff Rachel Carroll ("Plaintiff Carroll") is an adult individual residing in Fort Collins, Colorado.   Plaintiff Carroll is, and was, at all relevant times, an employee of Larimer County, and by virtue of that employment was a participant in the health benefits plan sponsored and self-funded by Larimer County -- the Larimer County Employee Benefit Choice Plan, which was administered by UMR.  After the birth of her child in August 2015, Plaintiff Carroll sought coverage from UMR for comprehensive lactation support and counseling, but was denied coverage and not issued any reimbursement, resulting in an out-of-pocket expenditure of $280.

**_Defendants._**

26.     Defendant UnitedHealth Group, a Delaware corporation, is a diversified managed health care company with its principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota.  UnitedHealth Group provides a vast array of healthcare products and services through two business platforms:  the health benefits operating under UnitedHealthcare, Inc. and health services operating under Optum.

27.     Defendant UHC, a subsidiary of UnitedHealth Group with its principal place of business in Minnesota, provides health care benefits to an array of customers and markets through reportable segments, including: UnitedHealthcare Employer & Individual, which serves employers ranging from sole proprietorships to large, multi-site and national employers, public sector employers and other individuals and serves the nation's active and retired military and their families through the TRICARE program; UnitedHealthcare Medicare & Retirement, which delivers health and well-being

benefits for Medicare beneficiaries and retirees; and UnitedHealthcare Community & State, which manages health care benefit programs on behalf of state Medicaid and community programs and their participants.

28.     Defendant UMR, a UnitedHealthcare company domiciled in Delaware, is a third-party administrator of health insurance benefits doing business as: Avidyn Health, Fiserv Health – Kansas, Fiserv Health – Wausau Benefits, UMR, UMR Health Insurance Services, and UMR, Inc. which provide health benefit plans to members of the Classes and Plaintiff Carroll.

29.     Defendant UnitedHealthcare Insurance Company ("UHC Insurance"), doing business as UnitedHealthOne, is one of Defendant UnitedHealth Group's wholly-owned subsidiaries that provides health benefit plans to members of the Classes and Plaintiffs Condry and Endicott.  UHC Insurance is incorporated in Connecticut and has its principal place of business in Hartford, Connecticut.

30.     Defendant UHC Services, a wholly-owned subsidiary of UnitedHealth Group, provides health benefit plans to members of the Classes and to Plaintiffs Hoy and Bishop.  UHC Services is a Minnesota corporation with its principal place of business in Minnesota.  Through and in combination with UHC's subsidiaries, affiliates and agents, it administers health insurance policies for Defendants. UHC Services is in the business of providing health benefit plans and policies of health insurance, including individual health benefit plans, employer-sponsored group health plans, and government-sponsored health benefit plans.  UHC Services is the designated claims administrator for employer-sponsored group health plans.

31.     Defendant UHC's UnitedHealthcare Employer & Individual segment offers an array of consumer health benefit plans and services nationwide, including providing: fully insured health plan product offerings; administrative and other management services to customers that elect to self-fund the health care costs of their employees and employees' dependents; and a variety of insurance options for purchase by individuals, including students.  UnitedHealthcare Employer & Individual offers its products through affiliates that are licensed as insurance companies, health maintenance organizations (HMOs), or third-party administrators (TPAs).  In 2015, UHC's UnitedHealthcare Employer & Individual segment participated in 23 individual and 12 small group state public ACA Exchanges and

in 2016 it participated in individual public ACA Exchange offerings in 34 states.  For 2017, UHC's individual and family marketplace medical policies are offered by Health Plan of Nevada, Inc., UnitedHealthcare of New York, Inc., or UnitedHealthcare of the Mid Atlantic, Inc. (https://www.uhc.com/individual-and-family/understanding-health-insurance/how-insurance-works/health-insurance-marketplace).

32.     Defendants participate in various federal, state and local government health care benefit programs, including as a payer in Medicare Advantage, Medicare Part D, various Medicaid programs, Children's Health Insurance Programs (CHIP), and through a TRICARE contract with the Department of Defense which provides health insurance for the nation's active and retired military and their families.  UnitedHealth Group states that it "receive[s] substantial revenues from these programs." 2015 Form 10-K, UnitedHealth Group, at p. 16, https://www.sec.gov/Archives/edgar/data/731766/000073176616000058/unh2015123110-k.htm (last visited 1/11/2017).

33.     Defendant UHC's UnitedHealthcare Military & Veterans business is the provider of health care services for nearly 3 million active duty and retired military service members and their families in 21 states under the Department of Defense's (DoD) TRICARE Managed Care Support contract.  UHC's TRICARE contract began on April 1, 2013 and continues through at least 2017.  *See also, infra,* ¶¶169-172.

34.     In addition, Defendant UHC's UnitedHealthcare Medicare & Retirement segment provides health insurance services, among other things, to individuals age 50 and older.  Premium revenues from the Centers for Medicare & Medicaid Services (CMS) represented 26% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2015, most of which were generated by UnitedHealthcare Medicare & Retirement.   *See* 2015 Form 10-K, UnitedHealth Group, at p. 4.

35.     Further, Defendants provide Federal Employee Program (FEP) health plan benefits to federal employees through various health plans, including UnitedHealthcare of California and United Healthcare Insurance Company, Inc.[3]

36.     Other UnitedHealth Group subsidiaries that provide health benefit plans to members of the Classes include the following entities:

| Name of Entity | Doing Business As (if different) |
| --- | --- |
| All Savers Insurance Company | |
| AmeriChoice Corporation | |
| AmeriChoice Health Services, Inc. | |
| AmeriChoice of Connecticut, Inc. | |
| AmeriChoice of New Jersey, Inc. | UnitedHealthcare Community Plan |
| Harken Health Insurance Company | |
| Health Net Insurance of New York, Inc. | |
| Health Plan of Nevada, Inc. | |
| MAMSI Insurance Resources, LLC | |
| MAMSI Life and Health Insurance Company | MAMSI LIFE AND HEALTH MLH |
| Medica Health Plans of Florida, Inc. | EZ Care |
| Medica HealthCare Plans, Inc. | |
| Oxford Health Insurance, Inc. | |
| Oxford Health Plans (CT), Inc. | |
| Oxford Health Plans (NJ), Inc. | |
| Oxford Health Plans (NY), Inc. | |
| Oxford Health Plans LLC | Oxford Agency - Oxford Health Plans Inc. |
| PacifiCare Life and Health Insurance Company | UnitedHealthOne |
| PacifiCare of Arizona, Inc. | PacifiCare Secure Horizons |
| PacifiCare of Colorado, Inc. | Comprecare, Inc. Secure Horizons |
| PacifiCare of Nevada, Inc. | PacifiCare Secure Horizons |

---

[3]     The Federal Employees Health Benefits Program (FEHBP) was established by the Federal Employees Health Benefits Act ("FEHB Act"), which was created to provide health insurance benefits for federal employees, annuitants, and qualified dependents.

| | |
|---|---|
| Sierra Health and Life Insurance Company, Inc. | |
| Sierra Health Services, Inc. | Sierra Military Health Services, LLC |
| UHC of California | PacifiCare<br>PacifiCare of California<br>Secure Horizons<br>UnitedHealthcare of California |
| Unison Health Plan of Delaware, Inc. | UnitedHealthcare Community Plan |
| Unison Health Plan of the Capital Area, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare Benefits of Texas, Inc. | PacifiCare<br>Secure Horizons |
| UnitedHealthcare Benefits Plan of California | |
| UnitedHealthcare Community Plan of California, Inc. | |
| UnitedHealthcare Community Plan of Georgia, Inc. | |
| UnitedHealthcare Community Plan of Ohio, Inc. | Unison<br>Unison ABD Plus<br>Unison Advantage<br>Unison Health Plan<br>Unison Kids |
| UnitedHealthcare Community Plan of Texas, L.L.C. | United Healthcare - Texas<br>UnitedHealthcare Comminity Plan |
| UnitedHealthcare Community Plan, Inc. | |
| UnitedHealthcare Insurance Company of Illinois | |
| UnitedHealthcare Insurance Company of New York | |
| UnitedHealthcare Insurance Company of the River Valley | |
| UnitedHealthcare of Alabama, Inc. | |
| UnitedHealthcare of Arizona, Inc. | |
| UnitedHealthcare of Arkansas, Inc. | Complete Health |
| UnitedHealthcare of Colorado, Inc. | MetraHealth Care Plan |
| UnitedHealthcare of Florida, Inc. | AMERICHOICE<br>EVERCARE AT HOME<br>OPTUMHEALTH<br>OVATIONS |
| UnitedHealthcare of Georgia, Inc. | United HealthCare of Georgia |
| UnitedHealthcare of Illinois, Inc. | |

SECOND AMENDED CLASS ACTION COMPLAINT

| | |
|---|---|
| UnitedHealthcare of Kentucky, Ltd. | United HealthCare of Kentucky, L.P. |
| UnitedHealthcare of Louisiana, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare of Mississippi, Inc. | |
| UnitedHealthcare of New England, Inc. | |
| UnitedHealthcare of New Mexico, Inc. | |
| UnitedHealthcare of New York, Inc. | UnitedHealthcare Community Plan |
| UnitedHealthcare of North Carolina, Inc. | |
| UnitedHealthcare of Ohio, Inc. | |
| UnitedHealthcare of Oklahoma, Inc. | PacifiCare<br>PacifiCare Health Options<br>PacifiCare of Oklahoma<br>Secure Horizons |
| UnitedHealthcare of Oregon, Inc. | Secure Horizons |
| UnitedHealthcare of Pennsylvania, Inc. | |
| UnitedHealthcare of Texas, Inc. | |
| UnitedHealthcare of the Mid-Atlantic, Inc. | |
| UnitedHealthcare of the Midlands, Inc. | |
| UnitedHealthcare of the Midwest, Inc. | |
| UnitedHealthcare of Utah, Inc. | UnitedHealthcare of Idaho, Inc. |
| UnitedHealthcare of Washington, Inc. | PacifiCare<br>Secure Horizons<br>UnitedHealthcare Community Plan |
| UnitedHealthcare of Wisconsin, Inc. | UnitedHealthcare of Wisconsin -<br>Personal Care Plus |
| UnitedHealthcare Plan of the River Valley, Inc. | |

37.     Whenever in this Second Amended Complaint reference is made to any act, deed or transaction of one of the Defendants, the allegation is imputed to its officers, directors, agents, employees or representatives.

## JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action based on diversity of citizenship under the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2).   The amount in controversy, exclusive of interest and costs, exceeds the sum or value of five million dollars ($5,000,000) and this is a class action in which members of the Classes are citizens of states different

from Defendants.  Further, greater than two-thirds of the members of the Classes reside in states other than the state in which Defendants are citizens.

39.     This Court also has federal question subject matter jurisdiction based on the ACA claims asserted herein.

40.     In addition, this action is brought under ERISA.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). Moreover, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), provides for nationwide service of process. All Defendants are residents of the United States and subject to service in the United States, and this Court, therefore, has personal jurisdiction over them. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because Defendants reside or may be found in this District.

41.     This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in this District.  Each Defendant systematically and continuously conducts business in California and otherwise has minimum contacts with California sufficient to establish personal jurisdiction.  Each Defendant: is authorized to do business and is conducting business throughout the United States, including in this District; is authorized to market and sell, and has in fact marketed and sold health insurance and healthcare products to citizens in this District; has sufficient minimum contacts with the various states of the United States, including in this District; and/or sufficiently avails itself of the markets of the various states of the United States, including in this District, through its promotion, sales, and marketing within the United States, including in this District, to render the exercise of personal jurisdiction by this Court permissible.

42.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District. Venue is also proper because Defendants are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through promotion, marketing, and sales in this District.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FACTUAL ALLEGATIONS**

**A.      Breastfeeding is a National Public Health Policy.**

43.      The protection, promotion and support of breastfeeding have been a national public policy for over 25 years.  In October 2000, former Surgeon General David Satcher, M.D., Ph.D., issued the *HHS Blueprint for Action on Breastfeeding,* then reiterating the commitment of previous Surgeons General to support breastfeeding as a public health goal. *See* http://www.pnmc-hsr.org/wp-content/uploads/2011/01/BreastfeedingBlueprint.pdf (last visited 1/11/2017).

44.      Breastfeeding, with its many known health benefits for infants, children, and mothers, is a key strategy to improve public health. According to the CDC, breastfeeding is one of the most effective preventive measures mothers can take to protect their health and that of their children. CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies*. Atlanta: U.S. Department of Health and Human Services, 2013, available at: http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF  (last visited 1/11/2017).

45.      In 2011, Regina M. Benjamin, M D., M.B.A., Vice Admiral U.S. Public Health Service Surgeon General, and Kathleen Sebelius, the then-HHS Secretary, jointly issued the *HHS Call to Action* specifying the society-wide responsibilities to encourage and support breastfeeding ("*HHS Call to Action*").  HHS, *The Surgeon General's Call to Action to Support U.S. Department of Health and Human Services*, 2011, available at: http://www.ncbi.nlm.nih.gov/books/NBK52682/pdf/Bookshelf_NBK52682.pdf (last visited 1/11/2017).

46.      Further, numerous prominent medical organizations, including, but not limited to, the American Academy of Pediatrics, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American College of Nurse-Midwives, the American Dietetic Association, and the American Public Health Association, recommend that breastfeeding commence immediately upon birth and continue uninterrupted until the child's first birthday. *HHS Call to Action*, *supra*, p. 4.

47.      Therefore, access to and coverage for Comprehensive Lactation Benefits advances the long-held public policy goal to improve the health of Americans by increasing access and diminishing

the cost barriers to sustained breastfeeding during the first year of a child's life.  As detailed in the *HHS Call to Action*:

(A)     the American Academy of Pediatrics stated, "Human milk is species-specific, and all substitute feeding preparations differ markedly from it, making human milk uniquely superior for infant feeding. Exclusive breastfeeding is the reference or normative model against which all alternative feeding methods must be measured with regard to growth, health, development, and all other short- and long-term outcomes." *HHS Call to Action*, *supra*, p. 5.

(B)     "The health effects of breastfeeding are well recognized and apply to mothers and children in developed nations such as the United States as well as to those in developing countries. Breast milk is uniquely suited to the human infant's nutritional needs and is a live substance with unparalleled immunological and anti-inflammatory properties that protect against a host of illnesses and diseases for both mothers and children." *Id*. at p. 1.

(C)     Quality sustained breastfeeding provides health benefits to the mother, including lowered risk of breast and ovarian cancers, and long term health benefits to the infant, which in turn enhance the health of society and decrease costs due to poor childhood and adult health. Breast-fed babies suffer lower rates of hospitalizations for lower respiratory tract diseases in the first year, gastrointestinal infection, acute ear infection, Sudden Infant Death Syndrome, childhood leukemia, asthma, type 2 diabetes, and childhood obesity. *Id.* at p. 2.

48.     The *HHS Call to Action* also cited psychological, economic and environmental benefits attributed to breastfeeding, specifically, that breastfeeding may reduce the risk of postpartum depression; families who follow optimal breastfeeding practices could save more than $1,200 to $1,500 a year in expenditures for infant formula in the first year alone; If 90% of U.S. families followed guidelines to breastfeed exclusively for six months, the US would save $13 billion annually from reduced direct medical and indirect costs[4] and the cost of premature death; if 80% of U.S.

---

[4]     Costs related to illnesses reduced or avoided through breastfeeding include: sudden infant death syndrome, hospitalizations for lower respiratory tract infection in infancy, atopic dermatitis, childhood leukemia, childhood obesity, childhood asthma and type 1 diabetes mellitus.

families followed the guidelines, $10.5 billion a year would be saved; and, environmentally, breastfeeding requires minimal additional resources (a small amount of additional calories is all that is required) compared to infant formula which requires a significant carbon footprint of energy to produce formula, paper containers to store and ship that largely end up in landfills and fuel to prepare, ship and store. *Id.* at pp. 3-4.

49.    Various studies conducted by states in the context of Medicaid coverage of lactation services also demonstrate the need and reason for coverage of Comprehensive Lactation Benefits as a preventive health care benefit.  North Carolina estimated that covering lactation consultations would prevent 14-18 infant deaths and save North Carolina Medicaid $7 million in treating common and sometimes lethal infancy infections,  http://www.ncleg.net/DocumentSites/Committees/NCCFTF/Perinatal%20Health/2014-2015/PHC%20-%20Lactation%20Cost%20Benefit%20Estimates.pdf   (last visited 1/12/2017).

50.    Furthermore, the importance of education is a central theme in the *HHS Call to Action:*

> "Unfortunately, education about breastfeeding is not always readily available to mothers nor easily understood by them. Many women rely on books, leaflets, and other written materials as their only source of information on breastfeeding, but using these sources to gain knowledge about breastfeeding can be ineffective, especially for low income women, who may have more success relying on role models. *The goals for educating mothers include increasing their knowledge and skills relative to breastfeeding and positively influencing their attitudes about it."*

*HHS Call to Action*, *supra*, p. 11 (emphasis added).

51.    The *HHS Call to Action* also highlighted that mothers need "access to trained individuals who have established relationships with members of the health care community, are flexible enough to meet mother's needs outside of the traditional work hours and locations, and provide consistent information." *Id.* Yet, outside of the hospital setting, mothers "may have no means of identifying or obtaining the skilled support needed to address their concerns about lactation and breastfeeding; further, there may be barriers to reimbursement for needed lactation care and services." *Id.* at p. 25.

52.    According to the *HHS Call to Action,* International Board Certified Lactation Consultants ("IBCLCs") are credentialed health care professionals specializing in the clinical

18

management of breastfeeding certificated by the International Board of Lactation Consultant Examiners which operates "under the direction of the U.S. National Commission for Certifying Agencies and maintains rigorous professional standards" and are the "only health care professionals certified in lactation management." *Id.* at p. 27.   IBCLCs work in many health care settings, such as hospitals, birth centers, physicians' offices, public health clinics, and their own offices.  There are over 15,000 certified IBCLCs in the United States and the average lactation consultation ranges from $120 - $350 per session, based on location.

53.     In 2013, the CDC set objectives, illustrated in the chart below, to promote, support, and ultimately increase breastfeeding rates in the United States by 2020.  *See* CDC, *Strategies to Prevent Obesity and Other Chronic Diseases: The CDC Guide to Strategies to Support Breastfeeding Mothers and Babies*. Atlanta: HHS; 2013, available at:  http://www.cdc.gov/breastfeeding/pdf/BF-Guide-508.PDF (last visited 1/11/2017).

| **Healthy People 2020** Objectives | | |
|---|---|---|
| Maternal, Infant, and Child Health (MICH) Objectives | Baseline | Target |
| MICH 21: Increase the proportion of infants who are breastfed | | |
| Ever | 74.0% | 81.9% |
| At 6 months | 43.5% | 60.6% |
| At 1 year | 22.7% | 34.1% |
| Exclusively through 3 months | 33.6% | 46.2% |
| Exclusively through 6 months | 14.1% | 25.5% |

54.     Over the past few decades, the rate of breastfeeding has increased, but disparities have persisted. Research suggests that (1) race and ethnicity are associated with breastfeeding regardless of income, and (2) income is associated with breastfeeding regardless of race or ethnicity.



"5 Reasons American Women Won't Breastfeed," *Wall Street Journal*, April 14, 2014, available at: http://blogs.wsj.com/briefly/2014/04/14/5-reasons-american-women-wont-breastfeed/ (last visited 1/11/2017).

55.     As reported on September 3, 2016 by *The New York Times* Editorial Board, in "America's Shocking Maternal Deaths," the rate at which women die during pregnancy or shortly after childbirth *has risen* materially in the United States, with the United States having the second-highest maternal mortality rate among 31 members of the Organization for Economic Cooperation and Development; only Mexico had a higher rate. For example, in Texas, "the maternal mortality rate doubled from 17.7 per 100,000 live births in 2000 to 35.8 in 2014. *See* https://www.nytimes.com/2016/09/04/opinion/sunday/americas-shocking-maternal-deaths.html?_r=0 (last visited 1/11/2017).  Compare that with Germany, which had 4.1 deaths per 100,000 live births in 2014."  As the article asserted: "A big part of the problem is the inequality embedded in America's health care system. The [ACA] made health insurance more available, but millions of families still cannot afford the care they need." The inequality of the United States health care system exists directly because of conduct of the type alleged herein: insurers' bolstering their bottom lines by avoiding costs of mandated women's health care services and shifting the cost, which is more than just dollars and cents, to women.

56.     Addressing the pervasive disparities that existed (and continue to exist) in the American health care system and securing for all women and families the immense health benefits of

breastfeeding are the impetuses of the preventive service mandates of the ACA and its inclusion of providing access to and coverage of Comprehensive Lactation Benefits.

### B.   Breastfeeding and Comprehensive Lactation Benefits Are Time-Sensitive.

57.   Importantly, and obviously, breastfeeding *is an extremely time-sensitive event*. Initiating breastfeeding within the first hours and days of a newborn's life can significantly impact its success. *HHS Call to Action*, *supra*, pp. 21-22.

58.   Moreover, the need for Comprehensive Lactation Benefits often arises days after birth, when the mother and child are home, and during this postpartum period the provision of Comprehensive Lactation Benefits is essential to the continuation of successful breastfeeding. *Id.* at p. 13. Further, continuation of breastfeeding upon illness or a mother's return to work presents another critical milestone; it is at such times that a mother may seek Comprehensive Lactation Benefits, as well as access to breastfeeding pumps. *Id.* at pp. 29-32.

59.   Lactation support, encouragement, education and counseling must be timely and occur during pregnancy, at the time of birth, and until the child is weaned. Lactation equipment may be necessary immediately following birth, at one or several times during the first year, or continuously during the first year.   Immediate access to lactation services and products is critical because the window to address such needs is narrow.

### C.   The Pregnancy Discrimination Act.

60.   Since 1978, the PDA has required employers of 15 or more employees that choose to provide their employees with health insurance to cover pregnancy-related expenses.

61.   As explained by the United States Equal Employment Opportunity Commission:

> The Pregnancy Discrimination Act amended Title VII of the Civil Rights Act of 1964. Discrimination on the basis of pregnancy, childbirth, or related medical conditions constitutes unlawful sex discrimination under Title VII, which covers employers with 15 or more employees, including state and local governments. Title VII also applies to employment agencies and to labor organizations, as well as to the federal government. Women who are pregnant or affected by pregnancy-related conditions must be treated in the same manner as other applicants or employees with similar abilities or limitations.

Title VII's pregnancy-related protections include:

. . .

**• Health Insurance**
Any health insurance provided by an employer must cover expenses for pregnancy-related conditions on the same basis as costs for other medical conditions. An employer need not provide health insurance for expenses arising from abortion, except where the life of the mother is endangered.

Pregnancy-related expenses should be reimbursed exactly as those incurred for other medical conditions, whether payment is on a fixed basis or a percentage of reasonable-and-customary-charge basis.

The amounts payable by the insurance provider can be limited only to the same extent as amounts payable for other conditions. No additional, increased, or larger deductible can be imposed.

Employers must provide the same level of health benefits for spouses of male employees as they do for spouses of female employees.

The U.S. Equal Employment Opportunity Commission, *Facts About Pregnancy Discrimination*, Sept. 8, 2008, *available at* https://www.eeoc.gov/facts/fs-preg.html (last visited Sept. 29, 2016).

**D.      Comprehensive Lactation Benefits Are a Preventive Service Required by the ACA.**

62.      In 2010, the ACA expanded the maternity-related coverage requirement to all new individual and small group policies.  42 U.S.C. § 18022(b)(1)(D).  Thus, beginning August 1, 2012, unless grandfathered, all health insurance plans, including employer-sponsored health plans, must cover, with no charge to the patient for "a copayment, coinsurance or deductible for those services when they are delivered by a network provider," "[c]omprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment." U.S. Department of Health and Human Services, Health Resource and Services Administration, *Women's Preventive Services Guidelines*, *available at* http://www.hrsa.gov/womensguidelines/ (last visited Sept. 29, 2016); 29 C.F.R. 2590.715-2713.  Section 715 of ERISA, 29 U.S.C. § 1185d, incorporates the pertinent requirements of the ACA into ERISA.

63.      Section § 2713 of the ACA, which is codified at 42 U.S.C. § 300gg-13, requires non-grandfathered group health care plans and health insurers offering group or individual health insurance to provide coverage for a range of preventive services and mandates that the plans, "at a minimum

provide coverage for and shall not impose any cost sharing requirements" for such services. Specifically, the ACA provides the following, in relevant part:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . (4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph...

42 U.S.C. § 300gg-13(a)(4).

64.     The term "cost-sharing" "in general" includes "deductibles, co-insurance, copayments, or similar charges; and any other expenditure required of an insured individual which is a qualified medical expense….with respect to essential health benefits covered under the plan." 42 U.S.C § 18022(c)(3)(A).

65.     The required preventive services derive from recommendations made by four expert medical and scientific bodies – the USPSTF, the Advisory Committee on Immunization Practices, the HRSA, and the IOM committee on women's clinical preventive services. The USPSTF is an independent panel of 16 nationally-recognized experts in primary care and prevention who systematically review the evidence of effectiveness and develop recommendations for clinical preventive services. The panel is convened by the Agency for Healthcare Research and Quality, which is part of HHS.  Recommendations issued by the USPSTF are considered to be the "gold standard" for clinical preventive services. When analyzing a particular preventive service, the USPSTF evaluates the balance of potential benefits against harms, and then assigns a letter grade to the service. A letter grade of "A" or "B" means the service is recommended.[5]  In its Final Recommendation Statement issued in October 2008, USPSTF recommended "intervention during pregnancy and after birth to promote and support breastfeeding" with a grade B.[6]

---

[5]     *See* USPSTF, www.uspreventiveservicestaskforce.org/Page/Name/grade-definitions  (last visited 1/11/2017).
[6]     USPSTF, www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/ breastfeeding-counseling  (last visited 1/11/2017).

66.     On October 25, 2016, an updated Evidence Report and Systematic Review with respect to Primary Care Interventions to Support Breastfeeding was issued updating the 2008 review (http://jamanetwork.com/journals/jama/fullarticle/2571248 (last visited 11/18/2016)), and the USPSTF again recommended, after reviewing the evidence on the effectiveness of interventions to support breastfeeding, "providing interventions during pregnancy and after birth to support breastfeeding (B recommendation)." http://jamanetwork.com/journals/ jama/fullarticle /2571249?resultClick=1 (last visited 1/11/2017). The USPSTF reiterated the importance and effectiveness of Comprehensive Lactation Benefits as follows:

> There is convincing evidence that breastfeeding provides substantial health benefits for children and adequate evidence that breastfeeding provides moderate health benefits for women. However, nearly half of all mothers in the United States who initially breastfeed stop doing so by 6 months, and there are significant disparities in breastfeeding rates among younger mothers and in disadvantaged communities.
> *     *     *
> Adequate evidence indicates that interventions to support breastfeeding increase the duration and rates of breastfeeding, including exclusive breastfeeding.

67.     The USPSTF recommendations are specifically incorporated into Section 2713 of the Public Health Service Act (29 CFR 2590.715-2713) as follows:

> [Non-grandfathered health plans] must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements…:
>> **(i)** Evidenced-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force with respect to the individual involved…;
>> *     *     *
>> **(iv)** With respect to women…evidence-informed preventive care and screening provided for in comprehensive guidelines supported by the Health Resources and Services Administration ….

68.     The comprehensive HRSA Guidelines, Women's Preventive Services: Required Health Plan Coverage Guidelines, were adopted and released on August 1, 2012, and expanded the previously required intervention to promote and support breastfeeding by specifically requiring new plans, as of

August 1, 2012, to cover comprehensive prenatal and postnatal lactation support and counseling, and breastfeeding equipment and supplies, such as breast pumps, for the duration of breastfeeding.[7]

69.    Section 1001 of the ACA amends § 2713 of the Public Health Services Act to provide that all non-grandfathered group health plans and health insurance issuers offering group or individual coverage are required to cover one hundred percent (100%) of the costs of certain recommended preventive services for women, including "comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment for the duration of breastfeeding."[8]

70.    The ACA requirement mandating comprehensive prenatal and postnatal lactation support, supplies, and counseling applies to *all* private plans – including individual, small group, large group, and self-insured plans in which employers contract administrative services to a third-party payer – with the exception of those plans that maintain "grandfathered" status.

71.    The DOL, HHS, and the Treasury Department (the "Departments") are charged with establishing regulations and guidelines that specify the implementation of the ACA. The Departments have jointly prepared Frequently Asked Questions ("FAQs") regarding the implementation of the ACA, including FAQs regarding preventive services and Comprehensive Lactation Benefits.  These FAQs are publicly available, including through the DOL and CMS websites.

72.    In the FAQs Part XXIX, dated October 23, 2015, the Departments reiterated previous guidance and "answer[ed] questions from stakeholders to help people understand the laws and benefit from them, as intended." *See* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-xxix.pdf (last visited 10/18/2016).

73.    Questions 1 through 5 of the FAQs Part XXIX, which specifically address Comprehensive Lactation Benefits under the ACA are provided here (emphasis added):

---

[7]    *See* HHS, Women's Preventive Services Guidelines, available at https://www.hrsa.gov/womensguidelines/ (last visited 1/11/2017).
[8]    *See* FAQs About Affordable Care Act Implementation (Part XII), Q20, which states that "coverage of comprehensive lactation support and counseling and costs of renting or purchasing breastfeeding equipment extends for the duration of breastfeeding," available at www.dol.gov/ebsa/faqs/faq-aca12.html   and   www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/aca_implementation_ faqs12.html (last visited 10/10/2016).

**Q1: Are plans and issuers required to provide a list of the lactation counseling providers within the network?**

*Yes.* The HRSA guidelines provide for coverage of comprehensive prenatal and postnatal lactation support, counseling, and equipment rental as part of their preventive service recommendations, including lactation counseling…group health plans subject to the Employee Retirement Income Security Act (ERISA)…must provide a Summary Plan Description (SPD) that describes provisions governing the use of network providers, *the composition of the provider network,* and whether, and under what circumstances, coverage is provided for out-of-network services …issuers of qualified health plans (QHPs) in the individual market Exchanges and the SHOPs currently *must make their provider directories available online.*

**Q2:** My group health plan has a network of providers and covers recommended preventive services without cost sharing when such services are obtained in-network. **However, the network does not include lactation counseling providers. Is it permissible for the plan to impose cost sharing with respect to lactation counseling services obtained outside the network?**

*No.* As stated in a previous FAQ, while nothing in the preventive services requirements under section 2713 of the PHS Act or its implementing regulations requires a plan or issuer that has a network of providers to provide benefits for preventive services provided out-of-network*, these requirements are premised on enrollees being able to access the required preventive services from in-network providers*…if a plan or issuer does not have in its network a provider who can provide a particular service, then the plan or issuer must cover the item or service when performed by an out-of-network provider and not impose cost sharing with respect to the item or service. Therefore, if a plan or issuer does not have in its network a provider who can provide lactation counseling services, the plan or issuer must cover the item or service when performed by an out-of-network provider without cost sharing.

**Q3: The State where I live does not license lactation counseling providers and my plan or issuer will only cover services received from providers licensed by the State. Does that mean that I cannot receive coverage of lactation counseling without cost sharing?**

*No.* Subject to reasonable medical management techniques, *lactation counseling must be covered* without cost sharing by the plan or issuer when it is performed by any provider acting within the scope of his or her license or certification under applicable State law. Lactation counseling could be provided by another provider acting within the scope of his or her license or certification (for example, a registered nurse), and the plan or issuer would be required to provide coverage for the services without cost sharing.

**Q4: A plan or issuer provides coverage for lactation counseling without cost sharing only on an inpatient basis. Is it permissible for the plan or issuer to impose cost sharing with respect to lactation counseling received on an outpatient basis?**

SECOND AMENDED CLASS ACTION COMPLAINT

*No*. If a recommendation or guideline does not specify the frequency, method, treatment, or setting for the provision of a recommended preventive service, then the plan or issuer may use reasonable medical management techniques to determine any such coverage limitations. However, ***it is not a reasonable medical management technique to limit coverage for lactation counseling to services provided on an in-patient basis***. Some births are never associated with a hospital admission (e.g., home births assisted by a nurse midwife), and it is not permissible to deny coverage without cost sharing for lactation support services in this case. Moreover*, **coverage for lactation support services without cost sharing must extend for the duration of the breastfeeding which, in many cases, extends beyond the in-patient setting for births that are associated with a hospital admission.***

**Q5: Are plans and issuers permitted to require individuals to obtain breastfeeding equipment within a specified time period (for example, within 6 months of delivery) in order for the breastfeeding equipment to be covered without cost sharing?**

***No. The requirement to cover the rental or purchase of breastfeeding equipment without cost sharing extends for the duration of breastfeeding***, provided the individual remains continuously enrolled in the plan or coverage.[9]

74.    Among other things, the FAQs confirm that:

(A)    Defendants are required to provide a list of in-network lactation consultants.

(B)    If a plan does not have in-network lactation consultant providers, the plan may not impose cost sharing for lactation consulting services obtained out of network.

(C)    Plans may not limit lactation counseling services to an in-patient basis.

(D)    Coverage for lactation support services must extend for the duration of breastfeeding.

(E)    Plans may not require individuals to obtain equipment within a specified time period, such as within six months of delivery, in order for it to be covered without cost sharing.

---

[9]    *See* CMS, *"FAQs About Affordable Care Act Implementation (Part XXIX) And Mental Health Parity Implementation" (10/23/2015), Q1-5*, available at: https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/FAQs-Part-XXIX.pdf (last visited /1/11/2017).

75.     Having in-network providers of the required preventive service is key and is highlighted in the following relevant subsections of 29 CFR 2590.715-2713(a)(3) (titled "Coverage of preventive health services") (emphasis added):

> (3) *Out-of-network providers* - (i) Subject to paragraph (a)(3)(ii) of this section, nothing in this section requires a plan or issuer *that has a network of providers to provide benefits for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider*. Moreover, nothing in this section precludes a plan or issuer *that has a network of providers from imposing cost-sharing requirements for items or services described in paragraph (a)(1) of this section that are delivered by an out-of-network provider*.  (ii) If a plan or issuer does not have in its network a provider who can provide an item or service described in paragraph (a)(1) of this section, the plan or issuer must cover the item or service when performed by an out-of-network provider, and may not impose cost sharing with respect to the item or service.

76.     Plainly, absent a network, Plaintiffs and the members of the Classes cannot be deemed by Defendants to have chosen to have gone "out-of-network" for the services, yet that is precisely what Defendants have done in their administration of the preventive benefit.

77.     Defendants have forced Plaintiffs and the members of the Classes to either forego the preventive services or go "out-of-network" and pay the price.  This practice violates the ACA, the anti-discrimination provisions of the ACA, the terms of the plan documents and ERISA.

78.     Further supporting the principle that an insured can only be the subject of cost sharing for preventive services performed by an out-of-network provider when the insured is presented with a "choice" of using an in-network provider for such services is the following excerpt from the July 19, 2010 Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act:

> "Plans and issuers negotiate allowed charges with in-network providers as a way to promote effective, efficient health care, and allowing differences in cost sharing in- and out-of-network enables plans to encourage use of in-network providers. Allowing zero cost sharing for out of network providers could reduce providers' incentives to participate in insurer networks. The Departments decided that permitting cost sharing for recommended preventive services provided by out-of-network providers is the appropriate option to preserve choice of providers for individuals, while avoiding potentially larger increases in costs and transfers as well as potentially lower quality care."

75 Fed. Reg. 41726, 41738 (July 19, 2010) (to be codified at 26 CFR 54, 29 CFR 2590 and 45 CFR 147) (emphasis added).

    **E.**    **Defendants Have Engaged in a Systemic Practice With Respect to Comprehensive Lactation Benefits that Violates the Preventive Service Mandates of the ACA, Plan Provisions and ERISA.**

    79.    Defendants provide, and serve administrators for, non-grandfathered health plans that are required to cover certain preventive health services and screenings mandated by the ACA, including Comprehensive Lactation Benefits, as alleged *supra*.

    80.    In Defendants' Preventive Care Services, Commercial Coverage Determination Guideline (Effective 10/1/2016), Defendants acknowledge that the HHS requirements, for plan years beginning on or after August 1, 2012, include specifically the "Expanded Women's Preventive Health" service of "Breastfeeding Support, Supplies, and Counseling," and characterize their coverage of such services as purportedly "comprehensive":[10]

---

[10]    https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/Medical%20Policies/Medical%20Policies/Preventive_Care_Services_CD.pdf (last visited 1/10/2017).

# UnitedHealthcare®

**UnitedHealthcare® Commercial**
**Coverage Determination Guideline**

# PREVENTIVE CARE SERVICES

**Guideline Number:** CDG.016.12                          **Effective Date:** October 1, 2016

**Table of Contents**                                         **Page**
INSTRUCTIONS FOR USE ........................................ 1
BENEFIT CONSIDERATIONS ................................... 1
COVERAGE RATIONALE............................................ 2
DEFINITIONS ............................................................. 5
APPLICABLE CODES ................................................. 6
REFERENCES ..........................................................45
GUIDELINE HISTORY/REVISION INFORMATION ..........45

**Related Commercial Policies**
- Breast Imaging for Screening and Diagnosing Cancer
- Cardiovascular Disease Risk Tests
- Computed Tomographic Colonography
- Cytological Examination of Breast Fluids for Cancer Screening
- Fecal DNA Testing
- Genetic Testing for Hereditary Breast Ovarian Cancer Syndrome (HBOC)
- Preventive Medicine and Screening Policy
- Vaccines

## INSTRUCTIONS FOR USE

This Coverage Determination Guideline provides assistance in interpreting UnitedHealthcare benefit plans. When deciding coverage, the member specific benefit plan document must be referenced. The terms of the member specific benefit plan document [e.g., Certificate of Coverage (COC), Schedule of Benefits (SOB), and/or Summary Plan Description (SPD)] may differ greatly from the standard benefit plan upon which this Coverage Determination Guideline is based. In the event of a conflict, the member specific benefit plan document supersedes this Coverage Determination Guideline. All reviewers must first identify member eligibility, any federal or state regulatory requirements, and the member specific benefit plan coverage prior to use of this Coverage Determination Guideline. Other Policies and Coverage Determination Guidelines may apply. UnitedHealthcare reserves the right, in its sole discretion, to modify its Policies and Guidelines as necessary. This Coverage Determination Guideline is provided for informational purposes. It does not constitute medical advice.

UnitedHealthcare may also use tools developed by third parties, such as the MCG™ Care Guidelines, to assist us in administering health benefits. The MCG™ Care Guidelines are intended to be used in connection with the independent professional medical judgment of a qualified health care provider and do not constitute the practice of medicine or medical advice.

**Expanded Women's Preventive Health**
*These are the requirements of Health and Human Services for plan years that begin on or after 8/1/12.*

*For additional services covered for women, see the Preventive Care Services table above. Certain codes may not be payable in all circumstances due to other policies or guidelines.*

| Service: | Code(s): | Preventive Benefit Instructions: |
|---|---|---|
| **Breastfeeding Support, Supplies, and Counseling** <br><br> HHS Requirement: Breastfeeding support, supplies, and counseling: Comprehensive lactation support and counseling, from a trained provider, during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment, in conjunction with each birth. | Support and Counseling: **Procedure Code(s):** <br> • S9443 <br> • 99241, 99242, 99243, 99244, 99245 <br> • 99341, 99342, 99343, 99344, 99345 <br> • 99347, 99348, 99349, 99350 <br><br> *Also see the codes in the* ***Wellness Examinations*** *section of the Preventive Care Services table above.* <br><br> **Diagnosis Code(s):** <br> • *ICD-10:* Z39.1 <br><br> Breast Pump Equipment & Supplies: **Procedure Code(s):** <br> *Personal Use Electric:* <br> • E0603 <br> *Breast Pump Supplies:* <br> • A4281, A4282, A4283, A4284, A4285, A4286 <br><br> **Diagnosis Code(s):** <br> • Pregnancy Diagnosis Code (see Pregnancy Diagnosis Code list above), **OR** <br> • *ICD-10:* Z39.1 | Support and Counseling: <br> • The Diagnosis Code listed in this row is required for   99241 – 99245, 99341 – 99345, and 99347 – 99350 <br> • The Diagnosis Code listed in this row is not required for S9443 <br><br><br><br><br> Breast Pump Equipment & Supplies: <br> • E0603 is limited to one purchase per birth. <br> • E0603, and A4281 – A4286 are payable as preventive with at least one of the diagnosis codes listed in this row. |

SECOND AMENDED CLASS ACTION COMPLAINT

81.     Moreover, in Defendants' "network bulletin" dated May 2013, which provides information to health care professionals and facilities, Defendants even acknowledge the need to "expand" their reimbursement policy to "align[] UnitedHealthcare more closely with CMS and CPT Guidance" and created the "Nonphysician Healthcare Professionals Billing Evaluation and Management Codes Policy" which included, as a separate specialist, "Lactation specialist":



(http://www.uhc-networkbulletin.com/page.aspx?QS=2e4c31a3756cb940c68abdcab6ee94c2b436a3366fc7c38bdf3821e856bbad80, last visited 11/17/2016).

82.     In addition, Defendants' health plans and plan documents set forth that non-grandfathered health plans provide preventive care benefits consistent with the provisions of the ACA, including for breastfeeding support, supplies and consultation. For example, Plaintiff Condry's Certificate of Coverage provides the following, which specifically tracks the ACA Preventive Services mandate, and cites to sources that acknowledge coverage for comprehensive breastfeeding support as a preventive care service:

### 21. Preventive Care Services

Benefits for preventive care that are payable at 100% of Eligible Expenses (without application of any Copayment, Coinsurance, or deductible) apply to the following:

- Evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the *United States Preventive Services Task Force*. 

- Immunizations that have in effect a recommendation from the *Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention*.

- With respect to infants, children and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the *Health Resources and Services Administration*.

- With respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported by the *Health Resources and Services Administration*.

For a comprehensive list of recommended preventive services, go to www.healthcare.gov/center/regulation/prevention.html.

(The specific URL cited in Plaintiff Condry's Certificate of Coverage is inactive; current www.healthcare.gov link to Preventive care benefits for women can be found at: https://www.healthcare.gov/coverage/preventive-care-benefits/ and https://www.healthcare.gov/preventive-care-women/, last visited 1/9/2017)

- If you do not have a grandfathered plan, in-network benefits for preventive care services described below will be paid at 100%, and not subject to any deductible, coinsurance or copayment. If you have pharmacy benefit coverage, your plan may also be required to cover preventive care medications that are obtained at a network pharmacy at 100%, and not subject to any deductible coinsurance or copayment, as required by applicable law under any of the following:

  - Evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the *United States Preventive Services Task Force*.

  - Immunizations that have in effect a recommendation from the *Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention*.

  - With respect to infants, children and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the *Health Resources and Services Administration*.

  - With respect to women, such additional preventive care and screenings as provided for in comprehensive guidelines supported by the *Health Resources and Services Administration*.

83.     However, the foregoing information is a subterfuge and misleading, and has not resulted in women getting access to and coverage for Comprehensive Lactation Benefits.  Defendants fail to establish networks of lactation consultants nationwide and fail to provide timely, complete and accurate information to women of the identity of in-network lactation consultants nationwide. Defendants prevent women from getting access to timely and necessary Comprehensive Lactation Benefits and circumvent the clear requirement that health plans provide, at no-cost, Comprehensive Lactation Benefits as a preventive service, just like all other preventive services.

84.     In contravention of the ACA's preventive health services mandate and the Defendants' plan documents, Defendants have failed to provide mandated preventive benefits coverage for Comprehensive Lactation Benefits and have established administrative procedures intended to frustrate and deter plan members from receiving mandated preventative benefits by, among other things:

    (A) failing to establish a network of lactation consultants;

    (B) improperly attributing an out-of-network characterization to Comprehensive Lactation Benefits in response to insureds' inquires and when such benefits are sought;

    (C) providing inconsistent and misleading information through their customer service representatives, including but not limited to: the necessity of a gap exception and approval of out-of-network provider charges with the commitment to reimburse lactation consultation services in full prior to the service being provided, only to have the claim denied in whole or in part;

    (D) imposing major administrative barriers to insureds seeking to receive information about and access to Comprehensive Lactation Benefits, including gap exceptions, the failure to identify the reason a claim was denied, and the failure to provide consistent accurate guidance for reimbursement;

    (E) failing to construct a list of in-network providers of Comprehensive Lactation Benefits; and

    (F) failing to provide any list of in-network providers of Comprehensive Lactation Benefits, including failing to provide such list either by mail, through customer representatives that provide phone consultation to members, or through the Defendants' websites.

85.     Defendants have also wrongly erected significant administrative barriers that prevent and deter women from obtaining timely Comprehensive Lactation Benefits.  Among these barriers, Defendants have failed to establish networks of providers and failed to provide plan participants with

any list or directory that clearly discloses the in-network providers (if any) who are certified and qualified to provide Comprehensive Lactation consultations.[11]

86.     Defendants have, contrary to the plain intent and purpose of the ACA's imposition of no-cost preventive services and the inclusion of Comprehensive Lactation Benefits as a preventive service, improperly shifted costs to the insured by failing to establish networks of providers of Comprehensive Lactation Benefits.

87.     Time is of the essence with respect to breastfeeding. Mothers who seek out and need guaranteed, no-cost women's preventive services pursuant to the ACA, are victims of Defendants' barriers.  Defendants have erected these barriers to prevent their insureds from timely receiving, if they receive it at all, Comprehensive Lactation Support.  Defendants then illegally force their insureds, who obtain such support, to pay for it, by failing to provide full reimbursement.

### F.     Plaintiffs' Experiences.

88.     Each named Plaintiff, like the members of the Classes, has been denied, through Defendants' wrongful conduct, the women's preventive service benefit for Comprehensive Lactation Benefits that are required by the ACA and their insurance contracts.

### *Plaintiff Condry*

89.     Shortly after the home birth of her child on February 13, 2015, Plaintiff Condry and her daughter experienced difficulties breastfeeding. Initially after the birth, Plaintiff Condry's daughter lost approximately 8 ounces of weight, which was deemed to be within the normal range of weight loss.  Plaintiff Condry's midwife and pediatrician anticipated the newborn would regain the weight within 2 weeks.  However, irrespective of her daughter's appetite, Plaintiff Condry's daughter had not regained the weight after 3 weeks postpartum, during which time breastfeeding had become

---

[11]     Physicians and clinicians who "are ambivalent about breastfeeding or who feel inadequately trained to assist patients with breastfeeding may be unable to properly counsel their patients on specifics about breastfeeding techniques, current health recommendations on breastfeeding, and strategies to combine breastfeeding and work." *HHS Call to Action*, supra, p. 15.  In a recent study of obstetricians' attitudes, 75% admitted they had either inadequate or no training in how to appropriately educate mothers about breastfeeding. The information on breastfeeding included in medical texts is often incomplete, inconsistent, and inaccurate." *Id.* at p. 26.

increasingly painful for Plaintiff Condry.  In need of immediate assistance, Plaintiff Condry and her daughter were referred to Ellen H. Schwerin, MPH, IBCLC, RLC of Happy Milk Lactation Support.  On March 4, 2015, Plaintiff Condry had an in-home lactation consultation provided by the IBCLC for which she paid $225 out-of-pocket.

90.     Following the in-home lactation consultation, Plaintiff Condry submitted the claim to UHC Insurance for coverage and reimbursement.  UHC Insurance processed and fully denied the service as "not a reimbursable service," thereby holding Plaintiff Condry responsible for the $225 service fee.  The EOB dated March 18, 2015 indicated that, "[t]his is not a reimbursable service.  There may be a more appropriate CPT or HCPCS code that describes this service and/or the use of the modifier or modifier combination is inappropriate."

91.     Irrespective of the denied claim, Plaintiff Condry and her newborn still required and sought the assistance of the same IBCLC on two separate occasions, March 19, 2015 and April 14, 2015, in order to successfully continue breastfeeding.  Plaintiff Condry paid $181 and $150 for the second and third visit, respectively.

92.     Plaintiff Condry did not submit claims for the second or third lactation consultation, nor did she take further action by appealing the first denied claim because she believed it would have been futile based upon the previous difficulties she encountered seeking coverage from UHC Insurance for numerous claims associated with her home birth.  Specifically, when Plaintiff Condry decided to have a home birth, a covered service under her policy, she learned that there was no qualified midwives in-network within 50 miles.

93.     Following the required procedure, Plaintiff Condry sought pre-approval for the home birth by requesting a gap exception, which was granted, but was set to expire on January 20, 2015, before the child's due date of February 13, 2015.  The UHC Insurance representative instructed Plaintiff Condry to call the day before the gap exception was to expire to have it extended.  Plaintiff Condry then secured the services of SLB Medical Group, LLC ("SLB"), which specializes in insurance billing for midwives.  When the SLB representative called UHC Insurance on Plaintiff Condry's behalf the day before the gap exception expired, as instructed, the UHC Insurance representative stated that an extension would not be provided and that a new application would have to

be made.  The UHC Insurance representative told the SLB representative to expect a call back from UHC Insurance with more information.  No such call was received.  Meanwhile, Plaintiff Condry was unaware that the gap exception had been denied until after the birth of her child on February 13, 2015.

94.     Plaintiff Condry submitted her claims associated with the birth of child to UHC Insurance for coverage.  Plaintiff Condry received an EOB from UHC Insurance dated May 8, 2015 which stated that UHC Insurance would only cover $1,391.58 of the $7,767 child birth claim, leaving Plaintiff Condry responsible for the remaining $6,375.42.   UHC Insurance cited, among other justifications, that the Medicare amount was applied for the services, even though Plaintiff Condry did not have Medicare, since the physician or health care provider was out-of-network.  Plaintiff Condry filed an appeal on or around May 27, 2015.  On June 2, 2015, Plaintiff Condry received a letter from UHC Insurance acknowledging receipt of the appeal and informing her that the appeal was under review and that a decision would be issued within 30 days.  UHC Insurance issued a decision letter on August 7, 2015, approximately 65 days after the June 2, 2015 letter, upholding its previous benefit decision.  UHC Insurance re-confirmed that "this service(s) is not eligible for payment as you requested. You are responsible for all costs . . .".  UHC Insurance recognized that Plaintiff Condry's provider "had problems reaching a UnitedHealthcare customer service representative . . .when trying to obtain an extension for an existing network gap approval on file . . . [however, UHC Insurance] cannot retroactively grant a network gap exception."

95.     In response to UHC Insurance's decision, Plaintiff Condry filed an appeal with the California Department of Insurance on December 2, 2016, which was then forwarded to the Texas Department of Insurance since Plaintiff Condry's UHC Insurance policy was written in the state of Texas.  The appeal resulted in the issuance of a reimbursement check dated February 17, 2017, made out to and addressed to Plaintiff Condry's midwife for $5,053.22.  The partial reimbursement for the home birth still held Plaintiff Condry responsible for $1,322.20 for the birth claim.

96.     Ultimately, as a result of UHC Insurance's wrongful conduct, and the arbitrary and capricious claims processing practices, Plaintiff Condry was denied the no-cost Comprehensive Lactation Benefits she was entitled to receive under the ACA resulting in a total out-of-pocket expenditure of $556 for the three lactation consultations.

1    ***Plaintiff Hoy***

2    97.    Immediately following the birth of her child on September 4, 2015, Plaintiff Hoy

3    sought lactation counseling services from the hospital based lactation consultant.  After multiple

4    follow-up requests, Plaintiff Hoy was finally seen by the lactation consultant.  The session lasted less

5    than fifteen minutes.  Following discharge, Plaintiff Hoy's pediatrician became concerned about her

6    son's weight.  Indeed, because her son had been unable to regain his birth weight and, in fact, was

7    rapidly losing weight, despite nursing around the clock, Plaintiff Hoy's pediatrician referred her and

8    her son to see Louisa Brandenburg, IBCLC, and Jennifer McClure, IBCLC, two qualified lactation

9    consultants at the Breastfeeding Resource Center in Abington, Pennsylvania ("BRC").  Plaintiff Hoy

10   also consulted with her obstetrician gynecologist ("ob/gyn") who supported the referral to BRC as

11   both the pediatrician and the ob/gyn believed that Plaintiff Hoy and her newborn son would benefit

12   from the specialized services of an IBCLC as neither were in a position to provide those services.[12]

13   98.    Prior to visiting BRC, Plaintiff Hoy attempted to access lactation support and

14   counseling through UHC Services by performing various searches for providers on the UHC portal.

15   She was unable identify any in-network lactation providers anywhere in the metropolitan Philadelphia

16   area. On September 9, 2015, before receiving lactation counseling services from an out-of-network

17   provider, Plaintiff Hoy called UHC Services to confirm that the services would be fully covered since

18   there were no in-network providers in the Philadelphia region.

19   99.    During the call, reference no. C3207, the UHC Services representative informed

20   Plaintiff Hoy that UHC Services would not cover the out-of-network services.  Plaintiff Hoy was

21   advised that any lactation consultant services offered during her hospital stay were covered, but any

22   outpatient lactation services were not necessarily required to be covered by the ACA.  Furthermore,

23   according to the UHC Services representative, Plaintiff Hoy's plan was silent as to whether outpatient

24   lactation services were covered; therefore, UHC Services would fully deny coverage.

25

26

27   [12]    In fact, Plaintiff Hoy's pediatrician performed an exam of her son, as well as observed Plaintiff
     Hoy nursing her son, but he was unable to resolve this increasingly serious nursing issue.

28

100.    Due to the urgency of the medical needs of Plaintiff Hoy and her newborn child, on September 10, 2015, Plaintiff Hoy sought the necessary and immediate lactation services from BRC, the out-of-network provider recommended by both her pediatrician and ob/gyn, with subsequent appointments on September 28, 2015 and October 5, 2015.  The BRC lactation consultant diagnosed Plaintiff Hoy's son with a tongue tie. Plaintiff Hoy was charged and paid $155 for the initial visit on September 10, 2015, $95 for the second visit on September 28, 2015, and $95 for the third visit on October 5, 2015, resulting in a total out-of-pocket expenditure of $345.

101.    On October 22, 2015, Plaintiff Hoy contacted UHC Services again to address coverage for the lactation services she had received.  This time, the UHC Services representative informed Plaintiff Hoy that UHC would cover out-of-network services at 60%, in contrast to 100% for in-network services.  The representative acknowledged that since Comprehensive Lactation Benefits were considered a preventive care service under the ACA and in the absence of a network for the service, Plaintiff Hoy may be eligible for a "gap exception."  The UHC Services representative advised Plaintiff Hoy to file a written appeal with supporting information to UHC Services, and that she would receive a substantive response within 30 days.

102.    Following the representative's advice and in accordance with the plan's claims procedures, Plaintiff Hoy submitted a written appeal with the denied claims on October 23, 2015. Plaintiff Hoy received a form letter from UHC Services dated October 28, 2015, acknowledging that the written appeal had been received and informing her that a substantive response would be provided within 30 days.

103.    On November 17, 2015, Plaintiff Hoy received another form letter from UHC Services, this time informing her that her "questions and concerns . . . do not qualify as an appeal," and "[a]s a result, [her] letter and any attached documents have been forwarded to the appropriate [UHC Services] department for review." That letter further stated that Plaintiff Hoy would receive a response "shortly."  Plaintiff Hoy received no such response.

104.    On December 29, 2015, Plaintiff Hoy called UHC Services to follow up on her October 23, 2015 written appeal.  The UHC Services representative informed Plaintiff Hoy that UHC Services did not keep a record of what "department" Plaintiff Hoy's October 23, 2015 written appeal was

38

forwarded to pursuant to UHC Services' November 17, 2015 letter, and advised Plaintiff Hoy to send another letter describing her appeal.  Plaintiff Hoy specifically asked the representative to review her claim and appeal information in UHC Services' "system" to identify any missing information.  The representative did so and confirmed that everything was in order.  The representative instructed Plaintiff Hoy that, out of an abundance of caution, she should resubmit her appeal with the claim numbers provided to Plaintiff Hoy by the representative.  The representative gave Plaintiff Hoy a fax number to use.  Following these instructions, Plaintiff Hoy faxed a letter to UHC Services on the same day, December 29, 2015, again describing her claims, the erroneous denial of the claims, and the issues described above.

105.    On the same date, December 29, 2015, Plaintiff Hoy filed a complaint with the Pennsylvania Insurance Department, describing her experience with the appeals process and UHC Services' failure to issue a timely and substantive response.

106.    On December 31, 2015, Plaintiff Hoy received another form letter from UHC Services – which was identical to the form letter she received on October 28, 2015 – again acknowledging that the written appeal had been received and informing her that a substantive response would be provided within 30 days.

107.    On January 11, 2016, Plaintiff Hoy received yet another form letter from UHC – which was identical to the letter Plaintiff Hoy received on November 17, 2015.  Like the November 17, 2015 letter, Plaintiff Hoy was informed that her "questions and concerns . . . do not qualify as an appeal," and "[a]s a result, [her] letter and any attached documents have been forwarded to the appropriate [UHC Services] department for review." That letter further stated that Plaintiff Hoy would receive a response "shortly." Again, Plaintiff Hoy received no such response.

108.    On January 19, 2016, Plaintiff Hoy received a letter from the Pennsylvania Insurance Department regarding her December 29, 2015 complaint.  In the letter, the Pennsylvania Insurance Department informed Plaintiff Hoy that it was unable to assist her because, according to UHC Services, Plaintiff Hoy never appealed her claim denials internally and/or UHC Services never formally denied her appeal, notwithstanding Plaintiff Hoy's repeated contact with UHC Services as detailed above, and her two written appeals on October 23, 2015 and December 29, 2015.

109.     Even assuming, *arguendo*, that Plaintiff Hoy's claim should have been treated as a claim for out-of-network services (which it should not because, as set forth *supra*, there were no in-network providers identified in the UHC portal or otherwise available), such treatment was contrary to her plan's claims procedures, under which a participant may make three types of claims for benefits for out-of-network services: (1) Urgent Care request for benefits; (2) Pre-Service request for Benefits[13]; and (3) Post-Service request for Benefits.[14]

110.     An Urgent Care request for benefits is defined as "a request for Benefits provided in connection with Urgent Care services, as defined in Section 14, Glossary," with "Urgent Care services" defined as "treatment of an unexpected Sickness or Injury that is not life-threatening but requires outpatient medical care that cannot be postponed.  An urgent situation requires prompt medical attention to avoid complications and unnecessary suffering, such as high fever, a skin rash, or an ear infection."

111.     To submit a claim, the participant can either fill out a claim form or "attach a brief letter of explanation to the bill, and verify that the bill contains the information listed below," or include the following information in the letter:

- [the participant or beneficiary's] name and address;
- the patient's name, age and relationship to the Employee;
- the number as shown on [the participant or beneficiary's] ID card;
- the name, address and tax identification number of the provider of the service(s);
- a diagnosis from the Physician;
- the date of service;
- an itemized bill from the provider that includes:

  - the Current Procedural Terminology (CPT) codes;
  - a description of, and the charge for, each service;
  - the date the Sickness or Injury began; and
  - a statement indicating either that [the participant or beneficiary is], or [is] not, enrolled for coverage under any other health insurance plan or program. If

---

[13]     A Pre-Service request for benefits is defined as "a request for Benefits which the Plan must approve or in which you must obtain prior authorization from UnitedHealthcare before non-Urgent Care is provided."

[14]     A Post-Service request for benefits is defined as "a claim for reimbursement of the cost of non-Urgent Care that has already been provided."

[the participant or beneficiary is] enrolled for other coverage [the participant or beneficiary] must include the name and address of the other carrier(s).

Failure to provide that information "may delay any reimbursement."

112.    To appeal a denied pre-service or post-service claim for benefits, the participant or his/her representative must submit in writing the following:

- the patient's name and ID number as shown on the ID card;
- the provider's name;
- the date of medical service;
- the reason [the participant or beneficiary] disagree[s] with the denial; and
- any documentation or other written information to support [the participant or beneficiary's] request.

Denials for Urgent Care request for benefits need not be in writing, and may be completed over the phone.

113.    The following tables provide for the required timing under which UHC Services must respond, based upon the type of request:

**Urgent Care Request for Benefits**

| Type of Request for Benefits or Appeal | Timing |
| --- | --- |
| If your request for benefits is incomplete, UHC must notify the claimant within: | 24 hours |
| The claimant must then provide completed request for benefits to UHC within: | 48 hours after receiving notice of additional information required |
| UHC must notify the claimant of the benefit determination within: | 72 hours |
| If UHC denies the claimant's request for benefits, you must appeal an adverse benefit determination no later than: | 180 days after receiving the adverse benefit determination |
| UHC must notify the claimant of the appeal decision within: | 72 hours after receiving the appeal |

        * Urgent Care appeals need not be in writing.

**Pre-Service Request for Benefits**

| Type of Request for Benefits or Appeal | Timing |
| --- | --- |
| If the claimant's request for benefits is filed improperly, UHC must notify the claimant within: | 5 days |

| If the claimant's request for benefits is incomplete, UHC must notify the claimant within: | 15 days |
|---|---|
| The claimant must then provide completed request for benefits to UHC within: | 45 days |
| **UHC must notify the participant of the benefit determination:** | |
| - if the initial request for benefits is complete, within: | 15 days |
| - after receiving the completed request for benefits (if the initial request is incomplete), within: | 15 days |
| The participant must appeal an adverse benefit determination no later than: | 180 days after receiving the adverse benefit determination |
| UHC must notify the participant of the first level appeal decision within: | 15 days after receiving the first level appeal |
| The participant must appeal the first level appeal (file a second level appeal) within: | 60 days after receiving the first level appeal decision |
| UHC must notify the participant of the second level appeal decision within: | 15 days |

### Post-Service Request for Benefits

| Type of Request for Benefits or Appeal | Timing |
|---|---|
| If the claimant's claim is incomplete, UHC must notify the claimant within: | 30 days |
| The claimant must then provide completed request for benefits to UHC within: | 45 days |
| **UHC must notify the participant of the benefit determination:** | |
| - if the initial claim is complete, within: | 30 days |
| - after receiving the completed claim for benefits (if the initial request is incomplete), within: | 30 days |
| The participant must appeal an adverse benefit determination no later than: | 180 days after receiving the adverse benefit determination |
| UHC must notify the participant of the first level appeal decision within: | 30 days after receiving the first level appeal |
| The participant must appeal the first level appeal (file a second level appeal) within: | 60 days after receiving the first level appeal decision |
| UHC must notify the participant of the second level appeal decision within: | 30 days |

SECOND AMENDED CLASS ACTION COMPLAINT

114.    In sum, more than 120 days had passed since Plaintiff Hoy first requested and was informed that she would be denied complete coverage for services on September 9, 2015 and more than 81 days had passed since Plaintiff Hoy filed her first appeal on October 23, 2015, until UHC informed Plaintiff Hoy on January 11, 2016, that, yet again, her written appeal did not qualify as an appeal—which was not a substantive response.  Plaintiff Hoy has not received any updates regarding her claims from UHC subsequent to the January 11, 2016 letter and prior to the filing of this Second Amended Complaint.

115.    Plaintiff Hoy estimates that she spent approximately 20 hours trying to have her claim for lactation support and counseling processed and paid for by UHC Services, only to be fully denied reimbursement, resulting in an outstanding out-of-pocket expenditure of $345.  Accordingly, because of Defendants' wrongful conduct, Plaintiff Hoy was denied the no-cost ACA preventive service to which she was entitled.

### ***Plaintiff Endicott***

116.    A few weeks after the birth of her child on July 22, 2015, Plaintiff Endicott was experiencing pain while breastfeeding.  She and her daughter were diagnosed and treated for thrush, a common infection that can affect breastfeeding.  However, after the infection cleared, Plaintiff Endicott continued to endure difficulties breastfeeding, at which point she decided to seek the professional assistance of a lactation consultant.

117.    Initially, Plaintiff Endicott attempted to access Comprehensive Lactation Benefits through her hospital, Hartford Hospital, as suggested by her plan documents.  After several unreturned phone calls, Plaintiff Endicott was finally able to reach the hospital-based consultant who determined, over the phone, that Plaintiff Endicott's condition did not require care.

118.    Frustrated and in need of immediate help, Plaintiff Endicott turned to the internet, where she identified Lori Atkins, RN, IBCLC, as a qualified, trained provider.  Plaintiff Endicott had two in-home lactation consultations on September 23, 2015 and October 1, 2015.  Plaintiff Endicott paid $215 for the first consultation and $40 for the second appointment, for a total out-of-pocket expenditure of $255.

119.     Plaintiff Endicott submitted a superbill for the lactation consultations to UHC Services for coverage and reimbursement in October 2015.  In response to these claims, Plaintiff Endicott received a notification from UHC Services which enclosed copies of two letters dated October 29, 2015 addressed to Ms. Atkins.  The letters confirmed that UHC Services had received two claims for Plaintiff Endicott for health care services provided by Ms. Atkins, but that neither claim could be processed because revised claim forms needed to be submitted containing the valid ICD-9 diagnosis code and ICD-9 indicator for the September 23, 2015 consultation, and revised ICD-10 diagnosis code(s) and indicator were needed for the October 1, 2015 consultation.  The letters further stated that Plaintiff Endicott's claims were on hold for 45 days to allow for the health care professional to submit the requested documentation, at which time, Plaintiff Endicott's claims would be processed within 15 days.

120.     Plaintiff Endicott then received another notification from UHC Services dated November 26, 2015, informing her of the status of her claims and instructing that no action was required because the two enclosed letters had been sent directly to the health care professional. Enclosed were copies of two letters dated November 26, 2015, addressed to Ms. Atkins advising her that UHC Services had received two claims for Plaintiff Endicott for health care services provided by Ms. Atkins, but that neither claim could be processed because revised claim forms needed to be submitted containing the valid ICD-9 diagnosis code(s) for the September 23, 2015 consultation, and the revised ICD-10 diagnosis code(s) and indicator were needed for the October 1, 2015 consultation. The letters further stated that Plaintiff Endicott's claims were on hold until the requested documentation was provided by the health care professional, at which time, Plaintiff Endicott's claims would be processed within 15 days.

121.     Plaintiff Endicott then received an EOB dated February 12, 2016 from UHC Services that processed both lactation consultation claims by applying $173 of the $215 charge for Plaintiff Endicott's September 23, 2015 consultation to her deductible and applying the full $40 charge for her October 1, 2015 consultation to her deductible, leaving her responsible for the full $255.  The explanation provided for the manner in which Plaintiff Endicott's September 23, 2015 claim was processed was, "[y]our deductible has not been met. The amount shown is owed to your physician or

health care provider." Meanwhile, the explanation provided for the manner in which Plaintiff Endicott's October 1, 2015 claim was processed was, "[y]our plan covers the eligible expense amount reimbursable under your plan for covered out-of-network health services. The eligible amount is based on a database of competitive fees for similar services or supplies in your area. Benefits are not available for that portion of the charge that exceeds the eligible amount determined for this service."

122. When Plaintiff Endicott contacted UHC Services by phone about the denied claims, she was informed that the ICD-9 and 10 diagnosis codes on the superbill were not effective on the dates of service and that new codes existed, which, according to UHC Services, providers refused to learn. When Plaintiff Endicott asked for UHC Services to provide the correct codes, UHC Services refused to divulge that information.

123. In addition, and in contrast to the UHC Services notifications Plaintiff Endicott received, the UHC Services representative told her that UHC Services had not sent Ms. Atkins the letters dated October 29, 2015 and November 26, 2015. Rather, UHC Services informed Plaintiff Endicott that it was her responsibility to notify Ms. Atkins about UHC Services' request for additional information. Plaintiff Endicott contacted Ms. Atkins who confirmed that she had not received any letter from UHC Services concerning Plaintiff Endicott's claims.

124. Frustrated by UHC Services' inconsistent, misleading, and inaccurate information, Plaintiff Endicott submitted a written complaint to the State of Connecticut Insurance Department on February 1, 2016, which prompted UHC Services to reprocess Plaintiff Endicott's claim. According to UHC Services' response to the Connecticut Insurance Examiner, UHC Services made an exception and re-processed Plaintiff Endicott's claims on February 11, 2016 using the invalid ICD-10 diagnosis code originally provided on Plaintiff Endicott's superbill, but since the lactation consultant was not a contracted provider with UnitedHealthcare, UHC Services applied the "eligible expense amount" of $213 ($173 for the first consultation and $40 for the second consultation) to Plaintiff Endicott's $1,100 non-network deductible. UHC Services further explained that "[p]er the Summary Plan Description, non-network providers may bill the member for any difference between the providers billed charges and the eligible expenses", leaving Plaintiff Endicott responsible for the full $255.

125.    Plaintiff Endicott estimates that she spent approximately 20 hours trying to access timely Comprehensive Lactation Benefits, and have her claim for lactation support processed and paid for by UHC Services, only to be fully denied reimbursement.  Accordingly, because of UHC Services' wrongful conduct, Plaintiff Endicott was denied the no-cost ACA preventive service to which she was entitled, resulting in an out-of-pocket expenditure of $255.

### *Plaintiff Bishop*

126.    After the birth of her son on July 2, 2015, while still admitted in the hospital, Plaintiff Bishop experienced difficultly breastfeeding because her son was not latching properly.  Initially she received lactation support from the hospital-based RN, BSN, IBCLC, Diba Tillery; however, when Plaintiff Bishop sought additional assistance later that day and the next day, Ms. Tillery was not working.  Plaintiff Bishop tried to seek assistance from the available nurses, but the services rendered were ineffective.

127.    Soon after being discharged from the hospital, Plaintiff Bishop returned to the hospital to ensure that her son was gaining weight.  Plaintiff Bishop learned that her son had actually lost weight which spurred her to request lactation services; however, Ms. Tillery was once again not available.  The nurse on duty told Plaintiff Bishop that her son needed to be fed immediately, or that the newborn would have to be re-admitted to the hospital.  Plaintiff Bishop tried to hand express milk, but the nurse said that was not sufficient and suggested that Plaintiff Bishop feed her son formula, which Plaintiff Bishop did to avoid having her son re-admitted to the hospital.

128.    At home, Plaintiff Bishop resorted to using a combination of pumping, nursing and formula to feed and nourish her son.  However, her son became ill from the formula.  Plaintiff Bishop tried numerous brands, yet her son continued to cry for up to 10 hours a day.  Eventually Plaintiff Bishop's son was diagnosed with a dairy allergy and the only formula he could barely tolerate was a hypoallergenic formula that cost approximately $30 *per* can.

129.    At the same time, Plaintiff Bishop was suffering from postpartum depression that was only deepening as her milk production began depleting.  In need of immediate professional support, Plaintiff Bishop accessed UHC Services' online portal and tried to locate an in-network lactation provider, but UHC Services did not have any provider listed.

46

130.    Desperate for help and in danger of her milk production ceasing, Plaintiff Bishop contacted Ms. Tillery, who agreed to see her on a private-patient basis because neither Plaintiff Bishop's nor her son's conditions warranted admission to the hospital.  On August 5, 2015, Plaintiff Bishop paid $130 out-of-pocket for an in-office lactation consultation with the RN, BSN, IBCLC, who successfully developed a supplementary nursing system, including pumping as well as nursing, which re-established Plaintiff Bishop's milk supply.  By week 9 postpartum, Plaintiff Bishop's son was nursing exclusively and all illness symptoms were resolved as a result of Plaintiff Bishop committing to a diary-free diet.

131.    Plaintiff Bishop submitted the lactation claim to UHC Services for coverage and reimbursement.  In an EOB dated September 28, 2015, UHC Services processed and fully denied the claim for lactation services, which was listed as a "Preventive Med" service.  The EOB stated, "This is not a reimbursable service. There may be a more appropriate CPT or HCPCS code that describes this service and/or the use of the modified or modifier combination is inappropriate."

132.    Plaintiff Bishop submitted a written appeal as instructed by the EOB and Ms. Tillery, separately, sent a letter to UHC Services dated October 19, 2015, which outlined the treatment rendered, the issuance of nipple cream, and listed corresponding ICD-9 diagnosis codes.  In response to her appeal, Plaintiff Bishop received another EOB dated October 30, 2015 fully denying the "Preventive Med" claim, again, and noting that, "[t]his claim was already reviewed and processed.  If this is a corrected claim, the provider must submit and indicate it is a corrected claim . . .".

133.    Plaintiff Bishop re-submitted the claim in accordance with the instructions contained on the October 30, 2015 EOB.  Yet, this renewed attempt proved to be futile.  Plaintiff Bishop received another EOB on November 11, 2015, which fully denied the lactation claim which was reflected on the EOB as "Special Medial" services and "Medical Supplies."  According to the EOB, the "Special Medical" services were denied for two distinct reasons:

> (1) "Payment for this service or supply is denied based on our reimbursement policy.  This service was included in a service already reported or it is not paid separately. If you used a network provider, you don't owe anything."

> (2) "Payment for services is denied.  We asked the member for more information and didn't receive it."

134.    In addition, the EOB listed two distinct explanations for denying the "Medical Supplies":

> (1) "Your plan does not cover this medical supply, prosthetic, orthotic appliance, or durable medical equipment, or the repair, modification or customization of any of these non-covered items."

> (2) "Payment for services is denied.  We asked the member for more information and didn't receive it."

135.    After spending an estimated 20 hours trying to access timely Comprehensive Lactation Benefits and have her claim for lactation support processed and paid for by UHC Services, Plaintiff Bishop was fully denied any reimbursement.  Accordingly, because of UHC Services' wrongful conduct, Plaintiff Bishop was denied the no-cost ACA preventive service to which she was entitled, resulting in an out-of-pocket expenditure of $130.

### *Plaintiff Barber*

136.    Immediately after the birth of her son in February 2016, Plaintiff Barber had problems breastfeeding and her son was losing weight quickly.  In need of immediate professional support, Plaintiff Barber's pediatrician recommended that she consult with Caroline Kerherve, IBCLC, a qualified, trained provider at Lactation and Postpartum Services LLC in San Francisco.

137.    Plaintiff Barber had two lactation consultations on February 19, 2016 and February 24, 2016.  Plaintiff Barber paid $345 for the first consultation and $245 for the second appointment, for a total out-of-pocket expenditure of $590.  These visits with a qualified, trained provider of Comprehensive Lactation Benefits revealed that Plaintiff Barber's son was unable to latch due to a tongue tie, a diagnosis which necessitated that Plaintiff Barber's son undergo a surgical procedure to be able to breastfeed.

138.    Plaintiff Barber submitted a claim for the lactation consultations to UHC Insurance for coverage and reimbursement on April 5, 2016.  Plaintiff Barber received an EOB dated April 29, 2016 from UHC Insurance that denied both lactation consultation claims.  The explanation provided was, "[y]our plan does not cover this non-medical service or personal item."

139.    Plaintiff Barber submitted a written appeal in February 2017.  On February 6, 2017, Plaintiff Barber received from UHC Insurance an acknowledgment of her appeal and, on February 9,

2017, Plaintiff Barber received a letter from UHC Insurance stating, "You asked us to look at this claim again. We reviewed the claim and determined it was processed correctly.  This service is not covered by the health benefit plan."

140.   Plaintiff Barber has spent approximately 7 hours attempting to access timely Comprehensive Lactation Benefits and to have her claim for lactation support and counseling processed and paid for by UHC Insurance.  However, because of Defendants' wrongful conduct, Plaintiff Barber was denied the no-cost ACA preventive service to which she was entitled, resulting in an out-of-pocket expenditure of $590.

### *Plaintiff Carroll*

141.   Shortly after the birth of her daughter on August 25, 2015, Plaintiff Carroll and her daughter began experiencing difficulties breastfeeding.  In need of immediate professional support, Plaintiff Carroll sought the assistance of Virginia Martin, CLC, a qualified, trained provider at A Nurtured Path, LLC.

142.   Plaintiff Carroll had two lactation consultations on September 16, 2015 and September 19, 2015.  Plaintiff Carroll paid $65 for the first consultation and $40 for the second appointment, for a total out-of-pocket expenditure of $105.  Plaintiff Carroll submitted both claims to UMR for coverage and reimbursement.  Plaintiff Carroll received an EOB dated November 17, 2015 for her September 16 claim which stated that the charges were denied because the charges exceeded "the usual, reasonable and customary fees."  The claim was processed at the "Out of Network Level of Benefits" in which $12.30 constituted an "amount not payable" and $52.70 was applied to Plaintiff Carroll's deductible; ultimately resulting in Plaintiff Carroll being responsible for the full $65. Plaintiff Carroll then received another EOB dated December 29, 2015 from UMR for her September 19 claim denying the claim in its entirety, stating "[t]his service is excluded by your health plan."

143.   When Plaintiff Carroll contacted UMR about the denied claims, the UMR representative told her that the claims were applied to her out-of-network deductible.  When Plaintiff Carroll inquired about the appeals process, the UMR representative told her that she could easily access the appeal form online.  Plaintiff Carroll attempted to locate those forms online, but was unable to find them.

144.   A few months later, Plaintiff Carroll and her daughter were still struggling with breastfeeding.   In need of additional professional assistance, Plaintiff Carroll sought two more lactation consultations from Cara Munson, RD, IBCLC, on November 2, 2015 and November 14, 2015.  Plaintiff Carroll paid $125 for the first consultation and $50 for the second appointment, for a total out-of-pocket expenditure of $175. These visits with a qualified, trained provider of Comprehensive Lactation Benefits revealed that Plaintiff Carroll's daughter was unable to latch due to a tongue tie, a diagnosis which necessitated that her daughter undergo a surgical procedure to be able to breastfeed. Dr. Jesse Witkoff, a pediatric dentist at A Wild Smile located in Denver, Colorado performed the surgery.

145.   Plaintiff Carroll submitted both the $525 claim for her daughter's surgery and the $175 claim for the lactation consultations to UMR for coverage and reimbursement.   Plaintiff Carroll received an EOB from UMR dated December 15, 2015 that fully denied her daughter's pediatric dentistry surgery.  The explanation provided was, "[t]his service is excluded by your health plan." Plaintiff Carroll then received another EOB dated December 29, 2015 from UMR denying both lactation consultation claims.  The explanation provided was, once again, "[t]his service is excluded by your health plan."

146.   Plaintiff Carroll estimates that she has spent approximately 6.5 hours attempting to access timely Comprehensive Lactation Benefits and to have her claims for lactation services processed and paid for by UMR.   However, because of Defendants' wrongful conduct, Plaintiff Carroll was denied the no-cost ACA preventive service to which she was entitled, resulting in an out-of-pocket expenditure of $280 for lactation services.

147.   Based on Plaintiffs' counsels' investigation, the Plaintiffs' experiences characterize the experience of numerous other women covered under UnitedHealth plans in a wide cross-section of the United States. Therefore, although Defendants operate a multi-tiered web of entities that provide health care coverage, it is apparent that the directives with respect to the handling of claims for breastfeeding support, supplies and counseling, including the failure to provide adequate or reasonable in-network providers for such services, emanate from a central UnitedHealth authority.

### G.  Defendants' Conduct Violates the Non-Discrimination Provision of the ACA.

148.    Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

149.    Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities.

150.    The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

151.    The Office for Civil Rights (OCR), Office of the Secretary HHS, issued the <u>final rule</u> (81 FR 31375) implementing Section 1557 of the ACA ("Final Rule"), stating as follows:

> Comment: Many commenters requested that OCR clarify that all enforcement mechanisms available under the statutes listed in Section 1557 are available to each Section 1557 plaintiff, regardless of the plaintiff's protected class.…

> The commenters primarily rely on reasoning in *Rumble v. Fairview Health Services*, in which the U.S. District Court for the District of Minnesota discussed the standards to be applied to Section 1557 private right of action claims and stated: "It appears Congress intended to create a new, health-specific, anti-discrimination cause of action that is subject to a singular standard, regardless of plaintiff's protected class status. Reading Section 1557 otherwise would lead to an illogical result, as different enforcement mechanisms and standards would apply to a Section 1557 plaintiff depending on whether plaintiff's claim is based on her race, sex, age, or disability. For example, it would not make sense for a Section 1557 plaintiff claiming race discrimination to be barred from bringing a claim using a disparate impact theory but then allow a Section 1557 plaintiff alleging disability discrimination to do so."

> Similarly, many commenters requested that the regulation clarify that a private right of action exists for disparate impact claims, arguing, like commenters discussed above, that all enforcement mechanisms should be available to all Section 1557 complainants. A few

51

commenters requested that the availability of a private right of action be addressed in the final rule itself, rather than in the preamble.

*Response*: **OCR interprets Section 1557 as authorizing a private right of action for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the legislation.**

81 Fed. Reg. 31375, 31439 (emphasis added).

152.    Accordingly, the Final Rule confirms that a private right of action exists for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the ACA (45 CFR 92; 81 FR 31375).

153.    Title IX prohibits discrimination on the basis of sex.  Plaintiffs and the members of the Classes are being excluded from participation in and being denied the benefits of the enumerated preventive health benefit for breastfeeding women, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of sex.

154.    In addition, as confirmed by the Final Rule, Title IX prohibits discrimination on the basis of sex, and "the definition of 'on the basis of sex' established by [the Final Rule] is based upon existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex includes discrimination on the basis of pregnancy, childbirth, …." 81 Fed. Reg. at 31388.

155.    Furthermore, as confirmed by the Final Rule, the term, "[o]n the basis of sex includes, but is not limited to, discrimination on the basis of pregnancy, false pregnancy, [ ] or recovery therefrom, childbirth or related medical conditions…." 81 Fed. Reg. at 31467; *see also, id.* at 31434 ("on the basis of sex" under Section 1557 includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions."); *see* 45 CFR 86.40(b) (prohibiting discrimination on the basis of "pregnancy, childbirth, false pregnancy…").

156.    The anti-discrimination provision, as well as other provisions of the ACA recognize, as stated by OCR in the Final Rule, "the difficulty many pregnant people experience in accessing certain

health care services."  *See* 81 Fed. Reg. at 31428 ("In response to this concern, OCR is clarifying here that the equal program access provision under § 92.206 is simply a specific application of the more general prohibition of discrimination under § 92.101(a). Under both provisions, denial of program access on any of the prohibited bases, including pregnancy or related medical conditions, is prohibited.")

157.    Moreover, lactation is a medical condition related to pregnancy and childbirth.  The term "medical condition" includes any physiological condition.  *See, e.g.,* Joseph Segen, McGraw-Hill Concise Dictionary of Modern Medicine 405 (2006); The American Heritage Medical Dictionary (2007); Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing, and Allied Health (7th ed. 2003); Mosby's Medical Dictionary (8th ed. 2009). Lactation, the postpartum production of milk, is a physiological process, triggered by hormones, of secreting milk from mammary glands and is directly caused by hormonal changes associated with pregnancy and childbirth. *See, e.g.*, Arthur C. Guyton, Textbook of Med. Physiology 1039-40 (2006) (describing physiological processes by which milk production occurs), cited at https://www.eeoc.gov/laws/guidance/pregnancy_guidance.cfm; Collins English Dictionary—Complete and Unabridged (HarperCollins Pub. 2003), available at: http://www.thefreedictionary.com/lactation (defining lactation as "the secretion of milk from the mammary glands after parturition"). Lactation is a physiological result of being pregnant and bearing a child, or induced lactation for the benefit of an adopted child or child borne through a surrogate.

158.    Further, to continue producing an adequate milk supply and to avoid painful complications associated with delays in expressing milk, a nursing mother will typically need to breastfeed or express breast milk using a pump two or three times over eight hours, thus, when facing lactation issues, breastfeeding women must be able to not only access the necessary care but do so promptly, to avoid further complications or even the inability to continue breastfeeding. *See, e.g., Overcoming Breastfeeding Problems*, U.S. Nat'l Library of Med., http://www.nlm.nih.gov/medlineplus/ency/article/002452.htm (last visited 9/4/2017).

159.    Defendants' practice with respect to coverage for preventive health benefits and not identifying in-network providers of Comprehensive Lactation Benefits, singles out lactating and

SECOND AMENDED CLASS ACTION COMPLAINT

breastfeeding insured women for less favorable treatment with respect to ACA mandated preventive health benefits.

160.    Because only women lactate and breastfeed, and because lactation is a pregnancy-related medical condition, Defendants' misconduct affects only women and therefore is facially sex-based.

161.    Less favorable treatment of a lactating insured, specifically in failing to give access to in-network providers of Comprehensive Lactation Benefits, is unlawful sex discrimination.

162.    By their conduct, Defendants are providing disparate levels of ACA mandated preventive services to breastfeeding and lactating women. Defendants' seemingly facially neutral policies of stating that they purportedly have in-network lactation consultants but not identifying such in-network providers, not giving lactating and breastfeeding insureds access to such in-network providers for this preventive service, and failing to provide information and access in a timely manner (which is critical for lactation and breastfeeding), has a disparate impact on breastfeeding and lactating insured women.

163.    Defendants' failures with respect to providing breastfeeding women their preventive health benefits (including their refusal to establish processes to provide timely identification of in-network trained providers of Comprehensive Lactation Benefits)[15], results in breastfeeding women being excluded from participation in and being denied the benefits of the enumerated preventive health benefit for breastfeeding women.

---

[15] PHS Act section 2706(a), as added by the ACA, and as incorporated into section 715(a)(1) of ERISA and section 9815(a)(1) of the Internal Revenue Code, states that a "group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable state law."  Section 2706(a) is applicable to non-grandfathered group health plans and health insurance issuers offering group or individual health insurance coverage for plan years (in the individual market, policy years) beginning on or after January 1, 2014.  From the standpoint of providers of lactation counseling, Defendants' conduct runs afoul of Section 2706(a), at minimum by discriminating against those who are licensed providers who are also IBCLCs or lactation consultants, and against IBCLCs who are state licensed (currently in Georgia and Rhode Island), by failing to identify them as in-network providers to insured breastfeeding women.

164. And, moreover, Defendants' policies, and lack thereof, impose a significant burden on breastfeeding and lactating women – a protected class. Defendants' practices are unlawful and discriminatory, and can be so irrespective of motivation or intent.

165. By their conduct alleged herein, Defendants are providing disparate levels of health benefits, and specifically ACA-mandated preventive services, for women. The challenged practice, of not, at a minimum, identifying and timely identifying in-network providers of Comprehensive Lactation Benefits has a substantial disparate impact on women.

166. Defendants are subject to Section 18116 because Defendants are health programs and activities which are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.  *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference).

167. Defendants are health programs and activities because they provide and administer health insurance and plans.

168. Defendants are receiving Federal financial assistance, including credits, subsidies and contracts of insurance, at least in the following ways.

169. UnitedHealth Group serves as a plan sponsor offering Medicare Part D prescription drug insurance coverage under contracts with CMS. Under the Medicare Part D program, UnitedHealth Group receives the following payments from CMS:

> (A) *Low-Income Premium Subsidy*. For qualifying low-income members, CMS pays some or all of the member's monthly premiums to UnitedHealth Group on the member's behalf.

> (B) *Catastrophic Reinsurance Subsidy*. CMS pays UnitedHealth Group a cost reimbursement estimate monthly to fund the CMS obligation to pay approximately 80% of the costs incurred by individual members in excess of the individual annual out-of-pocket maximum.

> (C) *Low-Income Member Cost Sharing Subsidy*. For qualifying low-income members, CMS pays on the member's behalf some or all of a member's cost sharing amounts, such as deductibles and coinsurance.

170.   Defendants also provide health plans through the ACA Exchanges (*see* ¶31 *supra*) and thereby receive Federal financial assistance in the form of the direct and/or indirect subsidies, including the "premium tax credit," provided for under the ACA for qualified individuals who purchase health insurance from Defendants through the Exchange.   A premium tax credit is a refundable tax credit designed to help eligible individuals and families with low or moderate income afford health insurance purchased through the Exchange. When enrolled in an Exchange plan, the insured can choose to have the Exchange compute an estimated credit that is paid to the insurance company to lower what the insured pays for monthly premiums (advance payments of the premium tax credit, or APTC). *See* http://fas.org/sgp/crs/misc/R41137.pdf (last visited 1/11/2017).  On information and belief, Defendants have and will receive such credits.

171.   In addition to the premium credits, the ACA establishes subsidies that are applicable to cost-sharing expenses. The HHS Secretary will provide full reimbursements to exchange plans that provide cost-sharing subsidies.  It was estimated in early 2014, that such cost-sharing subsidies would increase federal outlays from FY2015 through FY2024 by $167 billion. *See* http://fas.org/sgp/crs/misc/R41137.pdf (last visited 1/11/2017).  On information and belief, Defendants have and will receive such credits.

172.   Furthermore, the federal government provides funds, grants and/or other financial assistance to Defendants and their segments and operating businesses.  A review of the federal-government-run www.USASpending.gov – a website mandated by the Federal Funding Accountability and Transparency Act of 2006 (S. 2590) to give the American public access to information on how their tax dollars are spent – indicates as follows:

(A) UnitedHealth Military & Veterans Services, LLC has received over $9 Billion from 2012 through present from the federal government (DoD)[16]:

---

[16]   *See* https://www.usaspending.gov/Pages/TextView.aspx?data=RecipientFundingTrends& dunsnumber=826295136&fiscalyear=2016; https://www.usaspending.gov/transparency/Pages/ RecipientProfile.aspx?DUNSNumber=826295136&FiscalYear=2016  (last visited 1/9/2017).

| Fiscal Year | Award Type | Funds Awarded | Number of Transactions |
|-------------|------------|---------------|------------------------|
| 2012 | Contracts | $11,475,879 | 52 |
| 2013 | Contracts | $1,026,605,169 | 84 |
| 2014 | Contracts | $2,970,075,676 | 124 |
| 2015 | Contracts | $2,505,344,547 | 124 |
| 2016 | Contracts | $2,723,068,419 | 194 |
| 2017 | Contracts | $260,491,446 | 2 |

(B)  United Healthcare Services, Inc. has been paid $1,120,592 to date for FY 2017 by the Department of Treasury.[17]

173.    As alleged in ¶¶31-35 *supra,* Defendants have entered into agreements or contracts of insurance with the federal government.

174.    Defendants violated and continue to violate Section 1557(a) of the ACA on the basis of sex discrimination because, as set forth herein, Defendants' refusal  and failure to comply with the ACA's provisions with respect to preventive women's care for Comprehensive Lactation Benefits has a disparate discriminatory impact on breastfeeding and lactating women.

175.    By violating the women's preventive services requirements under the ACA, plan participants have been and continue to be denied mandated access to coverage for breastfeeding benefits. Defendants' denial of benefits and unlawful cost sharing has – in addition to violating the ACA – unjustly enriched Defendants and deprived thousands of women of their mandated lactation benefits.  If Defendants' unlawful and discriminatory conduct is not foreclosed, many more mothers will be wrongfully denied the benefits they are entitled to receive under the ACA.

**H.    Defendants' Status as, and Duties of, ERISA Fiduciaries.**

176.    ERISA fiduciaries include not only parties explicitly named as fiduciaries in the governing plan documents or those to whom there has been a formal delegation of fiduciary responsibility, but also any other parties who, in fact, performs fiduciary functions. Under ERISA, a person is a fiduciary "to the extent . . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting

---

[17]    https://www.usaspending.gov/transparency/Pages/RecipientProfile.aspx?DUNSNumber=071778674&FiscalYear=2017 (last visited 1/2/2017).

SECOND AMENDED CLASS ACTION COMPLAINT

management or disposition of its assets. . . .," ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), or "he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii). Thus, if a Defendant exercises discretionary authority or control in managing or administering the plan, or, if it exercises any authority or control (discretionary or not) with respect to management or disposition of plan assets, it is an ERISA fiduciary.

177.     At all relevant times, Defendants have been fiduciaries of the Defendants' health plans because: (a) they had the authority with respect to the Defendants' health plans' compliance with the ACA requirements; (b) they exercised discretionary authority and/or discretionary control with respect to their compliance with the ACA requirements for their health plans; (c) they had the authority to establish a network of providers for Comprehensive Lactation Benefits for their health plans; (d) they exercised discretionary authority and/or discretionary control with regard to establishing a network of providers for Comprehensive Lactation Benefits for their health plans; (e) they had the authority and/or discretionary responsibility over the management and administration of preventive services as required by the ACA for their health plans; and/or, (f) they exercised discretion over provider lists for their plans with respect to providers of Comprehensive Lactation Benefits, and, on information and belief, failed to establish a network of providers in order to maximize their profits and minimize their costs of coverage for ACA women's preventive services.

178.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These fiduciary duties under ERISA §§ 404(a)(1), 404(a)(1)(A), and (B) are referred to as the duties of loyalty and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

179.     In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to

protect the interests of the ERISA plans and their participants. An appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their fiduciary obligations.

180.    ERISA also holds fiduciaries liable for the misconduct of co-fiduciaries. ERISA § 405(a), 29 U.S.C. § 1105(a). Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, more than one ERISA fiduciary involved in a given issue.  Even if a fiduciary merely knows of a breach with which it had no connection, it must take steps to remedy that breach. *See* 1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080 ("[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .[T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.").

181.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies set forth in § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. §1104.

182.    In addition, Plaintiffs and the members of the Classes were not required to exhaust their administrative remedies and any pursuit, or further pursuit, of any administrative remedies would be futile.  Futility here is clear because pursuit of administrative remedies could not address Defendants' failure to establish in-network providers of Comprehensive Lactation Benefits nationwide, and to provide, cover, and administer Comprehensive Lactation Benefits as a no-cost preventive service in accordance with the ACA.  Defendants' health plans fail to comply with the provisions of the ACA

with respect to preventive services, the redress for which could not be accomplished by pursuit of administrative remedies.   Since the action concerns Defendants' violations with respect to the fundamental constructs of Defendants' plans and networks, and does not evoke Defendants' discretion with respect to the payment of an individual claim, any effort to exhaust administrative remedies would be futile and is not required as a matter of law.

183.   Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for appropriate equitable relief from Defendants as fiduciaries (and, in the alternative, from Defendants as knowing participants in breaches of any of ERISA's fiduciary responsibility provisions), including, without limitation, injunctive relief and, as available under applicable law, imposition of a constructive trust, equitable surcharge, and restitution.

## CLASS ACTION ALLEGATIONS

184.   Plaintiffs bring this action on behalf of themselves and the proposed Classes pursuant to FED. R. CIV. P. 23(a), 23(b)(2), 23(b)(2), and/or 23(b)(3).   Specifically, Plaintiffs seek to represent the following Classes:

> **ACA Class:** All persons who, on or after August 1, 2012, are or were participants in or beneficiaries of any non-grandfathered health plan and non-federal employee health plan, sold, underwritten or administered by Defendants in their capacity as insurer or administrator, who did not receive full coverage and/or reimbursement for Comprehensive Lactation Benefits.

> **Claims Review Class:** All participants and beneficiaries in one or more of the ERISA employee health benefit plans administered by Defendants in the United States, which provide benefits for healthcare services and for which claims administration duties are delegated to one or more of the Defendants.

> **Lactation Services Class:** All participants and beneficiaries in one or more of the ERISA employee health benefit plans administered by Defendants in the United States for which Defendants fail and refuse to provide payment or reimbursement for Comprehensive Lactation Benefits without cost to such participants and beneficiaries.

185.    Excluded from the Classes are Defendants, their subsidiaries or affiliate companies, their legal representatives, assigns, successors, and employees.

186.    <u>Numerosity/Impracticability of Joinder</u>: The members of the Classes are so numerous that joinder of all members is impracticable.  The exact number of the members of the Classes is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, but Plaintiffs are informed and believe that there are at least thousands of members of the Classes throughout the United States.

187.    <u>Commonality and Predominance</u>: This action is properly brought as a class action because of the existence of questions of law and fact common to the Classes.  Common questions of law and fact include, but are not limited to, the following:

(a) For the ACA Class, whether Defendants utilize a system that administers claims from participants and beneficiaries of any non-grandfathered health plan and non-federal employee health plan in contravention of the express terms and conditions of the ACA and plans' documents by failing to provide timely and substantive responses to requests for out-of-network benefits and/or appeals to denials of requests for out-of-network benefits;

(b) For the ACA Class, whether Defendants violate the express terms and conditions of the ACA and plans' documents by failing to offer either in-network lactation service providers within a reasonable distance of the plan participants and/or beneficiaries or full coverage of out-of-network lactation service providers for plan participants and/or beneficiaries who do not have in-network lactation service providers within a reasonable distance;

(c) For the Claims Review Class, whether Defendants utilize a system that administers claims from ERISA plan participants and beneficiaries in contravention of the express terms and conditions of the ERISA plans' documents by failing to provide timely and substantive responses to requests for out-of-network benefits and/or appeals to denials of requests for out-of-network benefits;

1        (d) For the Claims Review Class, whether Defendants utilize a system that

2        administers claims from ERISA plan participants and beneficiaries that violates

3        ERISA by failing to provide timely and substantive responses to requests for out-

4        of-network benefits and/or appeals to denials of requests for out-of-Network

5        benefits;

6        (e) For the Lactation Services Class, whether Defendants violate the express terms

7        and conditions of the ERISA plans' documents by failing to provide either in-

8        network lactation service providers within a reasonable distance of the plan

9        participants and/or beneficiaries or full coverage of out-of-network lactation

10       service providers for plan participants and/or beneficiaries who do not have in-

11       network lactation service providers within a reasonable distance;

12       (f) For the Lactation Services Class, whether Defendants breaching their fiduciary

13       duties under ERISA by failing to provide either in-network lactation service

14       providers within a reasonable distance of the plan participants and/or beneficiaries

15       or full coverage of out-of-network lactation service providers for plan participants

16       and/or beneficiaries who do not have in-network lactation service providers

17       within a reasonable distance;

18       (g) Whether the ERISA plans and/or their beneficiaries and participants are entitled

19       to declaratory and injunctive relief;

20       (h) Whether the ERISA plans and/or their beneficiaries and participants are entitled

21       to an accounting, disgorgement, restitution, and/or other appropriate equitable

22       relief;

23       (i) Whether Defendants are violating the ACA's mandate of providing access to and

24       coverage for Comprehensive Lactation Benefits to the members of the Lactation

25       Services Class and the ACA Class;

26       (j) Whether Defendants unlawfully discriminate on the basis of sex in violation of

27       the ACA by virtue of the conduct described herein;

28

(k) Whether Plaintiffs and the members of the Lactation Services Class and the ACA Class are entitled to a declaration regarding their rights under the ACA;

(l) Whether Plaintiffs and the members of the Lactation Services Class and the ACA Class are entitled to an Order enjoining Defendants from violating the ACA requirements related to Comprehensive Lactation Benefits and compelling compliance with the ACA; and

(m) Whether Defendants have been unjustly enriched (and if so, in what amount).

188.   Typicality:  Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, Plaintiffs and all members of the Classes have been injured and damaged in the same way as a result of Defendants' failure to provide access to coverage for Comprehensive Lactation Benefits; Plaintiffs Condry, Hoy, Endicott, Bishop, and Carroll, and all members of the Claims Review Class, have been injured and damaged in the same way as a result of Defendants' systematic process for handling claims and appeals for out-of-network benefits; and, Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber, and all members of the Lactation Services Class, have been injured and damaged in the same way as a result of Defendants' refusal to provide either in-network lactation service providers within a reasonable distance of the plan participants and/or beneficiaries or full coverage of out-of-network lactation service providers for plan participants and/or beneficiaries who do not have in-network lactation service providers within a reasonable distance.

189.   Adequacy of Representation:  Plaintiffs will fairly and adequately protect the interests of the members of the Classes because their interests are aligned and do not conflict with the interests of the members of the Classes they seek to represent.  Plaintiffs have retained highly competent counsel who are experienced in class action litigation, including ERISA litigation, and possess the requisite resources and ability to vigorously prosecute this case as a class action.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their Counsel.

190.   Superiority:  A collective action is superior to all other available means for the fair and efficient adjudication of this controversy.  Most of the members of the Classes would not be likely to file individual lawsuits because they lack adequate financial resources, access to attorneys or knowledge of their claims, because the damages suffered by individual members of the Classes may

be relatively small, and because the expense and burden of individual litigation would make it impossible for such persons to individually to redress the wrongs done to them. Individualized litigation presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. Moreover, Plaintiffs' claims for equitable relief are based on actions, and refusals to act, by Defendants that are generally applicable to Plaintiffs and all other members of the Classes, making final injunctive relief or other relief appropriate with respect to the Classes as a whole. Class treatment is also appropriate because Defendants engaged in a uniform and common practice, and all Class Members have the same legal right to, and interest in, redress for relief associated with violations of the ACA's lactation coverage requirements.

191. Plaintiffs know of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## EXHAUSTION/FUTILITY OF ADMINISTRATIVE REMEDIES

192. Also as detailed above, Plaintiff Condry's claim for her first lactation consultation was processed and completely denied as "not a reimbursable service." Plaintiff Condry did not submit claims for the second or third lactation consultation, nor did she take further action by appealing the first denied claim because she believed it would have been futile.

193. As detailed above, Plaintiff Hoy has spent a significant amount of time and resources attempting to resolve her benefit disputes with Defendants, and complied with the appeals process set forth in the Santander Plan. Notwithstanding her efforts, including her appeal to the Pennsylvania Insurance Department, Defendants have either ignored or "lost" Plaintiff Hoy's repeated written appeals, and have failed to respond substantively to Plaintiff Hoy's repeated written appeals. Accordingly, Plaintiff Hoy has exhausted the administrative remedies available to her and/or further pursuit of the administrative remedies would be futile.

194. As detailed above, despite Plaintiff Endicott's attempts to resolve her benefit disputes with Defendants, and her appeal to the State of Connecticut Insurance Department, Plaintiff Endicott's claims for Comprehensive Lactation Services were erroneously applied to her out-of-network

deductible.  Accordingly, Plaintiff Endicott has exhausted the administrative remedies available to her and/or further pursuit of the administrative remedies would be futile.

195.    As detailed above, Plaintiff Bishop repeatedly attempted to comply with Defendants' appeals process in an attempt to obtain coverage for her lactation benefits.  Yet, Plaintiff Bishop's investment of time and energy resulted in Defendants fully denying the claim and categorizing the service as, "not a reimbursable service."   Accordingly, Plaintiff Bishop has exhausted the administrative remedies available to her and/or further pursuit of the administrative remedies would be futile.

196.    Also as detailed above, despite her attempt to appeal Defendants' rejection of her claim, Plaintiff Barber's claim was processed and completely denied as "not covered by the health benefit plan." Accordingly, Plaintiff Barber has exhausted the administrative remedies available to her and/or further pursuit of the administrative remedies would be futile.

197.    Also as detailed above, Plaintiff Carroll's claims for lactation benefits were erroneously processed as not a covered service and/or applied to her out-of-network deductible, resulting in no reimbursement.  Plaintiff Carroll attempted to file an appeal, but was unable to successfully locate the form online. After additional claim denials, Plaintiff Carroll did not take any further action because she believed it would have been futile.

198.    Futility is also particularly clear since Plaintiffs have sufficiently alleged breaches of fiduciary duty by Defendants, and the existence of an inherent conflict of interest between Defendants' obligation as fiduciaries for ERISA plan participants and their business incentives, as alleged above.

199.    Plaintiffs allege that Defendants fail to provide either in-network lactation service providers within a reasonable distance of the plan participants and/or beneficiaries, or full coverage of out-of-network lactation service providers for plan participants and/or beneficiaries who do not have in-network lactation service providers within a reasonable distance.  Since Plaintiffs are challenging systematic processes, rather than an exercise of discretion with respect to an individual claim, any further effort to exhaust administrative remedies would be a futile act that is not required as a matter of law.

200.    Moreover, Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber allege that, contrary to the plans' documents and ERISA, Defendants use an administrative system that fails to provide timely responses to requests for out-of-network benefits and/or appeals to denials of requests for out-of-network coverage, which is another systematic process rather than an exercise of discretion with respect to an individual claim. As such, any further effort to exhaust administrative remedies in this regard would be a futile act that is not required as a matter of law.

## COUNT I

**Declaratory and Injunctive Relief for UnitedHealth's Breaches of Fiduciary Duty
in Violation of 29 U.S.C. §§ 1104(a)(1)(A)(I), 1104(a)(1)(B), and 1104(a)(1)(D),
Violation of 29 U.S.C. § 1133, and For Other Appropriate Equitable Relief
(On Behalf of the Claims Review Class)**

201.    Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber re-allege and incorporate the preceding paragraphs as if fully set forth herein.

202.    Pursuant to 29 U.S.C. § 1132(a), Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber bring this Count individually and on behalf of the Claims Review Class under ERISA, 29 U.S.C. § 1101, *et seq.* By having been given and/or assumed discretionary authority and responsibilities for administering healthcare benefits under employee benefit plans, Defendants are fiduciaries as defined in 29 U.S.C. §§ 1002(21)(A), 1102(a)(2).

203.    As the plans' fiduciaries, Defendants are obligated to discharge their duties "solely in the interest of the participants and beneficiaries" and exclusively for the purpose of providing and administering benefits to plan participants and beneficiaries. 29 U.S.C. §§ 1104(a)(1) and 1104(a)(1)(A)(I).

204.    In carrying out these fiduciary duties, Defendants are obligated to exercise ordinary care and must seek to administer plan benefits in strict accordance with the terms of the underlying plan documents. 29 U.S.C. §§ 1104(a)(1)(B) and 1104(a)(1)(D).

205.    In addition, ERISA § 503, 29 U.S.C. 1133, requires every ERISA plan to provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be

understood by the participant, and afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

206.    By utilizing a system when administering claims from ERISA plan participants and beneficiaries that fails to provide timely and substantive responses to requests for out-of-network benefits and/or appeals to denials of requests for out-of-network benefits, Defendants have breached their fiduciary duties to: (1) discharge their duties "solely in the interest of the participants and beneficiaries" and exclusively for the purpose of providing and administering benefits to plan participants and beneficiaries; (2) exercise ordinary care; and/or (3) administer the plans' benefits in strict accordance with the terms of the underlying plan documents.

207.    By utilizing a system when administering claims from ERISA plan participants and beneficiaries that fails to provide timely and substantive responses to requests for out-of-network benefits and/or appeals to denials of requests for out-of-network benefits, Defendants have violated ERISA 503, 29 U.S.C. § 1133.

## COUNT II

**Declaratory and Injunctive Relief for UnitedHealth's Breaches of Fiduciary Duty
in Violation of 29 U.S.C. §§ 1104(a)(1)(A)(I), 1104(a)(1)(B), and 1104(a)(1)(D)
and for Other Appropriate Equitable Relief
(On Behalf of the Lactation Services Class)**

208.    Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber re-allege and incorporate the preceding paragraphs as if fully set forth herein.

209.    Pursuant to 29 U.S.C. 1132(a), Plaintiffs bring this Count individually and on behalf of the Lactation Services Class under ERISA, 29 U.S.C. §1101, *et seq.*   By having been given and/or assumed discretionary authority and responsibilities for administering healthcare benefits under employee benefit plans, Defendants are fiduciaries as defined in 29 U.S.C. §1102(21)(A).

210.    As the plans' fiduciaries, Defendants are obligated to discharge their duties "solely in the interest of the participants and beneficiaries" and exclusively for the purpose of providing and

administering benefits to plan participants and beneficiaries. 29 U.S.C. §§ 1104(a)(1) and 1104(a)(1)(A)(I).

211.    In carrying out these fiduciary duties, Defendants are obligated to exercise ordinary care and must seek to administer plan benefits in strict accordance with the terms of the underlying plan documents. 29 U.S.C. §§ 1104(a)(1)(B) and 1104(a)(1)(D).

212.    By failing to provide either in-network lactation service providers within a reasonable distance of the plan participants and/or beneficiaries or full coverage of out-of-network lactation service providers for plan participants and/or beneficiaries who do not have in-network lactation service providers within a reasonable distance, Defendants have breached their fiduciary duty to discharge their duties "solely in the interest of the participants and beneficiaries," and exclusively for the purpose of providing and administering benefits to plan participants and beneficiaries, exercise ordinary care, and/or administer the plans' benefits in strict accordance with the terms of the underlying plan documents.

## COUNT III

### For Co-Fiduciary Breach and Liability for Knowing Breach of Trust
### (On Behalf Of Both ERISA Classes)

213.    Plaintiffs Condry, Hoy, Endicott, Bishop, and Barber re-allege and incorporate the preceding paragraphs as if fully set forth herein.

214.    As Defendants are fiduciaries under ERISA, they are liable under ERISA § 405(a) for each other's violations of ERISA.

215.    Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

      a.  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

      b.  if, by his failure to comply with ERISA § 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

c.   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA §§ 405(a)(1)-(3), 29 U.S.C. §§ 1105(a)(1)-(3).

216.   Each Defendant knowingly participated in and enabled the other Defendants' breaches of fiduciary duty by allowing Defendants to, as alleged herein, provide and administer health plans that were not in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits thereby causing Plaintiffs and members of the Classes to wrongfully pay for Comprehensive Lactation Benefits and/or to forego Comprehensive Lactation Benefits, and by failing to monitor Defendants' compliance with the ACA and plan documents.

217.   Defendants failed to fulfill their ongoing and continuing duty to determine whether their health plans were being established and administered in accordance with the ACA, and in the best interests of Plaintiffs and the members of the Classes.

218.   Each Defendant knew that each of the other Defendants provided and administered health plans that were not in compliance with the preventive services provisions of the ACA with respect to Comprehensive Lactation Benefits and each Defendant failed to make reasonable efforts under the circumstances to remedy the breach of fiduciary duty.

219.   Co-fiduciary liability is joint and several under ERISA, and thus Defendants are jointly and severally liable to Plaintiffs and the members of the Classes for the others' breaches of ERISA's fiduciary responsibility provisions.

220.   In the alternative, to the extent Defendants are not deemed fiduciaries or co-fiduciaries under ERISA, Defendants are liable to Plaintiffs and the Classes for all equitable relief as non-fiduciaries that knowingly participated in a breach of trust.

## COUNT IV

**Discrimination in Violation of Section 1557(a), 42 U.S.C. § 18116(a),
of the Patient Protection and Affordable Care Act
Against Defendants
(On Behalf of the ACA Class)**

221.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

222.    Section 1557(a) of the ACA contains a "nondiscrimination" provision that provides, in relevant part:

> [A]n individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under … title IX … shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

223.    The ACA nondiscrimination provision specifically prohibits discrimination on the basis of those grounds that are prohibited under other federal laws, including Title IX.

224.    Defendants are subject to Section 18116 because Defendants are health programs and activities which will or are "receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" may not discriminate on the basis of sex.   *See* 42 U.S.C. § 18116(a) (incorporating Title IX by reference), as alleged in ¶¶31-35, 166-175, *supra*.

225.    Title IX prohibits discrimination on the basis of sex.  Plaintiffs and the members of the Class, who are necessarily all women, are being excluded from participation in and being denied the benefits of the enumerated preventive health benefit for breastfeeding women, and being subjected to discrimination by Defendants (in Defendants' capacity as insurers and administrators of insurance plans) on the basis of their sex.

226.    The Final Rule (¶¶151-152 *supra*) confirms that a private right of action exists for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the ACA (45 CFR 92; 81 FR 31375).

227.    In addition, as confirmed by the Final Rule, Title IX prohibits discrimination on the basis of sex, and "the definition of 'on the basis of sex' established by [the Final Rule] is based upon existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex includes discrimination on the basis of pregnancy, childbirth, …." 81 Fed. Reg. at 31388. *See also,* ¶¶154-156 *supra*; 81 Fed. Reg. at 31434 ("on the basis of sex" under Section 1557

includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions."); see 45 CFR 86.40(b) (prohibiting discrimination on the basis of "pregnancy, childbirth, false pregnancy…").

228.   And, lactation is a medical condition related to pregnancy and childbirth.  *See also,* ¶¶157-158 *supra.* To continue producing an adequate milk supply and to avoid painful complications associated with delays in expressing milk, a nursing mother will typically need to breastfeed or express breast milk using a pump two or three times over eight hours, thus, when facing lactation issues, breastfeeding women must be able to not only access the necessary care but do so promptly, to avoid further complications or even the inability to continue breastfeeding. *Id.*

229.   Defendants' practice with respect to coverage for preventive health benefits and not identifying in-network providers of Comprehensive Lactation Benefits, singles out lactating and breastfeeding insured women for less favorable treatment with respect to ACA mandated preventive health benefits.

230.   Because only women lactate and breastfeed, and because lactation is a pregnancy-related medical condition, Defendants' misconduct affects only women and therefore is facially sex-based.

231.   Less favorable treatment of a lactating insured, specifically in failing to give access to in-network providers of Comprehensive Lactation Benefits, is unlawful sex discrimination.

232.   By their conduct, Defendants are providing disparate levels of ACA mandated preventive services to breastfeeding and lactating women. Defendants' seemingly facially neutral policy of stating that they purportedly have in-network lactation consultants but not identifying such in-network providers, not giving lactating and breastfeeding insureds access to such in-network providers for this preventive service, and failing to provide such access in a timely manner (which is critical for lactation and breastfeeding), has a disparate impact on breastfeeding and lactating insured women.

233.   Defendants' failures with respect to providing breastfeeding women their preventive health benefits (including Defendants' refusal to establish processes to provide timely identification of in-network trained providers of Comprehensive Lactation Benefits), results in breastfeeding women

being excluded from participation in and being denied the benefits of the enumerated preventive health benefit for breastfeeding women.

234.    And, moreover, Defendants' policies, and lack thereof, impose a significant burden on breastfeeding and lactating women, a protected class. Defendants' practices are unlawful and discriminatory, and can be so irrespective of motivation or intent.

235.    By their conduct alleged herein, Defendants are providing disparate levels of health benefits, and specifically ACA-mandated preventive services, for women. The challenged practice, of not, at a minimum, identifying and timely identifying in-network providers of Comprehensive Lactation Benefits has a substantial disparate impact on women.

236.    Defendants have violated and continue to violate Section 1557(a) of the ACA by discriminating, on the basis of sex, by failing to provide Comprehensive Lactation Benefits as a no-cost preventive service as mandated by the ACA; by failing to provide a listing of in-network providers for Comprehensive Lactation Benefits; by denying coverage for Comprehensive Lactation Benefits secured by purported out-of-network providers in the absence of the availability of in-network providers; by imposing cost and unreasonable administrative burdens intended to deter Plaintiffs and the members of the Class from seeking Comprehensive Lactation Benefits; and by placing other restrictions or limitations on Comprehensive Lactation Benefits, all of which causes (and has caused) widespread detrimental, disparate consequences to breastfeeding women.

237.    By violating the women's preventive services requirements under the ACA, Plaintiffs and the members of the Class have been and continue to be denied mandated access to coverage for Comprehensive Lactation Benefits.  Defendants' unlawful conduct violates the ACA and unjustly enriches Defendants, depriving thousands of women of their ACA-mandated women's preventive services.

238.    If Defendants' unlawful and discriminatory conduct is not foreclosed, many more of their female insureds will be wrongfully foreclosed from receiving Comprehensive Lactation Benefits, and/or reimbursement for Comprehensive Lactation Benefits as a preventive covered services, to which they are entitled under the ACA.

239.     Plaintiffs and members of the Class have been aggrieved and damaged by Defendants' violation of Section 1557 of the ACA.

<u>COUNT V</u>

<b>Violation of the Patient Protection and Affordable Care Act<br>
through Incorporation by Reference in Defendants' Plan Documents<br>
Against Defendants<br>
(On Behalf of the ACA Class)</b>

240.     Plaintiff Carroll re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

241.     Plaintiff Carroll and the ACA Class members' plan documents describe the plan's terms and conditions related to the operation and administration of the plans.

242.     Plaintiff Carroll and the ACA Class members' health plans are subject to the ACA.  In addition, the plan documents specifically reference and track the preventive care provisions of the ACA, including the women's preventive care provisions set forth in 42 U.S.C. § 300gg-13(a)(4).

243.     Accordingly, Plaintiff Carroll has the right to seek to enforce the provisions of the ACA, and, in particular, as alleged herein, the provisions of the ACA requiring the provision of Comprehensive Lactation Benefits as a no-cost women's preventive service.

244.     As a result of Defendants' failure to provide Comprehensive Lactation Benefits to Plaintiff Carroll and the members of the Class, Plaintiff Carroll and the members of the ACA Class have sustained monetary damages and, if Defendants' conduct is not stopped, will continue to be harmed by Defendants' misconduct.

<u>COUNT VI</u>

<b>Unjust Enrichment<br>
Against Defendants<br>
(On Behalf of the ACA Class)</b>

245.     Plaintiff Carroll re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

246.     Defendants have been unjustly enriched by the conduct alleged herein, including by: (a) withholding money due to Plaintiff Carroll and the members of the ACA Class paid for

Comprehensive Lactation Benefits; (b) implementing a course of conduct that prevents Plaintiff Carroll and members of the Classes from seeking Comprehensive Lactation Benefits (or making them pay out-of-pocket), including by their failure to establish a network of providers for Comprehensive Lactation Benefits; and (c) shifting the cost of ACA-mandated, no-cost women's preventive services to Plaintiffs and members of the ACA Class.

247.    Although it is part of Defendants' responsibilities and duties to provide and administer health insurance coverage that satisfies the ACA-mandated preventive care requirements, including for Comprehensive Lactation Benefits, Defendants have failed to fulfill such responsibilities.

248.    As a result, Plaintiffs and members of the ACA Class conferred an unearned tangible economic benefit upon Defendants by paying out-of-pocket for a preventive service, namely, Comprehensive Lactation Benefits.

249.    Equity weighs against Defendants retaining these economic benefits, which should be returned to Plaintiffs and members of the ACA Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the members of the Classes, pray for relief as follows as applicable for the particular cause of action:

A.    An Order certifying this action to proceed on behalf of the Classes, and appointing Plaintiffs and their counsel to represent the Class;

B.    An Order finding that Defendants violated their fiduciary duties to the members of the Classes and awarding Plaintiffs and members of the Classes such relief as the Court deems proper;

C.    An Order finding that Defendants violated the preventive services provisions of the ACA, and awarding Plaintiffs and members of the Classes such relief as the Court deems proper;

D.    An Order finding that Defendants violated the ACA "nondiscrimination" provision, Section 1557(a), 42 U.S.C. § 18116(a), and awarding Plaintiffs and members of the ACA Class such relief as the Court deems proper;

E.    An Order finding that Defendants were unjustly enriched and awarding Plaintiffs and members of the Classes such relief as the Court deems proper;

F.      Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by the ACA and ERISA with respect to Comprehensive Lactation Benefits;

G.      An Order awarding, declaring or otherwise providing Plaintiffs and members of the Classes all relief under ERISA, that the Court deems proper and such appropriate equitable relief as the Court may order, including damages, an accounting, equitable surcharge, disgorgement of profits, equitable lien, constructive trust, or other remedy;

H.      An Order finding that Defendants are jointly and severally liable as co-fiduciaries, in violations of ERISA;

I.      An Order awarding Plaintiffs and the members of the Classes other appropriate equitable and injunctive relief to the extent permitted by the above claims;

J.      An Order awarding Plaintiffs' counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine; and

K.      Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial  by jury for all claims asserted in this Second Amended Complaint so triable.

Dated: September 5, 2017

### CHIMICLES & TIKELLIS LLP

By:  */s/ Kimberly Donaldson Smith*
        Nicholas E. Chimicles (admitted *pro hac vice*)
        Kimberly Donaldson Smith (admitted *pro hac vice*)
        Stephanie E. Saunders (admitted *pro hac vice*)
        361 W. Lancaster Avenue
        Haverford, PA 19041
        Phone: (610) 642-8500
        Fax: 610-649-3633
        NEC@Chimicles.com
        KMD@Chimicles.com
        SES@Chimicles.com

1

2

3    KRISTEN LAW SAGAFI, California Bar No. 222249
     **TYCKO & ZAVAREEI LLP**
4    483 Ninth Street, Suite 200
     Oakland, CA  94607
5    Phone: (510) 254-6808
     Fax: (202) 973-0950
6    ksagafi@tzlegal.com

7    Marc A. Goldich (admitted *pro hac vice*)
     Noah Axler (admitted *pro hac vice*)
8    **AXLER GOLDICH LLC**
9    1520 Locust Street
     Suite 301
10   Philadelphia, PA 19102
     Phone: (267) 534-7400
11   Fax: (267) 534-7407
     mgoldich@axgolaw.com
12   naxler@axgolaw.com

13

14   James E. Miller (admitted *pro hac vice*)
     Laurie Rubinow (to seek admission *pro hac vice*)
15   **SHEPHERD, FINKELMAN, MILLER AND SHAH, LLP**
     65 Main Street
16   Chester, CT 06412
     Phone: (860) 526-1100
17   Fax: (866) 300-7367
     jmiller@sfmslaw.com
18   lrubinow@sfmslaw.com

19

     Jonathan W. Cuneo (to seek admission *pro hac vice*)
20   Pamela B. Gilbert (to seek admission *pro hac vice*)
     Matthew E. Miller (to seek admission *pro hac vice*)
21   Katherine Van Dyck (to seek admission *pro hac vice*)
     **CUNEO GILBERT & LADUCA, LLP**
22   4725 Wisconsin Ave. NW, Suite 200
     Washington, DC 20016
23   Phone: (202) 789-3960
     Fax: (202) 789-1813
24

25   ***Counsel for Plaintiffs and the Proposed Classes***

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I, Kimberly M. Donaldson Smith, hereby certify that on September 5, 2017, I

3

electronically filed a true and correct copy of the foregoing Second Amended Complaint with

4

the Clerk of the Court using the CM/ECF system.  Participants in the case who are registered

5

CM/ECF users will be served by the CM/ECF system.

6

7

8

9

                              /s/  *<u>Kimberly M. Donaldson Smith</u>*
                                   Kimberly M. Donaldson Smith

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT