**TYCKO & ZAVAREEI LLP**
KRISTEN LAW SAGAFI, California Bar No. 222249
ksagafi@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

Counsel for Plaintiffs

*Additional counsel for Plaintiffs on signature page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

RACHEL CONDRY, JANCE HOY, CHRISTINE ENDICOTT, LAURA BISHOP, FELICITY BARBER, and RACHEL CARROLL on behalf of themselves and all others similarly situated,

        Plaintiffs,

  v.

UnitedHealth Group Inc.; UnitedHealthcare, Inc.; UnitedHealthcare Insurance Company; UnitedHealthcare Services, Inc.; and UMR, Inc.,

        Defendants.

Case No.: 3:17-cv-00183-VC

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES**

**Date:   April 25, 2019**
**Time:   10:00 am**
**Place:  Courtroom 4**

**Honorable Vince G. Chhabria**

**PLEASE TAKE NOTICE** that on April 25, 2019, at 10:00 am in Courtroom 4 of the above-captioned court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs, Rachel Condry, Jance Hoy, Christine Endicott, Laura Bishop, Felicity Barber, and Rachel Carroll (collectively, the "Plaintiffs"), will move the Court for an order, pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure ("Rule 23"), certifying the following Classes:

**A. The "Claims Review Class"** defined as**:**

All participants and beneficiaries, in one or more of the ERISA employee health benefit plans administered by Defendants in the United States, which provide benefits for healthcare services and for which claims administration duties are delegated to one or more of the Defendants, who received from August 1, 2012 to present, an explanation of benefits for Comprehensive Lactation Services, that included one or more of the denial reasons:

(1) Remark code KM: "This is not a reimbursable service. There may be a more appropriate CPT or HCPCS code that describes this service and/or the use of the modifier or modifier combination is inappropriate."

(2) Remark code I5: "This service code is not separately reimbursable in this setting."

(3) Remark code 13: "Your plan does not cover this nonmedical service or personal item."

(4) Remark code B5: "Benefits for this service are denied. We sent a letter to the member asking for additional information. We have not received a Response."

**B. The "Lactation Services Class"** defined as**:**

All participants and beneficiaries in one or more of the ERISA, non-grandfathered, non-federal employee health benefit plans sold, underwritten or administered by Defendants in the United States in their capacity as insurer or administrator, who received from August 1, 2012 to present Comprehensive Lactation Services, for which Defendants did not provide coverage and/or imposed cost-sharing.

**C. The "ACA Class"** defined as:

All participants and beneficiaries in one or more of the non-grandfathered, non-federal employee health plans, sold, underwritten or administered by Defendants in the United States in their capacity as insurer or administrator, who received from August 1, 2012 to present Comprehensive Lactation Services, for which Defendants did not provide coverage and/or imposed cost-sharing.

For the Lactation Services Class and the ACA Class, a non-grandfathered plan means: (i) any health insurance policy created or purchased after March 23, 2010, and (ii) any health insurance policy created or purchased on or before March 23, 2010, that subsequently lost its grandfathered status.

1    For each of the Classes, Comprehensive Lactation Services means comprehensive lactation
2    support, counseling and education services provided during the antenatal, perinatal, and the postpartum
3    period.

4    Excluded from the Classes are Defendants, their subsidiaries or affiliate companies, their legal
5    representatives, assigns, successors and employees.

6    Plaintiffs also request that the Court appoint:

7    **A.**  For the Claims Review Class, Plaintiffs Barber, Bishop, Condry, Endicott, and Hoy as Class
8        Representatives;

9    **B.**  For the Lactation Services Class, Plaintiffs Bishop, Hoy and Endicott as Class
10       Representatives; and,

11   **C.**  For the ACA Class, Plaintiff Carroll as Class Representative.

12   Plaintiffs also request that the Court appoint their counsel, Chimicles Schwartz Kriner &
13   Donaldson-Smith LLP and Shepherd, Finkelman, Miller and Shah, LLP as Co-Lead Class Counsel, and
14   Axler Goldich LLC as Class Counsel.

15   This Motion is based on this Notice of Motion, the attached Memorandum of Points and
16   Authorities, the supporting Declaration of Kimberly Donaldson-Smith and Exhibits thereto ("Ex. __"),
17   and the arguments of counsel at the hearing on Plaintiffs' Motion.

18   Dated: February 20, 2019

**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**

By:  */s/ Kimberly Donaldson-Smith*
    Nicholas E. Chimicles (admitted *pro hac vice*)
    Kimberly Donaldson-Smith (admitted *pro hac vice*)
    Stephanie E. Saunders (admitted *pro hac vice*)
    361 W. Lancaster Avenue
    Haverford, PA 19041
    Phone: (610) 642-8500
    Fax: 610-649-3633
    NEC@Chimicles.com
    KMD@Chimicles.com
    SES@Chimicles.com

James E. Miller (admitted *pro hac vice*)
Laurie Rubinow (to seek admission *pro hac vice*)
**SHEPHERD, FINKELMAN, MILLER AND SHAH, LLP**
65 Main Street
Chester, CT 06412
Phone: (860) 526-1100
Fax: (866) 300-7367
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

*Proposed Co-Lead Class Counsel and Counsel for Plaintiffs*

Marc A. Goldich (admitted *pro hac vice*)
Noah Axler (admitted *pro hac vice*)
**AXLER GOLDICH LLC**
1520 Locust Street
Suite 301
Philadelphia, PA 19102
Phone: (267) 534-7400
Fax: (267) 534-7407
mgoldich@axgolaw.com
naxler@axgolaw.com

*Proposed Class Counsel and Counsel for Plaintiffs*

KRISTEN LAW SAGAFI, California Bar No. 222249
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA  94607
Phone: (510) 254-6808
Fax: (202) 973-0950
ksagafi@tzlegal.com

Jonathan W. Cuneo (to seek admission *pro hac vice*)
Pamela B. Gilbert (to seek admission *pro hac vice*)
Monica E. Miller (to seek admission *pro hac vice*)
Katherine Van Dyck (to seek admission *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Phone: (202) 789-3960
Fax: (202) 789-1813

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................................1

II.   SUMMARY OF THE CASE AND PERTINENT FACTS .................................................3

    A.    The Parties ...............................................................................................................3

    B.    The ACA's Preventive Coverage Mandate..............................................................4

    C.    UHC's Policies and Practices ..................................................................................6

    D.    The Members of the Classes Did Not Have Access to Network CLS Providers ...........9

    E.    The Remark Codes.................................................................................................12

III.  ARGUMENT .....................................................................................................................12

    A.    Class Action Prerequisites .....................................................................................12

    B.    Definitions of the Classes ......................................................................................13

    C.    The Proposed Classes Meet the Requirements of Rule 23(a)....................................14

        1.    The Proposed Classes are Sufficiently Numerous
            Rendering Joinder of All Class Members Impracticable ................................14

        2.    Plaintiffs Establish Commonality .................................................................16

        3.    Plaintiffs' Claims are Typical of the Claims of the Members
            of the Proposed Classes They Seek to Represent ...........................................17

        4.    Plaintiffs and Counsel Are Adequate Representatives .....................................21

    D.    Rule 23(b) Requirements .......................................................................................23

        1.    Rule 23(b)(1)...............................................................................................23

        2.    Rule 23(b)(2)...............................................................................................24

IV.   CONCLUSION...................................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Abdeljalil v. General Electric Capital Corp.*,
    306 F.R.D. 303 (S.D. Cal. 2015) ................................................................13

*Abdullah v. U.S. Security Assoc., Inc.*,
    731 F.3d 952 (9th Cir. 2013) ...................................................................17

*Arnold v. United Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) ..............................................................25

*Arthur v. United Indus. Corp.*,
    Case No. 2:17-cv-06983-CAS(SKx), 2018 U.S. Dist. LEXIS 83607
    (C.D. Cal. May 17, 2018) .......................................................................21

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ..................................................................19

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010) .............................................................17

*Des Roches v. California Physicians' Service*,
    320 F.R.D. 486 (N.D. Cal. 2017) ....................................................16, 23, 25

*Eternal Word TV Network, Inc. v. Sec'y of the U.S.HHS*,
    818 F.3d 1122 (11th Cir. 2016) ..............................................................5, 6

*Gessele v. Jack in the Box, Inc.*,
    No. 3:10-CV-960-ST, 2012 U.S. Dist. LEXIS 120377 (D. Or. Aug. 24, 2012) ..............................1

*Jimenez v. Allstate Ins. Co.*,
    765 F.3d 1161 (9th Cir. 2014) ..................................................................17

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ..................................................................17

*Knutson v. Schwan's Home Services, Inc.*,
    No. 3:12-cv-0964-GPC, 2013 U.S. Dist. LEXIS 127032 (S.D. Cal. Sept. 5, 2013) .....................13

*Martial v. Coronet Ins. Co.*,
    880 2d 954 (7th Cir. 1989) ......................................................................14

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ....................................................................16

*McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Trust*,
    268 F.R.D. 670 (W.D. Wash. 2010) ...........................................................13

ii

*Moeller v. Taco Bell Corp.*
    220 F.R.D. 604 (N.D. Cal 2004) .................................................................14, 25

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
    823 F.3d 948 (9th Cir. 2016) .................................................................................24

*Ogbuehi v. Comcast of Cal,/Colo./Fla./Or., Inc.*,
    303 F.R.D. 337 (E.D. Cal. 2014) ...........................................................................15

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ........................................................................*passim*

*Robertson v. National Basketball Ass'n*,
    556 F.2d 682 (2d Cir. 1977)...................................................................................24

*Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*,
    85 F.3d 455 (9th Cir. 1996) ...................................................................................25

*In re: TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ...........................................................................13

*Van Patten v. Vertical Fitness*,
    No. 12cv1614-LAB, 2013 U.S. Dist. LEXIS 189845 (S.D. Cal. Nov. 8, 2013) ...........13

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)................................................................................................16

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ...............................................................................21

*Wit v. United Behavioral Health*,
    317 F.R.D. 106 (N.D. Cal. 2016)......................................................................16, 25

*Wolf v. Hewlett Packard Co.*,
    No. CV 15-01221 BRO, 2016 U.S. Dist. LEXIS 18122 (C.D. Cal. Sep. 1, 2016)........13

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ..........................................................................13, 23


**<u>STATUTES</u>**

42 U.S.C. § 300gg-13(a)(1), (a)(4) .............................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>OTHER AUTHORITIES</u>

29 C.F.R. § 2560.503-1(b)(5) ........................................................................................24

29 C.F.R.  2590.715-2713...........................................................................................4

29 C.F.R.  2590.715-2713(a)(3)...................................................................................5

75 FR 41726 at 41730, Table 1....................................................................................5

Fed. R. Civ. P. 23, *et seq.*.....................................................................................*passim*

# I.     **INTRODUCTION**

At issue are UHC's policies and practices that constitute a failure to meet the ACA's preventive coverage mandate for comprehensive lactation support and counseling ("CLS").

As set forth in Sections II and III, *infra,* the pertinent questions of law and fact common to the members of the Lactation Services Class and ACA Class are grounded on: UHC's policies and procedures with respect to coverage for CLS; and, the following key holdings in the Court's June 27, 2018 Order re Motions for Summary Judgment and Motion to Strike ("SJ Order", Dkt. 146), that are applicable to the Classes' claims and support certification of the Classes:[1]

- The ACA requires meaningful access, "[i]llusory or de minimis access is not sufficient, and a woman does not have access to lactation support if she cannot practically find those services." (SJ Order at 2, ¶ 1);

- There is no diagnostic and preventive distinction for CLS, "[t]he statute requires coverage of lactation support regardless of whether a woman is receiving it in response to symptoms…" (*Id., ¶ 2*);

- "Even assuming that some pediatricians, OBGYNs and their practices provide [CLS], this fact - absent evidence that pediatricians and OBGYNs …were in fact providing those services to their patients **and** that the Defendants made the plaintiff aware of that - does not create a genuine issue of fact as to whether a particular plaintiff had meaningful access to [CLS]." (*Id.* at 3, ¶ 3, emphasis added).

Discovery has revealed that: UHC's system denoted lactation specialists with the specialty code "380"; UHC's system populated UHC's online provider finder search tool for "lactation specialists" with only network "380"-designated providers; and, nationally, throughout the Class Period, UHC <u>had</u> only a smattering of "380" network providers who, in turn, were the <u>only</u> network lactation specialists identifiable by UHC to insureds online. *See* Sections II.D and III.C.3, *infra*. Another of UHC's policies, evidencing failure of coverage for CLS, is that UHC's "SOPs" (*i.e.,* standard operating procedures), sought to shift its duties by directing its customer service representatives ("CSRs") to tell members to go back to their doctor in order to identify network

---

[1] Defendants waived any objection to class certification based on the so-called one way intervention rule. *See* Dkt. 57, p. 1 ("[D]efendant is affirmatively requesting a schedule in which the Court entertains cross-motions for summary judgment with respect to the named plaintiffs before entertaining a motion for class certification. This, by definition, is a waiver of the right to object to class certification based on the so-called one-way intervention rule."). *See also Gessele v. Jack in the Box, Inc.*, No. 3:10-CV-960-ST, 2012 U.S. Dist. LEXIS 120377, at *7 (D. Or. Aug. 24, 2012) ("by filing a motion for summary judgment prior to class certification, the defendant accepts the potential unfairness of one-way intervention").

1

CLS providers. (*Id.*, and fn. 15, *infra,* "The member's doctor may offer these services, or have relationships with other practitioners in his or her area to provide this care.").  Further, UHC's CLS coverage policies – which UHC admits have not changed throughout the Class Period to the present (*see* Ex. 10, UHC's Second Amended Responses to Plaintiffs' First Set of Interrogatories, dated January 2019 ("UHC Resp.") to Rogs. 1-4)) – are grounded in UHC's: 1) narrow construct of CLS (including its unsupported preventive/diagnostic care construct); 2) baseless position that all pediatricians and obstetricians provide CLS; and, 3) stance that CLS is simply part of post-partum wellness visits and sufficiently covered by physicians providing "routine postpartum care as part of global delivery reimbursement." *See* Sections II.C and III.C.3, *infra.* The resolution of whether UHC's CLS-related policies and procedures constitute ACA-mandated coverage for CLS presents questions common to the members of the Lactation Services Class and ACA Class.

As set forth in Sections II and III, *infra*, the Claims Review Class encompasses all members and beneficiaries of ERISA plans who received an explanation of benefits ("EOB") for a CLS claim that contained one or more of the four remark codes identified in the Court's SJ Order (*id.* at pgs. 6-7).  The pertinent questions of law and fact that are common to the members of the Claims Review Class are based on UHC's conduct, specifically its use of an EOB with one or more of the four remark codes, and whether the remark codes violate ERISA, a finding the Court has already answered in the affirmative. *Id.; see also* fn. 1*, supra.*

UHC's liability is measured in this Action by its misconduct, including its establishment and implementation of ACA-deficient policies and positions with respect to CLS coverage, and, its use of remark codes that were impossible to understand and failure to provide ERISA-mandated information to insureds. UHC's liability is not based on what any individual insured may now believe or then knew. Certainly, UHC (as well as insurers generally) do not operate ad-hoc. It would be reckless if UHC were to hinge *its ACA and ERISA compliance* on individualized knowledge or conduct of an insured.

Also, as discussed *infra* Section III.C.3, in its possible haste to conjure up "individualized" issues, UHC and its experts have asserted rash positions going to the propriety and import of some of UHC's fundamental systems and operations, including the effectiveness of managing, preventing

2

and detecting provider fraud and the capabilities of its auto-adjudication claims. UHC's arguments, however, are easily addressed and should be dismissed as red-herrings.

At bottom, this Action, in which the common legal and factual issues presented are grounded in UHC's policies and its conduct is ideally situated for certification under Rule 23. Plaintiffs, as proposed representatives of their respective Classes, amply demonstrate the suitability of certifying this Action and the proposed Classes under Rule 23.

## II.   SUMMARY OF THE CASE AND PERTINENT FACTS

### A.  The Parties

Defendant UnitedHealth Group Incorporated, through its subsidiaries, including Defendants UnitedHealthcare, Inc., UnitedHealthCare Services, Inc. ("UHS"), and UnitedHealthcare Insurance Company ("UHIC"), and UHS's subsidiary UMR, Inc. (collectively "UHC" or "Defendants"), is a diversified health care company in the business of insuring and administering health plans. UHC's Answer, Dkt. 82, at ¶¶ 27-30.

Plaintiffs Rachel Condry ("Condry"), Jance Hoy ("Hoy"), Christine Endicott ("Endicott"), Laura Bishop ("Bishop"), Felicity Barber ("Barber"), and Rachel Carroll ("Carroll") (collectively, "Plaintiffs") are members or beneficiaries of employer-sponsored health benefit plans (collectively, the "Plans") sold, underwritten or administered by one of the Defendants.  As Defendants admit, they or their subsidiaries administer and underwrite health care plans that are subject to the ACA's preventive services requirements, including those pertaining to breastfeeding support and counseling services.  UHC's Answer, Dkt. 82, at ¶79.  Each of the Plaintiffs' non-grandfathered, non-federal UHC plans require UHC to provide coverage for CLS as an ACA-mandated preventive services benefit.

In their complaint and throughout their prosecution of the Action, Plaintiffs have contended that Defendants' health plans and coverage for CLS violated the ACA, ERISA and the plan documents.  In June 2018, on the parties' cross-motions for summary judgment, the Court entered a SJ Order which (among other things):

(1) Granted Judgment to Plaintiffs Barber, Bishop, Condry, Endicott and Hoy against certain Defendants under Count One (asserting ERISA claims), finding that the remark codes

3

contained in the EOBs denying their CLS claims were "written in a way that made [the denials] virtually impossible to understand." SJ Order at 5-6.

(2) Granted Judgment to Plaintiffs Hoy and Bishop against certain Defendants under Count Two (asserting ERISA claims), finding a failure to provide CLS coverage. *Id*. at 4.

(3) Denying Judgment to either party as to Plaintiff Endicott (asserting claims on behalf of the Lactation Services Class for ERISA plans) and Plaintiff Carroll (asserting claims on behalf of the ACA Class for non-ERISA claims).

Further, the details of each of the Plaintiffs' experiences, with respect to their personal CLS experiences and the failure to secure coverage from UHC for CLS have been the subject of numerous filings.[2]  In sum, Plaintiffs, like the members of the Classes, were insured under UHC plans that operated pursuant to UHC's non-ACA compliant policies and procedures for CLS, with no meaningful access provided by UHC to an identifiable network of CLS providers, and, for the members of the Claims Review Class, received incomprehensible denial reasons in their EOBs.

**B.   The ACA's Preventive Coverage Mandate**

The ACA added Section 2713 to the Public Health Service Act (29 CFR 2590.715-2713) stating:

> [Non-grandfathered health plans] must provide coverage for all of the following items and services, and may not impose any cost-sharing requirements...:
>
> (i) Evidenced-based items or services that have in effect a rating of A or B in the current recommendations of the United States Preventive Services Task Force [USPSTF] with respect to the individual involved . . .;
> * * *
> (iv) With respect to women...evidence-informed preventive care and screening provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]. . . .

*See* 42 U.S.C. § 300gg-13(a)(1), (a)(4); UHC's Answer, Dkt. 82, at ¶¶56, 68-69.

On August 1, 2011 and December 20, 2016, HRSA adopted and released guidelines for "[b]reastfeeding support, supplies, and counseling" which HRSA described as "[c]omprehensive

---

[2] *See* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment and Plaintiffs' Cross-Motion for Partial Summary Judgment (Dkt. 116-4) at 12:7-20, 14:22-16:11, 17:7-20, 19:5-20:15, 22:7-15, 23:5-26:2, 28:13-29:12, and fns. 10, 12-16, 18-19, 29-30, 32; Plaintiffs' Reply in Support of Partial Summary Judgment (Dkt. 123-4) at 5:5-9:17; 14:16-17:24; 20:1-16, and fns. 8-9, 11-15, 22, 24, 31-32

4

lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment" (in 2011, Ex. 1), and as "[c]omprehensive lactation support services (including counseling, education, and breastfeeding equipment and supplies) during the antenatal, perinatal, and the postpartum period to ensure the successful initiation and maintenance of breastfeeding" (in 2016, Ex. 2). The 2008 USPSTF recommendation on breastfeeding (Ex. 3), states that breastfeeding support includes "interventions…after birth to promote and support breastfeeding" and "Professional support" which "can include providing information about the benefits of breastfeeding, psychological support [ ] and direct support during breastfeeding observations..." On October 25, 2016 the USPSTF stated that "[t]he scope of the review and type of interventions recommended [including breastfeeding support] did not change [from 2008]." (Ex. 4).[3]

The Tri-Departments[4] stated that the ACA expanded coverage for preventive services (i) so that "access and utilization of these services [would] increase," (Ex. 7 (75 FR 41726 at 41730, Table 1)); and (ii) to address "underutilization of preventive services" due to "market failures" identified as "plans' lack of incentive to invest in these services" and "eliminate cost-sharing requirements, thereby removing a barrier that could otherwise lead an individual to not obtain such services." *Id.* at 41731.

The removal of the financial barrier that could otherwise lead an individual to not obtain such services is reflected in 29 CFR 2590.715-2713(a)(3) (titled "Coverage of preventive health services"), under which insurers were relieved of their financial responsibility to insureds (that is, insurers could impose cost-sharing) *only if* the insurer "has a network of providers to provide

---

[3] The HRSA Guidelines expanded upon of the USPSTF recommendations, with their specific incorporation of "comprehensive" prenatal and postnatal lactation support. *See* 2/20/2013 FAQs, Part XII (Ex. 5) ("Q18: The [2008] USPSTF already recommends breastfeeding counseling. Why is this part of the HRSA Guidelines? Under the topic of "Breastfeeding Counseling" the USPSTF recommends interventions during pregnancy and after birth to promote and support breastfeeding. The HRSA Guidelines specifically incorporate comprehensive prenatal and postnatal lactation support, counseling, and equipment rental.")
[4] The Departments of HHS, Labor, and the Treasury (the "Tri-Departments") "released FAQs …to provide guidance related to the scope of coverage required under the recommendations and guidelines, including coverage of ….breastfeeding and lactation counseling…." (Ex. 6 at 41320); *see Eternal Word TV Network, Inc. v. Sec'y of the U.S.HHS*, 818 F.3d 1122, 1179 (11th Cir. 2016) ("When Congress enacted the ACA it ceded broad authority to [the Tri-Departments] to promulgate rules governing … women's preventive health services in employer-sponsored health plans.")).

[CLS]."[5]

## C. UHC's Policies and Practices

UHC recognized internally in 2011 that the HRSA recommendations on CLS raised coverage issues such as - "Need a contracting strategy (need to contract with specific providers). How should they bill for non-licensed lactation consulting visits? What about non-physician billing for classes? Need to resolve operationally how to pay" (Ex. 9, UHC_020548-49). Despite that recognition, a contracting strategy was not implemented and billing issues were not resolved to ensure UHC provided members with ACA-compliant policies and coverage.

Critically, UHC has stated that its policy is, and has been, that "preventive services….will be eligible for coverage without cost-shares *provided that* **such services are provided by a** *network* **provider**…" Ex. 10, UHC Resp. to Rog. 3(emphasis added).[6]   Of course, that policy is *prima facie* non-ACA compliant with respect to CLS as UHC did not have meaningful access to network CLS providers.   Defendants also admit that they

> "defined the scope of the [CLS] benefit in UnitedHealthcare's Preventive Care Services Coverage Determination Guideline ("CDG")[7], which identifies certain procedure codes (and a diagnosis code for certain of those procedure codes) as those eligible for coverage without cost-shares when billed as described in the CDG and in accordance with Defendants' policies and procedures. (*See, e.g.*, Dkt. 105-01 at 46; Dkt. 105-02 at 46; Dkt. 105-03 at 50; Dkt. 105-04 at 49; Dkt. 105-05 at 50.)"

---

[5] The 10/23/2015 FAQ Part XXIX, Q2 (Ex. 6) confirms that *imposing cost-sharing* on insureds is "*premised on enrollees being able to access the required preventive services from in-network providers*." (Emphasis added). The Departments of HHS, Labor, and the Treasury (the "Tri-Departments") "released FAQs …to provide guidance related to the scope of coverage required under the recommendations and guidelines, including coverage of ….breastfeeding and lactation counseling…." (Ex. 8 at 41320); *See Eternal Word TV Network, Inc.*, 818 F.3d at 1179 (11th Cir. 2016) ("When Congress enacted the ACA it ceded broad authority to [the Tri-Departments] to promulgate rules governing … women's preventive health services in employer-sponsored health plans.")).

[6] The CDG acknowledges that ACA preventive care services may include coverage for out-of-network providers: "**Network** Preventive Care Services that are identified by [the ACA] are required to be covered under the Preventive Care Services benefit with no member cost-sharing (*i.e.*, covered at 100% of Allowed Amounts without deductible, coinsurance or copayment). Depending on the plan, Allowed Amounts for services from out-of-network providers may not equal the provider's billed charges." Ex. 12, Page 2 of 43 of 10/1/18 CDG (bold in original).  Yet, UHC did not apply such coverage for out-of-network CLS providers because it took the stance that its existing network pediatricians and obstetricians provided CLS, of course notwithstanding that they were not identifiable or identified by UHC as CLS network providers.

[7] The CDG states that it "provides assistance in interpreting UnitedHealthcare benefit plans." Ex. 12, Pg 1.

*Id.*, Resp. to Rog. 1.[8]  UHC also confirmed that the CDG incorporates the preventive versus diagnostic care construct for CLS and services billed inconsistent with the CDG will be processed as non-preventive.  *Id.*, Resp. to Rog. 2 states: (a) "as reflected in the CDG, diagnostic care occurs where the member 'had a symptom(s) that required further diagnosis.'"; and (b) "[UHC's] Sixteenth Affirmative Defense refers to breastfeeding services designed to treat existing symptoms, which fall outside the scope of the preventive services encompassed by ACA. ***If such services are billed using codes in a manner not set out in the CDG, they will be processed as non-preventive care***." (Emphasis added).

Importantly, UHC's policy on CLS <u>has not changed</u> throughout the Class Period. UHC has stated that: "the general approach described in [*id.*, Resp. to Rogs. 1-4, *supra*], including the procedure and diagnosis codes identified in the CDG that are associated with breastfeeding support and counseling and pay at no cost-share, ***has not changed from August 2012 to the present***…". *Id.*, Resp. to Rog. 5, (emphasis added).

UHC has also cited to its other policies, including its Nonphysician Health Care Professionals Billing Evaluation and Management Codes Policy ("NP Policy", Ex. 13 and its Obstetrical Policy (Ex. 14 (UHC_003526-003538)), as purportedly applicable. *See,* Ex. 10, UHC Resp. to Rogs. 10-11.[9] Such policies are among the confusing and contradictory coding guidance documents which confounded providers as to the process for reimbursement related to CLS, and which suppressed the breadth of potential in-network providers of CLS during the Class Period.[10] UHC's policies are grounded on: 1) a diagnostic versus preventive construct inapplicable to CLS; 2) a baseless (yet convenient) position that all pediatricians and obstetricians provide CLS; 3) the

---

[8] The CDG applies to all members of the ACA and Lactation Services Classes. *See* Ex. 11, Declaration of Janice Huckaby, UHC Regional Chief Medical Officer, ¶ 6.

[9] *See, e.g.,* Ex. 15, Declaration of Denise Daubney ("Daubney Decl."), UHC Manager of Employer and Individual Payment Policy¶ 5 ("UHC maintains reimbursement policies that impact how UHC adjudicates and reimburses health care claims submitted for services provided to UHC's members.")

[10] *See also* Ex. 16, UHC_012277 (4/24/2012 UHC email re: AMA Meeting and Prev Care, which includes the following statement: "[There] has been an issue with providers understanding how to distinguish our 3 kinds of policies and knowing which one to refer to for accurate understanding."; Ex. 17, UHC_009191 (email between Mishelle Appleby and Sanford Cohen of UHC, noting that people "frequently misquote preventative benefits when using the coding summary" and that having both the Guidelines and the Summary "raises the risk of error between the two").

stance that CLS is simply part of post-partum wellness visits; and, 4) the view that CLS is sufficiently handled by physicians providing "routine postpartum care as part of global delivery reimbursement".[11,12]

UHC's internal communications affirm the import of UHC's deficient policies and positions about CLS on insureds.  For example, UHC's Dena Kivirahk, a Clinical Admin Supervisor, responded to questions in February 2013 about coverage for services by lactation consultants, stating that: "At this point we are denying based on 'not a covered health service', because its [sic] a Nurse that provides the service." (Ex.20, UHC_056774-78).  Instead of taking the steps to ensure that it had CLS providers in-network and identified to insureds, UHC punted the responsibility back to members, suggesting that they check with their in-network providers to see if the provider offered such services. (Ex. 21, UHC_114400).  Even two years after CLS coverage was to have begun, a May 1, 2014 "Lactation Consultants Meeting" agenda included these seminal questions: "Have we started contracting with Lactation specialists recently?" (Ex. 22, UHC_008061). "There is nothing in our provider directory that identifies for members the doctors/nurses who can provide lactation counseling." (*id*.).

UHC's policy was that UHC did not "need to develop a specific, broad strategy for contracting with lactation specialists since [it has] pediatricians and OB's that already provide this service." (Ex. 23, UHC_110054-56).[13]  The statement in early 2016 of UHC Chief Medical Officer,

---

[11] *See, e.g.,* Ex. 15, Daubney Decl., ¶ 10.

[12] One of UHC's proffered experts concedes that "UHG's [NP Policy] does not allow a provider such as a lactation consultant to bill E/M codes…" and "UHG's policy and practice [reflected in the Obstetrical Policy does] not allow[] providers to bill for lactation services separately for [ ] certain periods of time around birth…" Ex. 18, D'Apuzzo Amended Report at ¶¶ 26-27.  The import of the CDG and NP Policy is denial of CLS coverage, *e.g.*, the only lactation specific code S9443 (lactation classes) identified to be used by non-physicians, when used was denied as a non-medical or personal item for Plaintiff Barber's two claims. *See* Dkt. 134-4, Exs. E-2, E-3.

[13] That position is unsupported. *See* Ex. 24, Morton 12/4/2018 Report at 12 ("Although some pediatricians or OB/GYNs may provide CLS, it is by no means the norm, the availability of [] [CLS] from OB/GYNs or pediatricians is inconsistent and sporadic at best.  It is impractical and unrealistic to expect mothers to be able to determine which OB/GYNs, pediatricians or other primary care providers [] [in their health plan's network are providing] CLS as a covered benefit, and such policy ignores many practical aspects of a physicians practice, including, among other things, that care is limited to established patients, and availability of appointments for new patients typically require lengthy wait times."); *see also* SJ Order at ¶ 3 ("absent evidence that pediatricians and OBGYNs …were in fact providing those services to their patients **and** that the Defendants made the plaintiff aware of that - does not create a genuine issue of fact as to

East Region (11/2002 – 1/2016), Catherine (Cathy) Palmier, M.D. that, "***Unless we have some lactation consultants contracted*** we will have member dissatisfaction...***ob's and peds are not automatically skilled in lactation support***", was, however, another warning that UHC chose to ignore.  (Ex. 25, UHC_028002, emphasis added).  As discussed in Section II.D, *infra*, UHC never implemented a strategy for contracting with or identifying network lactation specialists, and as of August 2018, only had 122 current unique network lactation specialists, nationwide.

UHC's policies are plainly reflective of UHC putting its financial interests above the medical needs of its insureds.[14]  Having not provided the members of the Classes with a program and coverage that complied with the ACA, UHC's denial of and imposition of cost-sharing on CLS claims is improper.

**D.  <u>The Members of the Classes Did Not Have Access to Network CLS Providers</u>**

The evidence also establishes that UHC's failure to provide meaningful access to network CLS providers is determinable on a national class-wide basis.  The sum and substance of UHC's identification of network CLS providers consisted of: (i) its utilizing a "380" specialty code to populate its online provider directory and (ii) its customer service representatives following "SOPs" that just directed members back to their network providers.  Neither approach, either collectively or individually, demonstrates that UHC had a network of CLS providers or provided a modicum of meaningful access to network CLS providers, both prerequisites to the denial of coverage for and the imposition of cost-sharing on CLS claims.

*First*, UHC's policy of identifying network providers was applicable to all members of the Classes.  UHC used a specialty code "380" to designate lactation specialists and lactation specialist groups.[15]UHC admitted that "[t]he on-line directory pulls [ ] information from the National Data Base where contracted providers' demographic information, including specialty, is stored", and

---

whether a particular plaintiff had meaningful access to [CLS]." )

[14] *See* Ex. 26, UHC_011837 (email dated 1/27/2012 re: a conference call regarding Preventive Benefit Women's Health.  Goals include "we must identify key areas of opportunity to minimize the financial risks associated with these new guidelines.").

[15] *See* Ex. 10, UHC Resp. to Rog. 6 (In response to Plaintiffs' request for the identity of every lactation specialist and lactation specialist group in UHC's network during the Class Period, UHC responded that, "Such providers are identifiable in Defendants' systems by the specialty '380'").

therefore, only the network providers "identified by the specialty code '380'…have been electronically searchable as "Lactation Specialists" in Defendants' provider directory since March 2014." *Id.*, UHC Resp. to Rog. 7.

UHC also admitted, when asked how members are directed to network CLS providers (*id.*, UHC Resp. to Rogs. 7, 9) that:

- "members are encouraged to seek the ACA-mandated service from network providers, including in their plan documents, and are specifically directed to ask their network provider about the ACA-mandated service. *See, e.g.,* UHC_003916-3921 (SOP for Member Services Breast Pump Benefit) and UHC_003975-3987 (SOP for Quoting HCR Pre-Service Benefits)."[16]

- "they have provided the [SOP] documents to their customer service representatives for the purpose of responding to inquiries from members and insureds regarding coverage for the breastfeeding support and counseling services mandated by ACA."

Moreover, when asked what actions UHC took to provide UHC insureds with the ability to identify **in-network "providers of lactation and breastfeeding services, support and counseling"** (so, the question was ***not*** limited by the terms "lactation specialist" or "lactation specialist group" or "380"), UHC <u>referred back</u> to its Responses to Rogs. 7 and 9, which, according to UHC, "reflect the manner in which Defendants identify in-network providers for their members and insureds." *Id.*, UHC Resp. to Rog. 12) (emphasis added).[17]

*Second*, based on the foregoing and UHC's data produced identifying "380"-network providers during the Class Period, UHC had a *de minimis* number of CLS network providers identifiable by insureds throughout the Class Period.  UHC produced data on its network "380"-designated providers, both current (as of the production date in mid-2018) and terminated

---

[16] The SOP for Member Services Breast Pump Benefit (Ex. 27) states: on UHC_003918-3919 that "[i]f a member asks [a]bout lactation counseling and support [] [l]et the member know the following: ...
- Services are available for lactation counseling, and support at no cost-share.
- Educate the member so he or she can discuss specific services with his or her doctor.
- The member's doctor may offer these services, or have relationships with other practitioners in his or her area to provide this care."
The SOP for Quoting HCR Pre-Service Benefits(Ex. 28, UHC_003975-3976) only that "[i]f the member's inquiry is [r]elated to … lactation counseling [to] [f]ollow the Member Services Breast Pump Benefit SOP."
[17] Similarly, when asked to identify the "Documents relating to the 'availability of providers of lactation counseling services in Defendants' networks", UHC referred "Plaintiffs to their responses to Interrogatories Nos. 6, 7 and 9, which refer to the "380" lactation specialists and "SOPs". (*Id.*, Resp. to Rog. 13).

providers. Such documents, as summarized and depicted in the Expert Report of Plaintiffs' Expert Daniel McGlone (Ex. 29) and the maps thereto (Ex. 29-A), reflect that <u>nationwide</u> UHC has only <u>122</u> unique current "380" network providers and <u>22</u> unique terminated "380" providers.   Ex. 29 at 6.  In addition, for 20 states, UHC's data reflected that it had <u>no</u> "380" network providers identified during the Class Period.  *Id.* at 11.

Further, as reflected in Mr. McGlone's work, even viewing the data by the metropolitan statistical areas ("MSAs") where network "380" providers were located, there were four or less CLS providers identified per 1,000 live births, with most MSAs having less than one "380" provider per 1,000 live births. *Id.* at 13.  Also, particularly demonstrative of UHC's lack of an accessible network of CLS providers are the maps prepared by Mr. McGlone. The maps include a US national map and 20 detail maps, each representing a geographic Region, Metro Area or City and depicting UHC's identifiable network CLS providers. *See* Ex. 29-A.

Such condition, *i.e.* insureds did not have meaningful access to network CLS providers which existed during the Class Period and currently, is confirmed by UHC's communications.  *See,* Ex. 19, UHC_007982, June 19, 2014 email stating: "How does the Call Center advise members calling in for lactation consulting providers?" reveals that UHC's policy was to have the "Call Center" "advise[] member[s] to contact their in-network OB/GYN/Pediatrician as only INN [in network] benefits are covered."). On May 30, 2014, Ann Marie Naccarato, Director Member Services, said that there was no solution to the patient's dilemma:

> We have tested multiple scenarios in the portal and we tried checking physicians/hospitals individual websites for searches. Sometimes we come up with it and sometimes we do not-the time it takes would be a considerable AHT buster. ..I think our only option is to call the members OBGYN to see if they have [a lactation specialist] on staff or one that they recommend. The big drawback is that the person they are using may not be INN.

(Ex. 21, UHC_114402-06). In the November 2014 email from the UHC employee who raised serious questions with Kim Wickline, Health Reform Marketing and Communications, relating that "a national search on our directory[] had very few hits across the country," also stated that:

> Our communications say we have various in-network clinics[,] where are these clinics in the event the OB/GYNs and pediatricians are not providing the service? We provide very detailed info about breast pumps and how to access yet limited info on lactation support.

Ex.30, UHC_109546 (emphasis added). One "option" that was considered, and rejected, in early

1  2016 was to "[s]urvey Pedis and OB's on LC and update the directory."[18] Ex. 31, UHC_052645,

2  "*Although no final decision was made, the desire is not to survey unless there is a need to do so*."

3  *Id*. (emphasis added).

4  **E.  The Remark Codes**

5  "Remark codes" are provided in the EOBs sent to all members by UHC.  *See* Ex. 33,

6  Declaration of Nina Thompson at ¶¶ 2, 6.  According to UHC, its Remark Codes, including the four

7  remark codes that are encompassed in the Claims Review Class definition, are purportedly "written

8  to be short, understandable narratives and descriptions", but UHC's system is not "designed to

9  extract the specific exclusion language from the member's specific plan to include in the remark

10  code section of the EOB".  *Id.* at ¶¶ 7-8.

11  Moreover, the Remark Codes are developed by UHC's Remark Code Governance Team (*id.*

12  at ¶ 10), and UHC and its experts contend that they are "mapped to industry standard language." *Id.*

13  at ¶ 14.  A review of the Remark Codes and the purported industry standard to which they were

14  mapped, as set forth in ¶ 17 of the Thompson Declaration (Ex. 33), belie such contentions of

15  consistency:  For example, Ms. Thompson quotes Remark code KM: "This is not a reimbursable

16  service. There may be a more appropriate CPT or HCPCS code that describes this service and/or

17  the use of the modifier or modifier combination is inappropriate" and states that it was purportedly

18  mapped to the code "The procedure code is inconsistent with the provider type/specialty

19  (taxonomy)."  The "industry standard" (even if it could) provides no safe harbor for UHC, as

20  UHC's code is materially, substantively different, and as the Court has previously recognized, is

21  facially incoherent.

22  **III.    ARGUMENT**

23  **A.    Class Action Prerequisites**

24  To maintain a class action under Rule 23, Plaintiffs must establish all the elements of Rule

25  23(a) that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are

26  questions of law or fact common to each class; (3) the claims or defenses of the representative

27  

28  [18] During a 12/8/15 meeting the "Options under Consideration" included "Pursue a recruit, contract and list effort for lactation consultants", which, apparently, did not occur. Ex. 32, UHC_028140.

parties are typical of the claims or defenses of each class; and (4) the representative parties will fairly and adequately protect the interests of each class.

In addition to establishing the elements of Rule 23(a), Plaintiffs must establish at least one of the requirements of Rule 23(b).  For a class to be certified under Rule 23(b)(1), it must be shown that prosecuting separate actions would create a risk of incompatible standards of conduct for the defendant, or that adjudications with respect to individual class members would be dispositive of the interests of the other members. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001); *see also McCluskey v. Trustees of Red Dot Corp. Emp. Stock Ownership Plan & Trust*, 268 F.R.D. 670, 678 (W.D. Wash. 2010). Under Rule 23(b)(2), Plaintiffs are required to show that the Defendants have acted or refused to act on grounds that apply generally to each class. *See Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014).

### B.   Definitions of the Classes

Plaintiffs seek certification of the following Classes[19]:

**The "Claims Review Class"** defined as**:**

> All participants and beneficiaries, in one or more of the ERISA employee health benefit plans administered by Defendants in the United States, which provide benefits for healthcare services and for which claims administration duties are delegated to one or more of the Defendants, who received from August 1, 2012 to present, an explanation of benefits for Comprehensive Lactation Services, that included one or more of the denial reasons:
>
> (1) Remark code KM: "This is not a reimbursable service. There may be a more appropriate CPT or HCPCS code that describes this service and/or the use of the modifier or modifier combination is inappropriate."
> (2) Remark code I5: "This service code is not separately reimbursable in this setting."
> (3) Remark code 13: "Your plan does not cover this nonmedical service or

---

[19] Each definition is equivalent to or narrower than the Class definitions set forth in the Complaint, and thus appropriately considered by the Court. Specifically, the Classes encompass claims and issues that were raised in the Action from the outset that were the subject of the Court's SJ Order, and were the subject of discovery; there is no prejudice to the Defendants and any contrary argument is baseless. *See In re: TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 590-91 (N.D. Cal. 2010); *see also Van Patten v. Vertical Fitness,* No. 12cv1614-LAB, 2013 U.S. Dist. LEXIS 189845, at * 7-11 (S.D. Cal. Nov. 8, 2013) (considered modified class definition because there was no prejudice to defendant); *Abdeljalil v. General Electric Capital Corp.,* 306 F.R.D. 303, 306 (S.D. Cal. 2015); *Knutson v. Schwan's Home Services, Inc.,* No. 3:12-cv-0964-GPC, 2013 U.S. Dist. LEXIS 127032, at *10-13 (S.D. Cal. Sept. 5, 2013); *Wolf v. Hewlett Packard Co.,* No. CV 15-01221 BRO (GJSx), 2016 U.S. Dist. LEXIS 18122, at *21-22(C.D. Cal. Sep. 1, 2016) (considering revised class definition because it was "narrower than the definition in the operative complaint," and there was "no lack of diligence on the part of Plaintiff[.]")

13

personal item."

    (4) Remark code B5: "Benefits for this service are denied. We sent a letter to the member asking for additional information. We have not received a Response."

**The "Lactation Services Class"** defined as**:**

    All participants and beneficiaries in one or more of the ERISA, non-grandfathered[20], non-federal employee health benefit plans sold, underwritten or administered by Defendants in the United States in their capacity as insurer or administrator, who received from August 1, 2012 to present Comprehensive Lactation Services, for which Defendants did not provide coverage and/or imposed cost-sharing.

**The "ACA Class"** defined as:

    All participants and beneficiaries in one or more of the non-grandfathered, non-federal employee health plans, sold, underwritten or administered by Defendants in the United States in their capacity as insurer or administrator, who received from August 1, 2012 to present Comprehensive Lactation Services, for which Defendants did not provide coverage and/or imposed cost-sharing.

Excluded from the Classes are Defendants, their subsidiaries or affiliate companies, their legal representatives, assigns, successors, and employees.

For each of the Classes, Comprehensive Lactation Services means comprehensive lactation support, counseling and education services provided during the antenatal, perinatal, and the postpartum period.

**C.**    **<u>The Proposed Classes Meet the Requirements of Rule 23(a)</u>**

    *1.*    ***The Proposed Classes are Sufficiently Numerous Rendering Joinder of All Class Members Impracticable***

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable. *See Moeller v. Taco Bell Corp.* 220 F.R.D. 604, 608 (N.D. Cal 2004). Plaintiffs are not required to identify each and every potential member of the class or specify the exact number of potential class members. *See Martial v. Coronet Ins. Co.*, 880 2d 954, 957 (7th Cir. 1989). Instead, plaintiffs need only provide a properly supported estimate. *Id.* Additionally, courts may consider factors such as "the geographical diversity of class members, the ability of individual claimants to

---

[20] For the Lactation Services Class and the ACA Class, a non-grandfathered plan means: (i) any health insurance policy created or purchased after March 23, 2010, and (ii) any health insurance policy created or purchased on or before March 23, 2010 that subsequently lost its grandfathered status.

institute separate suits, and whether injunctive or declaratory relief is sought." *Ogbuehi v. Comcast of Cal,/Colo./Fla./Or., Inc.,* 303 F.R.D. 337, 345 (E.D. Cal. 2014) (citing *Jordan v. Cnty. of Los Angeles,* 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds,* 459 U.S. 810 (1982)).

Based solely on UHC's claims data, there are thousands of claims at issue and encompassed by the CLS received by the members of the ACA and Lactation Services Classes. UHC's expert, who presented opinions based on claims identified using UHC's disputed, narrow view of CLS,[21] identified: 12,873 out-of-network claims of which 7,845 were denied and 2,916 had cost-sharing imposed; and, 913 in-network claims for which cost-sharing was imposed. Ex. 35, dos Santos 12/11/2018 Report.

Furthermore, Mr. dos Santos' claims data does not include claims by insureds who received CLS for out-of-network lactation consultants that were not submitted, but for which insureds would have the opportunity to do so under an ACA-compliant construct established by UHC, if Plaintiffs prevail on their claims for the ACA and Lactation Services Classes. As Plaintiffs' expert identified, in rebuttal to Mr. dos Santos, one could estimate that UHC's membership would be expected to include more than 100,000 breastfeeding dyads, seeking between 45,000 and 46,000 outpatient CLS visits quarterly during the post-partum period (assuming one visit), and over 1.1 million outpatient lactation support and counseling visits in the aggregate from August 2, 2012 through August 9, 2018, the last date on which the claims data was provided. Ex. 36, 1/18/19 Rebuttal Expert Report of Dr. Mark L. Labovitz Ph.D., Ph.D., MBA, M.Sci., M.Sci., M.Sci., M.Art.  Mr. dos Santos, in contrast, makes no relative assessment in rendering his unfounded opinions about UHC's CLS network.  In any event, numerosity for each of the ACA and Lactation Services Classes is easily satisfied here.

---

[21] There is no one "code" for CLS.  Evident by the Parties' arguments throughout this case is that they dispute the scope of CLS, and therefore dispute the clinical indications and diagnoses codes that may reasonably be used by providers to indicate, including for billing purposes, that an encounter with a patient was for CLS.  It is Plaintiffs' position that, grounded in the HRSA Guidelines, CLS means comprehensive lactation support, counseling and education services provided during the antenatal, perinatal, and the postpartum period. But UHC seeks to restrict the definition of CLS to a limited set of diagnoses codes. Plaintiffs' Expert, Dr. Hanley (Ex. 34, Amended Report) identified diagnoses codes that may be reasonably used by providers to indicate that their encounter with a patient was for CLS.  Defendants have proffered their own purported experts, and, of course, cite to their CDG in support of their views.

1      Similarly, numerosity for the Claims Review Class is satisfied here as well.  The claims

2  data produced for just one of UHC's claims platforms includes over 8,000 claims for CLS that

3  include one or more of the four remark codes that are the subject of the Claims Review Class.

4          ***2.    Plaintiffs Establish Commonality***

5      The commonality prerequisite looks to whether the "claims 'depend upon a common

6  contention' such that 'determination of its truth or falsity will resolve an issue that is central to the

7  validity of each claim in one stroke.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir.

8  2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The proposed common

9  questions must be such that they will "generate common *answers* apt to drive the resolution of the

10  litigation." *Mazza*, 666 F.3d at 588 (quoting *Dukes*, *supra*, 564 U.S. at 350).

11      At issue are UHC's policies and practices with respect to CLS and whether they, and UHC's

12  conduct, constitute a failure to provide ACA-compliant preventive coverage for CLS.  With respect

13  to the ACA Class and the Lactation Services Class, the common contentions are whether UHC and

14  its plans, policies and procedures complied with the ACA with respect to providing coverage for

15  CLS as a preventive benefit.

16      With respect to the Claims Review Class, the common contentions are whether the Remark

17  Codes violated ERISA and failed to give the members of the Class a reasonable opportunity for a

18  full and fair review of the denials. The pertinent questions of law and fact common to the members

19  of each of the ACA Class, Lactation Services Class and the Claims Review Class are also based (in

20  part) on certain key holdings in the Court's SJ Order, as noted in Section I, *supra.* The resolution of

21  these common questions will generate common answers about UHC's coverage equally applicable

22  to the members of the Classes, and will drive the resolution of the litigation.

23      Following *Dukes* and *Mazza*, district courts in this Circuit have frequently found common

24  issues in cases involving ERISA claims handling practices. *See Des Roches v. California*

25  *Physicians' Service*, 320 F.R.D. 486, 497-504 (N.D. Cal. 2017) (rejecting various commonality

26  arguments advanced by health plan because of common questions created by the health plan's

27  development and use of claims guidelines).  Also, like here, in *Wit v. United Behavioral Health*,

28  317 F.R.D. 106, 127-129 (N.D. Cal. 2016), common issues were found as to whether United's

behavioral health coverage determination guidelines met generally accepted standards and whether it breached its fiduciary duty by using improper standards to assist in coverage determination. *See Escalante v California Physicians Service dba Blue Shield of California,* 309 F.R.D. 612, 618 (C.D. Cal. 2015) (common issue found as to health plan's practice in denying claims for artificial lumbar disc surgery); *see, e.g, In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig*., 270 F.R.D. 521, 529-30 (N.D. Cal. 2010) (holding commonality satisfied because "interpretation of the standard written policy language will present a question common to the class").

The Ninth Circuit has upheld commonality findings regarding less distinct practices than those presented here. *See Abdullah v. U.S. Security Assoc., Inc*., 731 F.3d 952, 962-963 (9th Cir. 2013) (legality of employer's meal break practice was common issue that was "apt to drive the resolution of the litigation"); *see also Parsons, supra*, 754 F.3d at 679-680 (commonality existed as to adequacy of state's system of privatized health care for inmates that created a risk of substantial harm for all class members); *Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1165-1166 (9th Cir. 2014) (employer's practice of requiring unpaid off-the-clock overtime presented common issue).

In sum, there is substantial evidence of commonality.

### 3. Plaintiffs' Claims are Typical of the Claims of the Members of the Proposed Classes They Seek to Represent

As summarized in *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017): "Typicality focuses on the class representative's claim—but not the specific facts from which the  claim arose—and ensures that  the interest of the class representative aligns with the interests of the class." The requirement is permissive, such that "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons v. Ryan,* 754 F.3d 657, 685 (9th Cir. 2014 (quoting *Hanlon,* 150 F.3d at 1020).

Plaintiffs' claims are reasonably co-extensive with and typical of those of absent members of the Classes.  For the Claims Review Class, Plaintiffs Barber, Bishop, Condry, Endicott, and Hoy are the proposed Class Representatives.  Each of these Plaintiffs received an EOB with one or more of the Remark Codes at issue, had their CLS claims denied based on one or more of the Remark Codes, and secured, on summary judgment, a finding by the Court that each of the four Remark

17

Codes was "virtually impossible to understand". For the Lactation Services Class, Plaintiffs Bishop, Hoy and Endicott are the proposed Class Representatives, and for the ACA Class, Plaintiff Carroll is the proposed Class Representative. On behalf of ERISA-governed plans and non-ERISA plans, respectively, these Plaintiffs seek to enforce the rights of the insureds to be covered by ACA-compliant policies and procedures, and to have UHC and its plans comply with the ACA with respect to providing coverage for CLS as a preventive benefit.

UHC's liability is dependent upon <u>UHC's conduct</u>: its establishment and implementation of deficient policies and positions with respect to CLS coverage; and, its use of remark codes that were impossible to understand and failure to provide ERISA-mandated information to insureds. UHC's liability in this case is not based on an individual Plaintiffs' knowledge or beliefs.

UHC cannot contend that a nationwide class is not certifiable. As evidenced by the discussion in Section II, *supra*: UHC's provider networks, its coverage policies, and its regulatory compliance are not established, operated or assessed on an individualized insured basis; and UHC confirms that the "SOP" for its CSRs is to place the onus back on the insured with respect to finding a network CLS provider.

Also, as discussed in Section II.D, *supra*, discovery has shown that <u>only</u> network providers classified internally by UHC with a "380" code were identifiable online to members specifically as CLS providers. In other words, absent the "380" code designation, a provider was not identifiable through UHC as an in-network CLS provider. And, as Mr. McGlone's Report and Maps depict: there was no meaningful, identifiable network of lactation specialists; UHC did not have identifiable CLS provider in most of the United States; and UHC had but an iota of CLS providers, in total, nationwide. *See* Section II.D, *supra*. Indeed, even in the few regions where a couple of network CLS providers were identified, meaningful access must be considered and assessed based on such number of providers relative to, for example, the number of live births in that geographic region. *Id*. A *de minimis* number of CLS providers requires one to speculate about those few providers' availability and accessibility, as such providers are, of course, providing services to other geographically proximate breastfeeding dyads.

Tellingly, it has been UHC's tactic to ignore the logical and factual importance of making

18

such an important relative assessment. Instead, likely recognizing the inevitable revelation of what the "380" network provider data, once produced, would expose, UHC has presumed and speculated about the "availability" of one or possibly two lactation specialists near any given member; or offers characterizations, through hearsay and speculation, about network pediatricians and obstetricians  who are purportedly CLS-trained or could have an identifiable IBCLC on staff, or its network "baby friendly" hospitals.  Such speculation, however, fails: in the face of the UHC's policies with respect to coverage and identification; and, because UHC never affirmatively undertook to survey its network providers over the last six years about whether they are CLS providers.[22]

For such reasons, UHC's arguments (whether raised in terms of addressing commonality, typicality or otherwise),[23] that the legal issues require a deep dive into Plaintiffs' medical records is a ruse and irrelevant in view of UHC's policies and procedures to which Plaintiffs Endicott and Carroll (like the other members of the Classes they seek to represent) were subjected.[24]  Like any member of the ACA and Lactation Services Classes, if Plaintiffs had actually received the full

_____

[22] *See* Ex. 49 (Wakefield Tr. at 117 ("Because there wasn't a survey done, correct, that you're aware of, of the pediatricians and OBs …?" "A: I'm not aware of a survey that was actually done." "At any point in time that you worked on this project, correct? ATo my knowledge, that's, that's correct."); Wakefield Tr. at 199: (Q: "So again [as of February 6, 2016], a survey of the providers with respect to lactation consulting had not been done, correct? A·· Not to my knowledge."))

[23] These and similar arguments addressed herein amount to nothing more than an administrative feasibility argument.  First, the requirement of ascertainability is "less pressing in an action under Rule 23(b)(1) or 23(b)(2)[.]" *Escalante*, *supra*, 309 F.R.D. at 621. The ascertainability requirement was designed for *Rule 23(b)(3)* actions. The Ninth Circuit follows those circuits that find no administrative feasibility requirement. "In sum, the language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).  Second, Plaintiffs herein have readily refuted such notion that there is any administrative feasibility concern. Even assuming, *arguendo*, that there was an ascertainability prerequisite applicable in a Rule 23(b)(1) and (2) case such as this, the proposed members of the Classes here can be identified through objective criteria.

[24] UHC undertook to have its expert, Dr. Lee, opine that Plaintiffs Carroll and Endicott received a full complement of lactation counseling from network providers, and did not have to use out-of-network providers. Of course, it is a desperate attempt at conjuring up individualized or typicality issues when none exists nor are pertinent to the common issues of law and fact. To put to rest such tactic, however, but not conceding relevancy, Plaintiffs' expert Dr. Morton opined that: it is "not the standard of care for physicians and their staff to provide [CLS] for the breastfeeding dyad, especially those at high risk or with complications" (Ex. 43, 1/25/19 Morton Report at 3); "it is not the standard of care for physicians to assume primary responsibility for the management of CLS" (*id.*); "Dr. Lee's assessment of the care…demonstrates his misunderstanding of the critical need for lactation specific care during the outpatient post-partum period and the value of CLS provided by lactation experts, such as physicians skilled in breastfeeding medicine and [IBCLCs]" (*id.* at 5); and, Plaintiffs "did not receive CLS from their primary care providers" (*id.* at 9).

19

_____

complement of CLS from their network physicians they would not have sought out services from and coverage for out-of-network lactation specialists.

Similarly unfounded is that resolution requires an individual review of providers' accounts payable and receivables, because UHC does not track whether providers actually collect co-pay, coinsurance, or deductible amounts.[25]  To make this argument, UHC is assuming rampant insurance fraud by providers, and rashly treats a practice that UHC expressly prohibits of its providers.  In UHC's Administrative Guide for providers (Ex. 41, UHC_003092)[26], "Examples of Potentially Fraudulent, Wasteful, or Abusive Billing" include "**Waiver of copay:** Failure to collect copayments or deductibles as part of the payment agreement." (emphasis in original)**.** Of course, as the Administrative Guide notes, UHC employs various internal and external sources to detect such fraud, including "UnitedHealthcare Payment Integrity functions". *Id.* Fundamentally, of course, UHC is dependent on the integrity in the billing process, and bases its insurance coverage and payment determinations on such information. It is a desperation move for UHC to disclaim the accuracy and impact of information contained in its systems and provider policies.

Equally unfounded is UHC's and its expert's claim that assessing CLS claims that were denied or for which cost-sharing was imposed would require inquiry into "individualized circumstances." *See, e.g..* Ex. 35, 12/11/2018 dos Santos Report, ¶ 50. It would not. Fundamentally, UHC's business includes the reprocessing of denied or improperly processed claims. Even if UHC may have to seek and receive information from a member directly (particularly when due to its failure to establish systems to adjudicate claims for CLS in accordance with the ACA), that would simply be a normal part of its business. Also, Plaintiffs' rebuttal expert, Mr. Labovitz, readily refutes the "individualized" contentions (*see* Labovitz Rebuttal Report, Ex. 36,  ¶¶ 47-56). Mr. Labovitz explains that UHC's auto-adjudication system (the means by which 90% of UHC's claims are processed): is a rules based computer program that determines the claim treatment; and to which sampling and statistical methods can applied to identify from the data

---

[25] *See, e.g,* Ex. 40, Declaration of Abby Seay, UHC Appeals Compliance Manager, who attests that UHC does not "track" cost-sharing amounts (*id.*, at ¶ 9).

[26] The Administrative Guide is incorporated by reference in UHC's Practitioner Contract, *see* Ex. 42, Declaration of Regina Vasquez, UHC's Director of Ancillary Contracting and Exhibit A thereto at pgs. 3-4).

"factors and filters values that drive a claim result, including but not limited to the relationship among claim elements such as provider type, provider network status, procedure codes and diagnosis codes that resulted in cost-share being applied and / or a claim being denied." UHC's arguments are unpersuasive and contradict the fundamental constructs of its insurance business.

The typicality prong is amply satisfied here.

### 4. Plaintiffs and Counsel Are Adequate Representatives

"To establish adequacy of representation [under Rule 23(a)(4)], the Court must resolve whether 'the named plaintiffs and their counsel have any conflicts of interest with other class members' and whether 'the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.'" *Arthur v. United Indus. Corp.*, Case No. 2:17-cv-06983-CAS (SKx), 2018 U.S. Dist. LEXIS 83607, at *27 (C.D. Cal. May 17, 2018) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). The law governing adequacy is well-settled that "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." 7A Charles Alan Wright, Arthur R. Miller, *et al.*, Federal Practice and Procedure, § 1768 (3d ed. 1986).

Both elements of adequacy are satisfied here. The proposed Class Representatives for the Claims Review Class, Plaintiffs Barber, Bishop, Condry, Endicott, and Hoy, do not have conflicts of interests with the proposed members of the Claims Review Class. *See* Section III.C.3. Those Plaintiffs have vigorously advocated the claims against UHC, and secured through the SJ Order a judgment for the four Remark Codes that are the subject of the Class Review Class. For the Lactation Services Class, Plaintiffs Bishop, Hoy and Endicott are the proposed Class Representatives, and for the ACA Class, Plaintiff Carroll is the proposed Class Representative. None of the Plaintiffs have conflicts of interests with the other members of the Classes. They have no interests that are antagonistic to the interests of the proposed Classes.

While Defendants may point to small factual differences between Plaintiffs and class members, such factual differences do not defeat adequacy.[27] *See Walters v. Reno*, 145 F.3d 1032,

---

[27] In the SJ Order at 8 the Court already rejected UHC's arguments about exhaustion, and specifically with respect to Plaintiff Carroll.

21

1046 (9th Cir. 1998) (factual differences in the merits of the named plaintiffs' underlying claims "have no bearing on the class representatives' abilities to pursue the class claims vigorously and represent the interests of the absentee class members").  Plaintiffs have vigorously represented the interests of the class members.  Each named Plaintiff has been actively involved in each phase of this litigation and will continue to vigorously pursue this litigation going forward. Plaintiffs Condry, Hoy, Endicott, Bishop, Barber, and Carroll have each responded to three sets of requests for production of documents, responding to a total of forty-two requests for production of documents.  They have produced their medical records and other pertinent information, including several hundred pages of documents each.  They have each worked through three sets of interrogatories, responding to a total of twenty-five interrogatories[28] identifying and describing all facts related to various positions in the Amended Complaint, among other things.  They each spent between six and eight hours sitting for depositions in this matter, spent hours preparing for those depositions, and gave detailed testimony concerning their respective interests in pursuing this case as lead plaintiffs and their passion for seeing this litigation through to its conclusion.[29]

The second prong of the adequacy is also easily satisfied.  Proposed Co-Lead Class Counsel, Chimicles Schwartz Kriner & Donaldson-Smith LLP and Shepherd, Finkelman, Miller & Shah, LLP, and Proposed Class Counsel Axler Goldich LLC are experienced and qualified in class action litigation, including ERISA class actions, and have secured certification of numerous class actions and brought them to successful conclusions. *See* Firm Resumes, Exs. 37-39. As they have done, Plaintiffs and Class Counsel will continue to adequately and zealously represent the members of the

---

[28] Except for Plaintiff Rachel Carroll, who responded to twenty-one interrogatories.

[29] *See, e.g.*, Condry Dep. (Ex. 44) at 55:9-21 ("I contacted [Plaintiffs' counsel] because I wanted to keep other women from having the same kind of troubles that I had getting what I thought were services that should have been covered under the law or that the law stated should have been covered.  I found it to be kind of a traumatic experience, so I wanted to keep others from having to do that."); Hoy Dep. (Ex. 45) at 46:2-11 (testifying that she believes, in general, UHC has an "obligation to provide a meaningful choice to a consumer of various providers who provide quality care," and that UHC did not do so); Endicott Dep. (Ex. 46) at 98:14-99:6 (testifying that, even before this lawsuit began, she was concerned about other people who would have been affected by this issue, and shared a link on Facebook to an intake form where people could go and share their stories); Bishop Dep. (Ex. 47) at 170:1-19 ("I have spoken to woman who have failed at breastfeeding and ended up formula feeding as a result, and I think that if I could be a part of a change that helps women be more successful at breastfeeding, then I would feel really good about that."); Barber Dep. (Ex. 48) at 153:7-154:13 ("[United] should have lactation consultants for women who find themselves in the situation that I did,"); *id.* at 193:14-194:5 ("[E]veryone should have access to the support regardless of whether they . . .are wealthy or not.").

1 Classes.

2     **D.**    **Rule 23(b) Requirements**

3     The next factor is whether this case fits one of the three subsections of Rule 23(b). Plaintiffs

4 seek to certify the Classes, which seek equitable relief only, under subsections (b)(1) and (b)(2).

5     *1.*    ***Rule 23(b)(1)***

6     Rule 23(b)(1) is divided into two subsections, Rule 23(b)(1)(A) and 23(b)(1)(B).

7 Certification here, with respect to all three Classes, is proper under both subsections. First, a class

8 action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions … would create a

9 risk of inconsistent or varying adjudications with respect to individual members of the class which

10 would establish incompatible standards of conduct for the party opposing the class."

11     The phrase "incompatible standards of conduct" refers to the situation where "different

12 results in separate actions would impair the opposing party's ability to pursue a uniform continuing

13 course of conduct." *Zinser*, *supra*, 253 F.3d at 1193. Certification under Rule 23(b)(1)(A), however,

14 requires more "than a risk that separate judgments would oblige the opposing party to pay damages

15 to some class members but not to others or to pay them different amounts[.]" *Id*.

16     The prospect of inconsistent declaratory and/or injunctive relief satisfies Rules 23(b)(1)(A).

17 *See Zinser, supra,* 253 F.3d at 1193 fn. 9. Indeed, certification under Rule 23(b)(1)(A) is

18 particularly appropriate in ERISA and injunctive relief class actions because health plans generally,

19 and ERISA fiduciaries, must apply the same standards to all members. *Des Roches*, *supra*, 320

20 F.R.D. at 506 ("The Court can envision few better scenarios for certification under (b)(1)(A) ....

21 This is because Rule 23(b)(1)(A) takes in cases where the party is obliged by law to treat the

22 members of the class alike ....")(quoting *Z.D. v. Group Health Coop.* 2012 WL 1977962, *7 (W.D.

23 Wash. 2012) and *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). That is precisely the

24 situation here. Plaintiffs and the members of the Classes are seeking declaratory and injunctive

25 relief in this matter that would require UHC to fundamentally reform its claims procedures and

26 practices regarding CLS, including with respect to the use of the Remark Codes at issue.

27     Plainly, pursuit of similar claims for systemic reform through multiple individual lawsuits

28 would be inefficient, and create a very real risk that different courts might order divergent or even

conflicting relief.  Accordingly, to avoid such a result, the Classes should be certified pursuant to Rule 23(b)(1)(A). *See Robertson v. National Basketball Ass'n*, 556 F.2d 682, 685 (2d Cir. 1977) (Rule 23(b)(1) certification is proper where plaintiffs sought rule changes that would impact future members).

Certification is also proper pursuant to Rule 23(b)(1)(B), which requires a showing that "adjudications with respect to individual class members … would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). The evidence has demonstrated that this Action fundamentally questions and seeks reform of UHC's policies applicable to all of its ACA-governed, ERISA and non-ERISA plans.  For ERISA plans, ERISA requires that, where appropriate, plan provisions must be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5).

 "Prosecuting separate actions in this case would have the result of subjecting [UHC] to incompatible standards of conduct[.]" *Moyle v. Liberty Mut. Ret. Ben. Plan,* 823 F.3d 948, 965 (9th Cir. 2016). The policies and procedures at issue here are not impacting a single or few UHC's subsidiaries' plans or members (relatively speaking). This Action evokes UHC's policies, set and administered at the highest level across all of its subsidiaries and plans.

### 2.      Rule 23(b)(2)

Certification of the Classes are also proper under Rule 23(b)(2) because UHC has "acted or refused to act on grounds that apply generally to the [Classes]", so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The key to certification under Rule 23(b)(2) is establishing, as Plaintiffs have done here (*supra),* the uniform, class-wide conduct on the part of the defendant. *See Parsons*, *supra*, 754 F.3d at 688. This requirement is "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class a whole." *Id*.

"That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule

24

23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." *Parsons*, *supra*, 754 F.3d at 688.

Certification under Rule 23(b)(2) is also particularly appropriate here because the Plaintiffs are requesting that UHC reprocess claims under a corrected standard with respect to CLS. *See Des Roches, supra*, 320 F.R.D. at 508; *Wit*, *supra*, 317 F.R.D. at 134-138; *see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460-461 (9th Cir. 1996).

Here, Plaintiffs and the members of the Classes are seeking declaratory and injunctive relief to remedy the same conduct, described above, with respect to CLS. This Action "necessarily involve[s] acts that are generally applicable to the class." *Moeller*, *supra*, 220 F.R.D. at 612; s*ee also Arnold v. United Theatre Circuit, Inc.*, 158 F.R.D. 439, 452 (N.D. Cal. 1994) (where class members challenged defendant's failure to change certain architectural features found at its theatres, and the challenged design features affected all class members in the same way, the court determined that such a scenario "is a paradigm of the type of action for which the (b)(2) form was created"). Certification, with respect to each of the three Classes, under Rule 23(b)(2) is therefore appropriate.

## IV.    CONCLUSION

Plaintiffs respectfully entry of an order, pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure ("Rule 23"): (1) certifying The Claims Review Class, The Lactation Services Class and The ACA Class, as defined herein and in the Motion;  (2) appointing Plaintiffs Barber, Bishop, Condry, Endicott, and Hoy as Class Representatives for the Claims Review Class, appointing Plaintiffs Bishop, Hoy and Endicott as Class Representatives For the Lactation Services Class; and, appointing Plaintiff Carroll as Class Representative for the ACA Class; and (3) appointing Chimicles Schwartz Kriner & Donaldson-Smith LLP and Shepherd, Finkelman, Miller and Shah, LLP as Co-Lead Class Counsel, and Axler Goldich LLC as Class Counsel.

Dated: February 20, 2019          **CHIMICLES SCHWARTZ KRINER
                                   & DONALDSON-SMITH LLP**


                                   By: */s/ Kimberly Donaldson-Smith*
                                   Nicholas E. Chimicles (admitted *pro hac vice*)

25

Kimberly Donaldson-Smith (admitted *pro hac vice*)
Stephanie E. Saunders (admitted *pro hac vice*)
361 W. Lancaster Avenue
Haverford, PA 19041
Phone: (610) 642-8500
Fax: (610) 649-3633
NEC@Chimicles.com
KMD@Chimicles.com
SES@Chimicles.com

James E. Miller (admitted *pro hac vice*)
Laurie Rubinow (to seek admission *pro hac vice*)
**SHEPHERD, FINKELMAN, MILLER AND SHAH, LLP**
65 Main Street
Chester, CT 06412
Phone: (860) 526-1100
Fax: (866) 300-7367
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

*Proposed Co-Lead Class Counsel and Counsel for Plaintiffs*
Marc A. Goldich (admitted *pro hac vice*)
Noah Axler (admitted *pro hac vice*)
**AXLER GOLDICH LLC**
1520 Locust Street
Suite 301
Philadelphia, PA 19102
Phone: (267) 534-7400
Fax: (267) 534-7407
mgoldich@axgolaw.com
naxler@axgolaw.com

*Proposed Class Counsel and Counsel for Plaintiffs*

KRISTEN LAW SAGAFI, California Bar No. 222249
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA  94607
Phone: (510) 254-6808
Fax: (202) 973-0950
ksagafi@tzlegal.com

Jonathan W. Cuneo (to seek admission *pro hac vice*)
Pamela B. Gilbert (to seek admission *pro hac vice*)
Monica E. Miller (to seek admission *pro hac vice*)
Katherine Van Dyck (to seek admission *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200

26

Washington, DC 20016
Phone: (202) 789-3960
Fax: (202) 789-1813

***Counsel for Plaintiffs***