**TYCKO & ZAVAREEI LLP**
KRISTEN LAW SAGAFI, California Bar No. 222249
ksagafi@tzlegal.com
483 Ninth Street, Suite 200
Oakland, CA 94607
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

Counsel for Plaintiffs

*Additional counsel for Plaintiffs on signature page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

RACHEL CONDRY, JANCE HOY, CHRISTINE ENDICOTT, LAURA BISHOP, FELICITY BARBER, and RACHEL CARROLL on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

UnitedHealth Group Inc.; UnitedHealthcare, Inc.; UnitedHealthcare Insurance Company; UnitedHealthcare Services, Inc.; and UMR, Inc.,

Defendants.

Case No.: 3:17-cv-00183-VC

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

**Date:    April 25, 2019**
**Time:   10:00 am**
**Place:   Courtroom 4**

**Honorable Vince G. Chhabria**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     UHC'S POLICIES FOR CLS COVERAGE, NOT
        "INDIVIDUALIZED ISSUES," WERE UNIFORM
        AND DRIVEN BY FINANCIAL INTERESTS .................................................2

III.    *UHC* DID NOT DEMONSTRATE MEANINGFUL ACCESS ..............................6

IV.     UHC "INDIVIDUALIZED ISSUES" ARGUMENTS
        ARE UNPERSUASIVE.........................................................................................9

V.      EACH PLAINTIFF HAS ARTICLE III STANDING ............................................13

VI.     PLAINTIFFS' ACA AND LACTATION SERVICES CLASSES
        ARE NOT EXPANDED AND ASSERT A COMMON INJURY.........................14

VII.    CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Hain Celestial Group, Inc.*,
   2014 U.S. Dist. LEXIS 162038, 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .............................15

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
   270 F.R.D. 521 (N.D. Cal. 2010)...............................................................................................12

*Des Roches v. Cal. Physicians' Serv.*,
   320 F.R.D. 486 (N.D. Cal. 2017)...........................................................................................11, 12

*Erickson v. Courtney*,
   702 Fed.Appx. 585 (9th Cir. 2017).................................................................................................9

*Farar v. Bayer AG*,
   No. 14-cv-04601-WHO, 2017 U.S. Dist. LEXIS 193729 (N.D. Cal. Nov. 15, 2017) ....................14

*Gessele v. Jack in the Box, Inc.*,
   No. 3:10-CV-960-ST, 2012 U.S. Dist. LEXIS 120377 (D. Or. Aug. 24, 2012)................................1

*Hill v. UnitedhealthCare Ins. Co.*,
   2017 U.S. Dist. LEXIS 218139 (C.D. Cal. Mar. 21, 2017) ............................................................10

*Johnson v. Hartford Cas. Ins. Co.*,
   No. 15-cv-04138-WHO, 2017 U.S. Dist. LEXIS 77482 (N.D. Cal. May 22, 2017).................13, 14

*Josephat v. St. Croix Alumina, LLC*,
   2000 U.S. Dist. LEXIS 13102 (D.V.I. Aug. 7, 2000)....................................................................11

*Phillips v. Sheriff of Cook County*,
   828 F.3d 541 (7th Cir. 2016) ........................................................................................................11

*Rikos v. Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493, 194 L. Ed. 2d 597 (2016) .................11

*Sanchez v. Capital Contractors, Inc.*,
   No. 14-cv-02622-MMC, 2017 U.S. Dist. LEXIS 87585 (N.D. Cal. June 7, 2017)..........................14

*Sandoval v. Cnty of Sonoma*,
   2015 U.S. Dist. LEXIS 55571, 2015 WL 1926269 (N.D. Cal. Apr. 27, 2015) ...............................15

*Schilling v. Kenton Cnty., Ky.*,
   No. 10-143-DLB, 2011 WL 293759 (E.D. Ky. Jan. 27, 2011)........................................................11

*Stafford v. Carter*,
  2018 U.S. Dist. LEXIS 34266 (S.D. Ind. Mar. 2, 2018)....................................................................10

*Steinley v. Health Net*,
  No. CV 18-5458 PSG, 2018 U.S. Dist. LEXIS 223853 (C.D. Cal. Dec. 4, 2018) ...........................14

*Trujillo, et al. v. UnitedHealth Group, Inc., et al.*,
  CV 17-2547, 2019 U.S. Dist. LEXIS 21927 (C.D. Cal. Feb. 4 2019)(Appeal filed, 02/20/2019) ...10

*Whitney v. Khan*,
  2019 U.S. Dist. LEXIS 38288 (N.D. Ill. Mar. 11, 2019) .................................................................11

*Wit v. United Behavioral Health*,
  Case No. 14-cv-02346-JCS (USDC ND Cal.) ........................................................................4, 5, 12

**STATUTES**

ERISA ...................................................................................................................................6, 10, 15

**OTHER AUTHORITIES**

29 CFR 2590.715-2713(a)(3)....................................................................................................................9

Rule 23 ......................................................................................................................................................11

1   Plaintiffs, Rachel Condry, Jance Hoy, Christine Endicott, Laura Bishop, Felicity Barber, and

2   Rachel Carroll (collectively, "Plaintiffs"), hereby submit their Reply In Further Support of

3   Plaintiffs' Notice of Motion and Motion for Class Certification and the Memorandum of Points and

4   Authorities in Support (ECF No. 161, "Pltfs. Memo" or "Plaintiffs' Motion" or "Motion"); and in

5   Reply to Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification (ECF No.

6   163, "Defs. Resp." or "UHC's Opposition" or "Opposition").   In support of Plaintiffs' Motion,

7   Plaintiffs filed the Declaration of Kimberly Donaldson-Smith (ECF No. 162-1, the "Pltfs. Decl.").

8   Filed concurrently herewith is the Supplemental Declaration of Kimberly Donaldson-Smith in

9   Support of Plaintiffs' Motion (the "Pltfs. Suppl. Decl."), with exhibits thereto.

10  **I.   <u>INTRODUCTION</u>**

11  Reading UHC's Opposition, one would believe that this is a lawsuit against providers for

12  rendering subpar medical services to a proposed class of patients.   (*See, e.g.,* Defs. Resp. at 2:18-

13  19, "While Plaintiffs may disagree with the quality and scope of the services rendered in certain

14  instances, the fact remains that no common injury exists across the putative classes.").   It is part of

15  UHC's Opposition, as well as its *Daubert* motions directed to Plaintiffs' experts, seek to conjure

16  up speculative and irrelevant arguments about "individualized inquiries" and try to revive its

17  already-rejected arguments.

18  By affirmatively seeking summary judgment as to the Plaintiffs, UHC made a calculated

19  assessment about its significant risk with respect to class certification.[1]   In the wake of the

20  foundational holdings provided in the Court's Summary Judgment Order (Dkt. 146, "SJ Order"),

21  and the facts that have now proven out in discovery, class certification must be granted.   UHC's

22  insureds, across the board (all plans, company-wide, nationwide), were subject to its policies, which

23  did not give any member meaningful access to CLS coverage, including meaningful access to

24  UHC-identified lactation providers.   In response, UHC deploys boilerplate typicality and

25

26

27  [1] *See* Pltfs. Memo at fn. 1; *see Gessele v. Jack in the Box, Inc.*, No. 3:10-CV-960-ST, 2012 U.S. Dist. LEXIS 120377, at *7 (D. Or. Aug. 24, 2012) ("by filing a motion for summary judgment prior to class certification, the defendant accepts the potential unfairness of one-way intervention").

28

1

commonality assertions and disregards the evidence and the SJ Order. The compelling facts and precedent, however, impel certification of the Classes.

## II.    UHC'S POLICIES FOR CLS COVERAGE, NOT "INDIVIDUALIZED ISSUES," WERE UNIFORM AND DRIVEN BY FINANCIAL INTERESTS

As detailed in Plaintiffs' Motion (*see, e.g.,* Section II.C), discovery has established that insureds were subject to UHC's ACA-deficient policies governing CLS coverage.[2]  UHC's Opposition does not refute the substance of Plaintiffs' arguments about its CLS policies, which UHC acknowledges have <u>not changed</u> throughout the Class Period.  (*See,* Pltfs. Memo at 6-7).

First, UHC determined that it would not establish a network of identified lactation providers.[3]  UHC's Opposition, which is reminiscent of both of its motion to dismiss and its summary judgment filings, and notwithstanding the Court's SJ Order, repeats UHC's stance that: "Defendants have thousands of in-network providers of lactation services, with OB/GYNs, pediatricians, and lactation specialists making up the majority of these providers" (Defs. Resp at 5:18-6:2).  Similarly, UHC states that "women are exposed to lactation services from various provider types—including OB/GYNs, pediatricians, and lactations specialists—throughout their pregnancy, during the hospitalization associated with delivery, and during expected postpartum visits." (Defs. Resp. at 6:8-11.)[4]  UHC did not affirmatively build a network of identified-lactation consultants, or even provide the identities of any network providers who were in fact providing CLS (other than the 380-designated providers, discussed *infra* at Section III).

Second, UHC admits that its Preventive Care Services Coverage Determination Guideline

---

[2]  *See, e.g.,* the CDG applies to all members of the ACA and Lactation Services Classes. Pltfs. Decl., Ex. 11, Declaration of Janice Huckaby, UHC Regional Chief Medical Officer, ¶ 6.
[3]  UHC's policy was that it did not "need to develop a specific, broad strategy for contracting with lactation specialists since [it has] pediatricians and OB's [sic] that already provide this service." (Pltfs Decl., Ex. 23, UHC_110054-56); *see also* Plaintiffs' Motion at pgs. 8-9, and Section II.D.
[4]  UHC relies on Dr. Henry Lee, who UHC also proffered during the summary judgment proceedings (Defs. Resp. at 6:11).  Plaintiffs are filing a Motion to Limit Consideration of the Expert Report of Dr. Henry Lee.  As stated in that motion, among other reasons, Dr. Lee's opinion should be afforded no weight because having in-network certain provider-types does not equate to relevant proof or evidence that UHC's pediatricians and OBGYNs were, in fact, providing CLS and that UHC made members aware of the identity of the actual providers (*not the "provider types."*)

("CDG") is the policy that "defined the scope of the [CLS] benefit" for UHC insureds. (*See,* Plaintiffs Motion at 6-7, citing to UHC's Resp. to Rog. 1.)   The CDG identifies certain procedure codes (and a diagnosis code for certain of those procedure codes) as the only codes eligible for coverage without cost-shares when billed as described in the CDG and in accordance with Defendants' policies and procedures.   Notably, UHC's Response reveals the improperly narrow construct and inadequacy of the CDG as it applies to CLS.[5]   Likewise, UHC confirmed in discovery that the CDG impermissibly incorporated the preventive versus diagnostic care construct for CLS and services billed outside the CDG were processed as non-preventive. (*Id.* at 7, citing to Resp. to Rog. 2 ("*If such services are billed using codes in a manner not set out in the CDG, they will be processed as non-preventive care.*" (Emphasis added)).   UHC has offered such policies in its defense and as proof of its purported compliance with the ACA. The policies are squarely at issue and the resolution of such issues is no different within or among the Classes.  *See,* Defs. Resp. at 7.

Third, in UHC's own words, its policy is, and has been, that "preventive services….will be eligible for coverage without cost-shares ***provided that*** such services are provided by a ***network provider***…" Pltfs. Decl. at Ex. 10, UHC Resp. to Rog. 3 (emphasis added).   UHC did not cover out-of-network CLS providers because of its policy that its existing network pediatricians and obstetricians provided CLS, of course notwithstanding that they were not actually identifiable or identified by UHC as CLS network providers to insureds.  That is the policy the Classes challenge.

***Why*** would UHC implement blatantly narrow and non-compliant Policies? Financial interests.  A UHC email dated 1/27/2012 concerning the ACA women's preventive benefits stated

---

[5] UHC states that: "Plaintiffs also seek to sweep in thousands of potential members whose claims ***were billed by providers under medical codes that do not on their face indicate that lactation services were provided*** and could reflect a different type of service." (Defs. Resp. at 3:4-6; 19.) First, the rendering of CLS services may be indicated by the use of numerous codes that, on their face, indicate lactation-related issues (which are not listed in the CDG, Pltfs Decl. Ex. 12 at pg 39) and codes relating to breast issues including when combined with other codes that may indicate a CLS visit. *See,* Dr. Hanley's Amended Report (Pltfs. Decl., Ex. 34) and, *see also,* fns. 2 and 3 in the Amended Report of UHC's expert, Ms. D'Apuzzo (Pltfs. Decl., Ex. 18). At bottom, there is not one code for CLS, there are many and they need to be accounted for. Second, the only reason that such a condition would exist, with the need to sweep in claims of thousands of potential class members, is that UHC's CDG provided for narrower coverage than is consistent with required practice.

that "we must identify key areas of opportunity to minimize the financial risks associated with these new guidelines." *See* Pltfs. Decl., Ex. 26, UHC_011837.  To "minimize" the financial risk, UHC assumed **$0** incremental costs/financial impact *specifically* for breastfeeding support counseling services (Pltfs. Suppl. Decl. Exhibit 1).

At $0 financial impact, UHC coverage could only consist of coverage included as part of delivery during the hospital stay and wellness visits with pediatricians and obstetricians. UHC could not meet its $0 financial impact assumption if it contracted with lactation specialists and lactation specialist groups, and then identified to its members those lactation consultants as well as coverage guidelines that were ACA compliant for CLS coverage.  UHC's objective was for CLS coverage to cost UHC nothing; that would have been impossible if UHC had implemented policies that gave members access to and utilization of CLS preventive coverage.

Plaintiffs' theory is not novel or untested, and it is a circumstance that UHC may be familiar with: Coverage policies and guidelines, including specifically CDGs, that are tainted by an insurer's financial interest are fundamentally flawed and non-ERISA and state law compliant, and expose an insurer to liability to a class of insureds. On March 5, 2019, Chief Magistrate Judge Spero in *Wit v. United Behavioral Health*, Case No. 14-cv-02346-JCS, (USDC ND Cal.), a behavioral health benefits class action against United Behavioral Health ("UHB") which manages behavioral health services for UHC members, issued Findings of Fact and Conclusions of Law [*Wit* FOF, Dkt. No. 418, Excerpts at Exhibit 2 to Pltfs. Supp. Decl].[6]  In *Wit*, the plaintiffs asserted that they were improperly denied benefits for the treatment of mental health and substance use disorders because UHB Guidelines, namely its Coverage Determination Guidelines and Level of Care Guidelines, did not comply with the plan terms and/or state law. (*Wit* FOF, Exhibit 2 at pg. 1). In discussing UBH's development of its Guidelines, Judge Spero addressed that "the process UBH uses to develop its Guidelines...is fundamentally flawed because it is tainted by UBH's financial interests." *Id.* at pgs.

---

[6] Because of its length, Plaintiffs attach excerpts of the FOFs reflecting the pages cited herein (Exhibit 2, Pltfs. Suppl. Decl.). The FOFs in their entirety are on the *Wit* docket, Case 3:14-cv-02346, USDC ND. Cal., Dkt. 418, or can be provided by Plaintiffs upon request.

90-94, ¶¶ 174 – 185.  Judge Spero found that such flaw arose from UBH's consideration of the general economic impact of increasing or decreasing coverage, and its setting coverage policies under such construct where UBH placed representatives of its Finance and Affordability Departments in key roles in the Guidelines development and approval process. *Id.* at 90-94, ¶¶ 174 – 185.  The *Wit* FOFs state that "financial incentives …infected the Guideline development process" (*id.* at ¶ 180), and that the "Guidelines were riddled with requirements that provided for ***narrower coverage than is consistent with generally accepted standards of care gives rise to a strong inference that UBH's financial interests interfered with the Guideline development process*." (*Id.* ¶ 183, emphasis added).

In sum, UHC's CLS coverage policies – which UHC admits have not changed throughout the Class Period to the present (*see* Pltfs. Decl., Ex. 10, UHC Resp. to Rogs. 1-4)) – are grounded in UHC's: 1) narrow construct of CLS (including its unsupported preventive/diagnostic care construct); 2) baseless position that all pediatricians and obstetricians provide CLS; and, 3) stance that CLS is simply part of delivery and post-partum wellness visits sufficiently covered by physicians who provide post-partum wellness visits and hospital delivery. *Supra; see also,* Defs. Resp. at 8:2-16; 16:8-11.[7] The resolution of whether UHC's CLS-related policies and procedures constitute ACA-mandated coverage for CLS presents questions common to the members of the Lactation Services Class and ACA Class.

Similarly impactful to UHC's financial interest is its use of the four Remark Codes for CLS (similarly impactful because the four Remark Codes are issued for denied claims).  Although UHC tacitly acknowledges the import of the SJ Order ("[e]ven assuming that the denial codes at issue were confusing in the abstract…", Defs. Resp. at 3) with respect to the Remark Codes, UHC then

---

[7] *See* Defs. Resp. at 8:11-15 and 16:8-14 stating that "Additional members ***likely*** received lactation services through global billing and post-partum wellness visits…." (emphasis added). Contrary to Defendants' vague and unsubstantiated assertions that "additional members likely received [] free in-network services through hospital-based programs" (Defs Resp. at 16:8-12), the outpatient one-on-one lactation services at Hartford Hospital are not free. *See* Souza Decl., Ex. D (Mar. 15, 2019 Marshall-Crim Dep.), at 98:2-99:8 (There is a fee for "an outpatient one-to-one visit" the fee ranges "depend[ing] on what services are rendered.")

5

deems the Remark Codes only "confusing in the abstract" requiring "individual assessments of each member's circumstances—including whether additional contact with Defendants occurred or an appeal was filed—to determine whether the alleged procedural violation prevented a "meaningful dialogue." *Id.  See also*, Plaintiffs Motions to Limit with respect to Ms. D'Apuzzo and Mr. Miller. There is no "in the abstract" – the Remark Codes were used on EOBs for CLS, and, as the Court held, each was confusing in the context of the CLS EOB.  UHC's position, if adopted, would eviscerate the fundamental purpose of the ERISA procedural requirement, which aims to remove such subjective determinations offered by UHC.  UHC must reprocess the CLS claims without any of the offending Remark Codes.

## III.    *UHC* DID NOT DEMONSTRATE MEANINGFUL ACCESS

Plaintiffs established that UHC's failure to provide meaningful access to network CLS providers is determinable on a national class-wide basis.  After the issuance of, and guided by, the Court's SJ Order, Plaintiffs adduced evidence through discovery that only network providers with the 380 Lactation Specialist code are identifiable (i) by UHC as providing CLS and (ii) are identified to insureds as such by UHC.  *Nationwide* UHC has only <u>122</u> unique current "380" network providers and <u>22</u> unique terminated "380" providers (since 2012).  In addition, for 20 states, UHC's data reflected that it had <u>no</u> "380" network providers identified during the Class Period.  *See*, Plaintiffs' Motion at pg. 9-12.  On its own, the *de minimus* providers identified by UHC as 380 network providers is conclusive of the systemic lack of UHC-identified network lactation providers.  Likewise, UHC's call center was telling members to contact their network providers and not making insureds aware of the identity of any network provider that in fact provided CLS.[8]

Faced with the undisputed facts, UHC claims that Plaintiffs are required to prove a negative – that each of the thousands of OB/GYNs and pediatricians in UHC's network are NOT providing

---

[8] *See,* Ex. 19, UHC_007982, June 19, 2014 email stating: "How does the Call Center advise members calling in for lactation consulting providers?" reveals that UHC's policy was to have the "Call Center" "advise[] member[s] **to contact their in-network OB/GYN/Pediatrician as only INN [in network] benefits are covered.**"). *See also,* fns. 11-12, *infra.*

1    lactation services.[9] On this issue, UHC's Opposition directs the Court and Plaintiffs to "see

2    concurrently filed *Daubert* motions". *See* Defs. Resp. at 18:6.  On April 4, 2019, Plaintiffs filed

3    oppositions to UHC's *Daubert* motions directed to Plaintiffs' four experts: Mr. McGlone [ECF No.

4    181], Dr. Hanley [ECF No. 184], Dr. Morton [ECF No. 182], and Dr. Labovitz [ECF No. 183].

5         UHC has never refuted Plaintiffs' demonstration about the 380-identified providers by

6    offering any relevant information. For example, UHC has failed to provide the name of each

7    provider in their network who, in fact, provides CLS.  Nor has it explained how it identified those

8    providers to the members of the Classes throughout the Class Period.  Instead, because UHC cannot

9    do that, UHC ignores the 380 designation, and cursorily argued that proof of its insureds getting

10    access to coverage can be gleaned from its claims data.  *See* Defs. Resp. at 8:1-17, citing to and

11    relying on Mr. dos Santos, one of UHC's proffered experts.   That analysis, however, is (i)

12    irrelevant, because it (again) skirts the relevant inquiry of whether the network CLS providers were

13    identified as such to insureds by UHC; and (ii) is flawed in its conclusion about UHC's breadth of

14    network by failing to consider the claims data relative to claims expected, which is an appropriate,

15    necessary comparison or assessment, if one is to render an opinion about breadth of a network in

16    the manner that UHC has offered.  *See* Plaintiffs' Memo at pg. 15; *see also*, Plaintiffs' Motion to

17    Limit Testimony and Opinions of Mr. dos Santos, filed concurrently herewith; and, Plaintiffs'

18    Opposition to UHC's *Daubert* directed to Dr. Labovitz [ECF No. 183].

19         The relevant facts are simple and not in dispute.  UHC only used a specialty code "380" to

20    designate lactation specialists and lactation specialist groups.[10]  UHC admitted that "[t]he on-line

21    directory pulls [ ] information from the National Data Base where contracted providers'

22    demographic information, including specialty, is stored", and therefore, **only the network**

23    **providers "identified by the specialty code '380'…have been electronically searchable as**

24

25    [9] *See* Defs. Resp. at 5:21-6:2 ("Defendants have thousands of in-network providers of lactation
    services, with OB/GYNs, pediatricians and lactation specialists making up the majority of those

26    providers.") This mantra is no more persuasive or supported now than it was at summary judgment.

27    [10] *See* Pltfs. Decl. Ex. 10, UHC Resp. to Rog. 6 (In response to Plaintiffs' request for the identity of
    every lactation specialist and lactation specialist group in UHC's network during the Class Period,

28    UHC responded, "Such providers are identifiable in Defendants' systems by the specialty '380'").

**"Lactation Specialists"** in Defendants' provider directory **since March 2014**." Pltfs. Decl., Ex. 10, UHC Resp. to Rog. 7 (emphasis added).  Prior to March 2014, 380-providers did not display on-line. *Id.*  UHC also admitted, when asked **how** members are directed to network CLS providers (*id.*, UHC Resp. to Rogs. 7, 9) that: "members are encouraged to seek the ACA-mandated service from network providers, including in their plan documents, and are **specifically directed to ask their network provider** about the ACA-mandated service."[11]   (Emphasis added). Moreover, when asked what actions UHC took to provide UHC insureds with the ability to identify **in-network "providers of lactation and breastfeeding services, support and counseling"** (so, the question was *not* limited by the terms "lactation specialist" or "lactation specialist group" or "380"), UHC <u>referred back</u> to Rogs. 7 and 9, which, according to UHC, "reflect the manner in which Defendants identify in-network providers for their members and insureds." *Id.*, UHC Resp. to Rog. 12.[12]

In addition to UHC's own admissions, Plaintiffs had their expert, Daniel McGlone, do a data analysis and geospatial mapping of the "380" Providers, since, again, those are the only lactation providers who are identified by UHC both internally and to UHC's members.  *See,* Expert Report of Plaintiffs' Expert Daniel McGlone (Pltfs. Decl. Ex. 29) and the maps attached thereto (*id.,* Ex. 29-A).  UHC's arguments with respect to Mr. McGlone's analysis are telling: UHC does not contend that there are 380-identified providers other than the 144 unique providers discussed in McGlone's work.  Instead, Defendants suggest that the data McGlone uses is insufficient by not capturing all the thousands of (faceless, nameless) lactation-services providers allegedly in UHC's network. (*See,* UHC's *Daubert* Motion re: McGlone, ECF No. 179 at 6 ("[E]vidence . . . demonstrates that thousands of women *did* receive lactation services from pediatricians, OBGYNs,

---

[11] UHC cited to the SOP for Member Services Breast Pump Benefit (Pltfs Decl. Ex. 27) which states on UHC_003918-3919 that "[i]f a member asks [a]bout lactation counseling and support [] []let the member know the following: ...Educate the member so he or she can discuss specific services with his or her doctor….The member's doctor may offer these services, or have relationships with other practitioners in his or her area to provide this care."

[12] Similarly, when asked to identify the "Documents relating to the 'availability of providers of lactation counseling services in Defendants' networks", UHC referred "Plaintiffs to their responses to Interrogatories Nos. 6, 7 and 9, which refer to the "380" lactation specialists and "SOPs". (*Id.*, Resp. to Rog. 13).

1   and others who are *not* self-described lactation specialists . . . .").); Defs. Resp. at 6.

2       That is sophistry.  But, more to the point, such sophistry is precisely the gamesmanship that

3   UHC has wrongly thrust on its members for over 6 years.  It must stop.

4   **IV.  UHC'S "INDIVIDUALIZED ISSUES" ARGUMENTS ARE UNPERSUASIVE [13]**

5       UHC admits that each member of the Classes sought lactation services (Defs. Resp. at 1:6).

6   Defendants even reference the concept of "threshold determinations regarding the parameters of the

7   benefit…on a class-wide basis." (*Id.* at 15:22-23). But, as is their wont, Defendants attempt to

8   conjure up "individualized claims with unique factual and legal underpinnings." (Defs. Resp. at

9   1:5).  The "individualized issues" are a primary basis for UHC's arguments with respect to

10  commonality and typicality. *See* Defs. Resp. at 9, 14-23, and 25.  UHC's arguments, however, are

11  contrary to the facts and case law, as well as the Court's SJ Order when viewed based on the record

12  and evidence of Defendants' conduct and policies, *see supra,* and Plaintiffs' Motion.

13      An initial fundamental point, that should dispense with UHC's speculations about impact on

14  insureds and "individualized issues," is that without a UHC-identified network of lactation

15  providers, UHC had to (i) cover, without cost-sharing, all CLS claims (irrespective of network

16  status) under the ACA and (ii) have policies consistent with that construct.[14]  Absent that, UHC

17  insureds were subjected to coverage under an ACA-deficient policy.  Plaintiffs seek, therefore, the

18  processing of CLS claims under a corrected policy that reflects the proper scope of CLS and

19  coverage for CLS without cost-sharing. *See,* Plaintiffs' Motion at fn. 6 citing the CDG's

20  acknowledgment that ACA preventive care services may include coverage for out-of-network

---

22  [13]Plaintiffs submitted legal authority and evidence in support of numerosity and the adequacy of
23  proposed Class Counsel. *See* Pltfs. Memo at III.C.3-4. UHC does not contest either, and therefore
    waives any contrary argument. *Erickson v. Courtney*, 702 Fed.Appx. 585, 588 (9th Cir. 2017).

24  [14] The ACA sought to remove the financial barrier that could otherwise lead an individual to not
    obtain preventive services, *see,* 29 CFR 2590.715-2713(a)(3) (titled "Coverage of preventive health
25  services"), under which insurers were relieved of their financial responsibility to insureds (that is,
    insurers could impose cost-sharing) *only if* the insurer "has a network of providers to provide
26  [CLS]." The 10/23/2015 FAQ Part XXIX, Q2 (Pltfs. Decl. at Ex. 6) confirms that ***imposing cost-***
    ***sharing*** on insureds is "***premised on enrollees being able to access the required preventive***
27  ***services from in-network providers***." (Emphasis added).

---

providers with no member cost-sharing (*i.e.*, covered at 100% of Allowed Amounts without deductible, coinsurance or copayment).

UHC's "individualize issues" have been rejected by courts in ruling on class certification motions. In *Trujillo, et al. v. UnitedHealth Group, Inc., et al.*, CV 17-2547, 2019 U.S. Dist. LEXIS 21927 (C.D. Cal. Feb. 4 2019)(Appeal filed, 02/20/2019), insureds alleged that "United has failed to ensure that benefit claim determinations are made in accordance with governing plan documents, failed to establish reasonable claims procedures, and failed to provide adequate notice of adverse benefit determinations in violation of [ERISA]". *Id.* at *2. In *Trujillo*, the prosthetic coverage at issue is "based on an individualized assessment of the member's functional needs", and the coverage criteria is set out in UHC's CDG specific to prosthetics. *Id.* at *3. Further, in opposition to the *Trujillo* plaintiffs' revised proposed class definition, the defendants raised, as UHC does here, among other things, that: (1) coverage involved, for prosthetic devices, "a series of billing codes" and that a prosthetic limb will typically have ten to twenty different L-codes; and, (2) "providers sometimes ignore that guidance and use the miscellaneous codes....." (*Id.* at *4-5).

> ERISA requires that, where appropriate, plan provisions must be "applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). Accordingly, if this Court were to find that the terms of United plans and ERISA claim processing and notice rules required United to act in a certain fashion, and another court found that those same terms and rules required United to act in a different fashion, United would face an "incompatible standard of conduct." To avoid such a result, the class should be certified pursuant to Rule 23(b)(1)(A).

*Trullio*, at *21-22; *see also Hill v. UnitedhealthCare Ins. Co.*, 2017 U.S. Dist. LEXIS 218139, at *25-27 (C.D. Cal. Mar. 21, 2017) (finding individual inquiry into each patient's circumstances to determine whether lumbar procedure should be covered under patient's insurance was **unnecessary** where "the main issue of the case... challenges Defendant's policy on its face, not Defendant's individualized coverage decisions")(emphasis added).[15]

---

[15] *Stafford v. Carter*, 2018 U.S. Dist. LEXIS 34266, at *13-17 (S.D. Ind. Mar. 2, 2018) (rejecting defendants' arguments that "whether a particular individual is receiving a standard of care treatment for their medical conditions is an individualized inquiry" and instead finding that common questions arise out of defendants' standard of care, whether plaintiffs had been denied certain treatments, and whether such denial caused injury).

Even if a review of medical records or gathering information from patients and providers, including objective data such as diagnoses codes were required to reprocess claims, as UHC contends, it does not defeat class certification. *See, e.g. Josephat v. St. Croix Alumina, LLC*, 2000 U.S. Dist. LEXIS 13102, at *39 (D.V.I. Aug. 7, 2000) (recognizing "the existence of individual issues such as the medical histories of each potential class member," but finding that the individual issues did not "predominate over the common issues such as Defendants' liability"); *Whitney v. Khan*, 2019 U.S. Dist. LEXIS 38288, at *17 (N.D. Ill. Mar. 11, 2019) (finding class certification appropriate where potential class members could be identified based on objective data in medical records); *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525-26 (6th Cir. 2015) (finding class ascertainable where it "can be discerned with reasonable accuracy using Defendants' electronic records…, though the process may require additional, even substantial, review of files") (emphasis omitted), *cert. denied*, 136 S. Ct. 1493, 194 L. Ed. 2d 597 (2016).[16]

*Des Roches v. Cal. Physicians' Serv.*, 320 F.R.D. 486 (N.D. Cal. 2017) is also instructive. In *Des Roches,* plaintiffs alleged that defendants made use of "guidelines" which violated the terms of plaintiffs' health care plans, in that the guidelines were far more restrictive than generally accepted standards of care in determining medical necessity for mental health and substance abuse treatments. *Id.* at 491. The court rejected defendants' argument that "determining whether each class member's claim would have been granted under the proper Guidelines 'would require a highly fact-intensive inquiry of individual claims—which precludes class certification under Rule 23'" *id.* at 497, instead finding that, "even if the Guidelines ***were not dispositive in every case***, this does not

---

[16] The cases cited by UHC are inapposite (Defs. Resp. at 15, fn 6). In *Phillips v. Sheriff of Cook County*, 828 F.3d 541, 554-555 (7th Cir. 2016), an action involving detainees claiming deliberate indifference on the part of the jail with regard to dental care, decertification because defendant implemented policies that aligned with national standards resulting in there "no longer [being] a single identifiable remedy that could help all class members." *Phillips*, 828 F.3d at 548-9. In *Schilling v. Kenton Cnty., Ky.*, No. 10-143-DLB, 2011 WL 293759, at *10 (E.D. Ky. Jan. 27, 2011), a § 1983 action alleging due process and Eighth Amendment violations on behalf of inmates denied medical care, the court determined it would need to determine whether the inmates "were deprived of constitutionally adequate medical care or subjected to physical and mental abuse in violation of their constitutional rights." *Id.* at *19.

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION
3:17-cv-00183-VC

change the fact that, assuming Plaintiffs' allegations are true, Defendants applied an incorrect standard in evaluating every class member's claims." *Id.* at 500 (emphasis added). Small variations are "not material to the theories upon which Plaintiffs' claims [were] based." *Id.* Rather, the "harm alleged []—the promulgation and application of defective guidelines to the putative class members—is common to all of the [] class members." *Id.* (internal quotation omitted).[17]

Also instructive is *Wit*. In *Wit*, the class was certified, notwithstanding that at trial (i) the parties would need to address and resolve whether the UBH Guidelines adhere to generally accepted standards of care when there is no "single source of generally accepted standards of care" (*Wit* FOF, Pltfs Suppl. Decl. Exhibit 2 at 27 ¶ 57); (ii) conduct "***extensive testimony on the generally accepted standards of care that apply*** to patient placement in the context of behavioral health treatment" would be given (*id.* at 33 ¶ 70, emphasis added); and address "that in every version of the Guidelines in the class period, and at every level of care that is at issue in this case, there is an excessive emphasis on addressing acute symptoms and stabilizing crises while ignoring the effective treatment of members' underlying conditions" (*id.* at 42 ¶ 82).

The foregoing cases also render other of UHC's "individualized issues" irrelevant. UHC points to Plaintiffs' (and presumably class members') varying contact with UHC, in terms of customer service calls, and, invokes (but misconstrues) the Court's summary judgment ruling. (Defs. Resp. at 1:14-19).[18] As discussed *supra* and in Plaintiffs' Motion, the evidentiary record

---

[17] Defendants make only a passing reference to key cases as cases that "involved challenges to discrete provisions in guidelines or plan terms that applied to ***every*** claim." Defs. Resp. at 20:27-21:4 (emphasis in original), citing *Des Roches* and *Wit*. As explained, the cases did not involve any more discrete provisions than are involved here, and in fact involved documents and issues analogous to the policies here. *Des Roches*, 320 F.R.D. at 497-504 (rejecting various commonality arguments advanced by health plan because of common questions created by the health plan's development and use of claims guidelines); *Wit*, 317 F.R.D. at 127-129 (common issues were found as to whether UBH's CDG met generally accepted standards and whether it breached its fiduciary duty by using improper standards to assist in coverage determination). *See, e.g,* *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 529-30 (N.D. Cal. 2010) (commonality satisfied as common question was interpretation of the standard written policy).

[18] Even if UHC were correct (which it is not), UHC would still need to demonstrate that the 380 – identified in-network UNH providers located in a geographically proximate location constituted an adequate network justifying their imposition of denying claims and cost-sharing for claims in that

12

demonstrates that any such contact is not relevant due to UHC's failure to identify CLS network providers to insureds (other than the *de minimus* number of 380 Providers), and its Policies, including its "SOP", that results in UHC conveying misinformation to insureds about what UHC is actually required to cover for CLS under the ACA. *See, e.g,* fns. 11-12*, supra.*

Finally, UHC's repeated proposition about the availability of a gap exception (*see, e.g., Defs. Resp. generally at 2, 8:14-17, 16) is a false narrative. First, UHC's process for getting a gap exception (*see* Huckaby Decl., Dkt. 119-1, Ex. M at ¶6) is wholly inadequate as it is devoid of any specific timeframes in which UHC is required to conduct its network investigation and issue a response, if any.  Second, whether a member sought a gap exception, received one or had one rejected is irrelevant.  What is relevant is if the member had cost sharing imposed or was not provided coverage by UHC for a CLS claim. Third, The ACA did not say that insurers were to provide a "gap exception" as coverage for Women's Preventive Services.   None of UHC's "individualized issues" give rise to a basis for which the Classes should not be certified.

## V.    EACH PLAINTIFF HAS ARTICLE III STANDING

Defendants' arguments concerning Article III standing (Defs. Resp. at 24:3-16) overlook that the Court granted summary judgment to Plaintiffs Condry, Hoy, Endicott, Bishop, Barber, and Carroll with respect to their claims asserted under Count I, the Claims Review Class claims, and to Plaintiffs Hoy and Bishop with respect to their claims asserted under Count II, the Lactation Services Class claims.  Plaintiffs have already been adjudicated to have suffered an injury-in-fact.

In addition, like millions of UHC insureds nationwide each Plaintiff may, by their own choosing or through a decision made by her employer (or a partner's/spouse's employer), again become insured by UHC.  Moreover, accepting Defendants' reasoning that any Plaintiff (even if she is not a current plan member) lacks standing to seek declaratory and injunctive relief "create[s] a difficult situation for insureds" and undermines the purpose of insurance. *Johnson v. Hartford Cas.*

area.  If UHC could make such showing, despite the *de minimus* number in an area, it would not, however, result in a carve-out of those insureds from the class.  Rather, for example, pointed inquiries would be made to those limited number of insureds about whether they sought any information from UHC about the 380-network providers prior to receiving out-of-network CLS.

*Ins. Co.*, No. 15-cv-04138-WHO, 2017 U.S. Dist. LEXIS 77482, at *31-32 (N.D. Cal. May 22, 2017) (holding that plaintiff had standing for injunctive relief because if again insured by Hartford, plaintiff "should be able to have confidence that Hartford will obey the law in the future if he shows that it is violating it now"). In *Johnson,* the Court rejected Hartford's argument that Johnson (who was not a policy holder), was not "realistically" threatened by future harm, because he would (i) need to purchase insurance from Hartford again, but also (ii) be so unlucky as to suffer another loss. *Id.* Furthermore, it would not be easily discernable, "absent substantial investigation," as to whether Defendants are complying with the law until the same circumstances arise again. *Johnson*, 2017 U.S. Dist. LEXIS 77482, at *30.  The court in *Farar v. Bayer AG*, No. 14-cv-04601-WHO, 2017 U.S. Dist. LEXIS 193729, at *21-22 (N.D. Cal. Nov. 15, 2017), cited *Johnson*, *supra*, for the proposition that "[A]ny consumer of Hartford's insurance products would not be able to easily discern whether it was complying with the law… As a result, Johnson has adequately demonstrated the prospect of future, repeated harm" and held that the plaintiffs had Article III standing.

Defendants cite to *Sanchez v. Capital Contractors, Inc.*, No. 14-cv-02622-MMC, 2017 U.S. Dist. LEXIS 87585, at *7 (N.D. Cal. June 7, 2017).  However, *Johnson* is directly on-point, and Plaintiffs are unlike the former employees in *Sanchez* who did not express any likelihood of returning to work or being injured in the future by the employer's practices. *Id.*  Here, UHC insures millions nationwide and any Plaintiff may, by their own choosing or through a decision made by her employer (or a partner's/spouse's employer), again become insured by UHC.

Therefore, Plaintiffs have a reasonable prospect of future, repeated harm that satisfies the standing requirements for injunctive relief.[19]

## VI.    PLAINTIFFS' ACA AND LACTATION SERVICES CLASSES ARE NOT EXPANDED AND ASSERT A COMMON INJURY

UHC contends that Plaintiffs expanded their class definitions.  In their SAC, Plaintiffs'

---

[19] If the Court were to find that Plaintiffs lack Article III standing to obtain declaratory and injunctive relief, Plaintiffs respectfully request that the Court grant Plaintiffs leave to amend to add plaintiffs who are currently insured by Defendants with respect to the declaratory and injunctive relief.  *See Steinley v. Health Net*, No. CV 18-5458 PSG, 2018 U.S. Dist. LEXIS 223853, at *17-18 (C.D. Cal. Dec. 4, 2018).

14

ACA Class included "[a]ll persons who…are or were participants in or beneficiaries of [ ] health plan[s]…administered by Defendants [ ], who did not receive full coverage and/or reimbursement for [CLS]." (ECF No. 78, at 60.) Similarly, Plaintiffs' Lactation Services Class included "[a]ll participants and beneficiaries in one or more of the ERISA employee health benefit plans administered by Defendants [ ] for which Defendants fail and refuse to provide payment or reimbursement for [CLS] without cost to such participants and beneficiaries." (*Id.*) *See also*, Plaintiffs' Opp. to UHC's *Daubert* motion directed to Dr. Labovitz [ECF No. 183]. The definitions expressly include all persons—not limited by in- or out-of-network, claims submitted or not submitted—who were not covered for CLS as a no-cost preventive services. The adjustment in wording of the class definitions—which did not differ in any material respect from the two corresponding SAC class definitions—is an "unremarkable feature of class actions." [20] Furthermore, for the reasons set forth herein and in Plaintiffs' Motion, the resolution of whether UHC's CLS-related policies and procedures constitute ACA-mandated coverage for CLS presents questions common to the members of both the Lactation Services Class and ACA Class. Relatedly, with respect to the members of the ACA and Lactation Services Classes who did not submit claims, UHC also argues (Defs. Resp. at 20:12-15) that "Plaintiffs offer no suggestion" for identifying this group…and data on live births is not a proxy." There are, of course, several objective and appropriate ways to identify the members of the class, including, for example, by using UHC's claims data for breast pump claims submitted during the Class Period-- breast pumps are directly correlated with insureds who initiate breastfeeding.

## VII.   <u>CONCLUSION</u>

For the reasons set forth herein and in Plaintiffs Motion, Plaintiffs respectfully request that the Court grant their Motion for Class Certification.

---

[20] *See Brown v. Hain Celestial Group, Inc.*, 2014 U.S. Dist. LEXIS 162038, 2014 WL 6483216, at *17 (N.D. Cal. Nov. 18, 2014) ("Courts, including those in the Ninth Circuit regularly allow class definitions to be adjusted over the course of a lawsuit."). *Sandoval v. Cnty of Sonoma,* 2015 U.S. Dist. LEXIS 55571, 2015 WL 1926269, at *4 (N.D. Cal. Apr. 27, 2015) (allowing plaintiffs to seek class certification of a narrowed putative class without needing to amend the complaint).

Dated: April 5, 2019

**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**

By: */s/ Kimberly Donaldson-Smith*
Nicholas E. Chimicles (admitted *pro hac vice*)
Kimberly Donaldson-Smith (admitted *pro hac vice*)
Stephanie E. Saunders (admitted *pro hac vice*)
361 W. Lancaster Avenue
Haverford, PA 19041
Phone: (610) 642-8500
Fax: (610) 649-3633
NEC@Chimicles.com
KMD@Chimicles.com
SES@Chimicles.com

James E. Miller (admitted *pro hac vice*)
Laurie Rubinow (to seek admission *pro hac vice*)
**SHEPHERD, FINKELMAN, MILLER AND SHAH, LLP**
65 Main Street
Chester, CT 06412
Phone: (860) 526-1100
Fax: (866) 300-7367
jmiller@sfmslaw.com
lrubinow@sfmslaw.com

***Proposed Co-Lead Class Counsel and Counsel for Plaintiffs***

Marc A. Goldich (admitted *pro hac vice*)
Noah Axler (admitted *pro hac vice*)
**AXLER GOLDICH LLC**
1520 Locust Street
Suite 301
Philadelphia, PA 19102
Phone: (267) 534-7400
Fax: (267) 534-7407
mgoldich@axgolaw.com
naxler@axgolaw.com

***Proposed Class Counsel and Counsel for Plaintiffs***

KRISTEN LAW SAGAFI, California Bar No. 222249
**TYCKO & ZAVAREEI LLP**
483 Ninth Street, Suite 200
Oakland, CA  94607
Phone: (510) 254-6808
Fax: (202) 973-0950
ksagafi@tzlegal.com

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan W. Cuneo (to seek admission *pro hac vice*)
Pamela B. Gilbert (to seek admission *pro hac vice*)
Monica E. Miller (to seek admission *pro hac vice*)
Katherine Van Dyck (to seek admission *pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
Phone: (202) 789-3960
Fax: (202) 789-1813

***Counsel for Plaintiffs***

PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION
3:17-cv-00183-VC

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019, I served the foregoing **PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTIN FOR CLASS CERTIFICATION** on the following counsel of record via email:

Martin J. Bishop
Rebecca R. Hanson
Thomas C. Hardy
Abraham J. Souza
**Reed Smith LLP**
10 S. Wacker Drive, 40th Floor
Chicago, IL 60606
mbishop@reedsmith.com
rhanson@reedsmith.com
thardy@reedsmith.com
asouza@reedsmith.com

Karen A. Braje
**Reed Smith LLP**
101 Second Street, Suite 1800
San Francisco, CA 94105
kbraje@reedsmith.com

Dianna C. Wyrick
**Reed Smith LLP**
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
dwyrick@reedsmith.com

Janet H. Kwuon
**Reed Smith LLP**
355 S. Grand Ave., Suite 2900
Los Angeles, CA 90071
jkwuon@reedsmith.com

***Attorneys for Defendants***

*/s/  Kimberly M. Donalson-Smith*
Kimberly M. Donaldson-Smith